# 23-6626(L)

## 23-6627(CON)

*To Be Argued By*:
DANA REHNQUIST

# United States Court of Appeals

### For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

SHAMIEK HYTMIAH, also known as SHA-BALLA, CONSTANTIN CHEESE, also known as CONS, DESMOND MURCHISON, also known as DEZ, ANDRE BARNABY, also known as GOONIE DRE, BRANDON DARBY, also known as BARRACK, ANTONIO DAVIS, also known as BIG BLOOD, TYQUAN HENDERSON, also known as GUN PLAY, MICHAEL MILES, also known as MENACE, AVERY MITCHELL, also known as SLAV, NAHJUAN PERRY, also known as NAS, PIERRE RAYMOND, also known as LEEKY, JAMES ROBERSON, also known as LITTLES, SHAWN SILVERA, also known as DUM OUT, SHAMEL SIMPKINS, also known as SHA BANG, RASHAWN SMITH, also known as SHAWN, KIMBERLY THOMPSON, also known as KIMMY, LAWRENCE WOODS, also known as LAZO, KAHMEL GRANT, also known as ORNELLY,

*Defendants,*

MATTHEW ELIAS, also known as HEDDIS,
LATIFF THOMPSON, also known as LABANGA,

*Defendants-Appellants*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF AND APPENDIX FOR THE UNITED STATES

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

ANTHONY BAGNUOLA,
DANA REHNQUIST,
 *Assistant United States Attorneys,*
  *Of Counsel.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. iv

PRELIMINARY STATEMENT ...................................................... 1

STATEMENT OF FACTS ................................................................. 3

    I.    The Charges ................................................................. 3

    II.    The Trial ........................................................................ 3

            A.    The Planning Phase ............................................. 4

            B.    The Robbery .......................................................... 6

            C.    The Aftermath ....................................................... 7

            D.    The Traffic Stop and Arrest .............................. 9

    III.    Sentencing Proceedings ......................................... 11

            A.    Elias's Sentencing ............................................... 11

            B.    Thompson's Sentencing ..................................... 14

SUMMARY OF ARGUMENT ...................................................... 16

ARGUMENT ...................................................................................... 18

POINT ONE - THE EVIDENCE WAS SUFFICIENT TO
            SUSTAIN THE VERDICT AGAINST ELIAS ................ 18

    I.    Standard of Review ................................................ 18

    II.    The Trial Evidence Established Elias's
          Accessorial Liability ............................................. 19

POINT TWO - THE DISTRICT COURT DID NOT ERR
            IN ITS EVIDENTIARY RULINGS ................................. 26

I.      Standard of Review ................................................. 26

II.     Evidence of Elias's Gang Affiliation Was
        Properly Admitted................................................... 27

        A.      Relevant Factual Background ..................... 28

        B.      The District Court Did Not Abuse Its
                Discretion by Admitting Evidence of
                Elias's Gang Affiliation ............................... 31

III.    Evidence of Thompson's Bloody Gloves Was
        Properly Admitted................................................... 35

        A.      Relevant Factual Background ..................... 36

        B.      The District Court Did Not Abuse Its
                Discretion by Admitting Evidence of
                Thompson's Bloody Gloves........................... 38

IV.     Evidence of the Arlo Home Security Camera
        Was Properly Admitted........................................... 42

        A.      Relevant Factual Background ..................... 42

        B.      The District Court Did Not Abuse Its
                Discretion by Admitting Evidence of the
                Arlo Security Camera .................................. 45

V.      The District Court Properly Admitted
        Detective Georg's Summary Testimony ................. 49

VI.     Any Evidentiary Error Was Harmless ................... 52

POINT THREE - THE DISTRICT COURT PROPERLY
                ORDERED ELIAS TO FORFEIT ROBBERY
                PROCEEDS................................................... 56

I.      Applicable Legal Standards.................................... 56

        A.      Standard of Review..................................... 56

iii

      B.      Criminal Forfeiture ...................................................... 56

II.    The District Court Did Not Err in Ordering Elias to Forfeit a Share of the Robbery Proceeds .......................................................................... 59

**POINT FOUR - THOMPSON'S SENTENCE WAS REASONABLE** ....................................................... 64

I.     Standard of Review ............................................... 64

II.    Thompson's Sentence was Substantively Reasonable .......................................................... 65

**POINT FIVE - THE DISTRICT COURT DID NOT PLAINLY ERR IN IMPOSING SPECIAL CONDITIONS OF SUPERVISED RELEASE** ..................................... 69

I.     Standard of Review ............................................... 69

II.    Applicable Law .................................................... 69

III.   The District Court Did Not Plainly Err in Imposing Special Conditions of Supervised Release ................................................................. 71

**POINT SIX - HOBBS ACT ROBBERY IS A CRIME OF VIOLENCE** ....................................................... 74

**CONCLUSION** ...................................................................... 75

iv

# TABLE OF AUTHORITIES

Page

## CASES

*Amato v. United States*,
  No. 19-cv-19449, 2021 WL 5578850 (D.N.J. Nov. 29, 2021) ..............67

*Gonzales v. Graham*,
  No. 17-cv-1321, 2020 WL 7397529 (N.D.N.Y. Dec. 17, 2020) ............33

*Honeycutt v. United States*,
  581 U.S. 443 (2017).................................................................. passim

*Libretti v. United States*,
  516 U.S. 29 (1995)...................................................................56

*Rosemond v. United States*,
  572 U.S. 65 (2014)...............................................................22, 23

*S.E.C. v. Metter*,
  706 F. App'x 699 (2d Cir. 2017) ........................................................60

*United States v. Barrett*,
  102 F.4th 60 (2d Cir. 2024).............................................................17, 74

*United States v. Beverly*,
  5 F.3d 633 (2d Cir. 1993) ...........................................................32, 39

*United States v. Broxmeyer*,
  699 F.3d 265 (2d Cir. 2012) ........................................................65, 68

*United States v. Capers*,
  20 F.4th 105 (2d Cir. 2021)...........................................................19

*United States v. Colombo*,
  909 F.2d 711 (2d Cir. 1990) .............................................................27

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012) .............................................................18

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) ............................................................. 64

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) ............................................................. 26

*United States v. Dupree,*
    870 F.3d 62 (2d Cir. 2017) ............................................................... 35

*United States v. Fleming,*
    397 F.3d 95 (2d Cir. 2005) ............................................................... 64

*United States v. Genao,*
    No. 23-6710, 2024 WL 4404042 (2d Cir. Oct. 4, 2024) ........................ 71

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002) ............................................................... 19

*United States v. Guadagna,*
    183 F.3d 122 (2d Cir. 1999) ............................................................. 19

*United States v. Guerrier,*
    No. 20-3469, 2022 WL 610338 (2d Cir. Mar. 2, 2022) ........................ 57

*United States v. Handakas,*
    329 F.3d 115 (2d Cir. 2003) ............................................................. 70

*United States v. Ingram,*
    721 F.3d 35 (2d Cir. 2013) ............................................................... 65

*United States v. Jacques,*
    321 F.3d 255 (2d Cir. 2003) ............................................................. 70

*United States v. Jimenez,*
    586 F. App'x 50 (2d Cir. 2014) ........................................................ 38

*United States v. Kenner,*
    443 F. Supp. 3d 354 (E.D.N.Y. 2020) ......................................... 58, 59

*United States v. Khan,*
    761 F. App'x 43 (2d Cir. 2019) ................................................... 58, 59

*United States v. Lemire,*
 720 F.2d 1327 (D.C. Cir. 1983) ..................................................... 49, 50

*United States v. Litvak,*
 889 F.3d 56 (2d Cir. 2018) .................................................................. 27

*United States v. Mack,*
 No. 20-376, 2021 WL 4851391 (2d Cir. Oct. 19, 2021) ........................ 47

*United States v. McCallum,*
 584 F.3d 471 (2d Cir. 2009) ................................................................ 27

*United States v. McCoy,*
 58 F.4th 72 (2d Cir. 2023) ................................................................... 74

*United States v. McGinn,*
 787 F.3d 116 (2d Cir. 2015) ................................................................ 27

*United States v. McIntosh,*
 No. 14-1908(L), 2023 WL 382945 (2d Cir. Jan. 25, 2023) ................... 59

*United States v. McPartland,*
 81 F.4th 101 (2d Cir. 2023) ................................................................. 26

*United States v. Mensah,*
 110 F.4th 510 (2d Cir. 2024) ............................................................... 50

*United States v. Moore,*
 189 F. App'x 915 (11th Cir. 2006) .................................................. 48, 49

*United States v. Nieves,*
 58 F.4th 623 (2d Cir. 2023) ................................................................. 54

*United States v. Papas,*
 715 F. App'x 88 (2d Cir. 2018) ............................................................ 58

*United States v. Rakhmatov,*
 No. 21-151(L), 2022 WL 16984536 (2d Cir. Nov. 17, 2022) ............... 72

*United States v. Rainford,*
 110 F.4th 455 (2d Cir. 2024) .......................................................... 56, 57

*United States v. Rivera,*
   679 F. App'x 51 (2d Cir. 2017) ..................................................... 20, 25

*United States v. Roberts,*
   660 F.3d 149 (2d Cir. 2011) ............................................................... 56

*United States v. Robinson,*
   544 F.2d 611 (2d Cir. 1976) ............................................................... 47

*United States v. Robinson,*
   697 F. App'x 732 (2d Cir. 2017) ................................................... 69, 73

*United States v. Robinson,*
   799 F.3d 196 (2d Cir. 2015) ............................................................... 25

*United States v. Rodriguez,*
   No. 22-1820, 2023 WL 8432697 (2d Cir. Dec. 5, 2023) ...................... 69

*United States v. Rosa,*
   11 F.3d 315 (2d Cir. 1993) ........................................................... 33, 39

*United States v. Rosado,*
   109 F.4th 120 (2d Cir. 2024) ............................................................. 71

*United States v. Rosario,*
   386 F.3d 166 (2d Cir. 2004) ............................................................... 73

*United States v. Ryan,*
   806 F.3d 691 (2d Cir. 2015) ......................................................... 65, 68

*United States v. Ryan,*
   406 F. App'x 565 (2d Cir. 2011) ........................................................ 64

*United States v. Sabin,*
   No. 23-6507, 2024 WL 4763930 (2d Cir. Nov. 13, 2024) .................... 72

*United States v. Stebbins,*
   523 F. App'x 1 (1st Cir. 2013) ........................................................... 67

*United States v. Tzakis,*
   736 F.2d 867 (2d Cir. 1984) ............................................................... 20

viii

*United States v. Uddin,*
   551 F.3d 176 (2d Cir. 2009) ................................................................. 57

*United States v. Valenti,*
   60 F.3d 941 (2d Cir. 1995) ........................................................... 35, 41

*United States v. Vanhise,*
   797 F. App'x 618 (2d Cir. 2020) ......................................................... 24

## STATUTES

18 U.S.C. § 924 ...................................................................... passim

18 U.S.C. § 981 ..................................................................... 57, 59

18 U.S.C. § 1951 ........................................................................... 2

18 U.S.C. § 1956 ......................................................................... 57

18 U.S.C. § 3553 ......................................................................... 65

21 U.S.C. § 853 ............................................................... 57, 58, 59

28 U.S.C. § 2461 ......................................................................... 57

## RULES

Fed. R. Evid. 401 ....................................................................... 46

Fed. R. Evid. 403 ................................................................. passim

Fed. R. Evid. 1006 ....................................................... 16, 49, 51

Fed. R. Crim. P. 16 ............................................................... 36, 39

Fed. R. Crim. P. 403 ................................................................... 27

Fed. R. Crim. P. 404 ................................................................... 28

## GUIDELINES

U.S.S.G. § 1B1.1 ........................................................................ 66

U.S.S.G. § 5D1.3 ................................................................ 70, 71

U.S.S.G. § 5G1.3 ................................................................ 64, 67

U.S.S.G. § 5K2.23 ............................................................... 64, 67

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-6626(L), 23-6627(C)

UNITED STATES OF AMERICA,

*Appellee*,

-against-

SHAMIEK HYTMIAH, also known as SHA-BALLA, CONSTANTIN CHEESE, also known as CONS, DESMOND MURCHISON, also known as DEZ, ANDRE BARNABY, also known as GOONIE DRE, BRANDON DARBY, also known as BARRACK, ANTONIO DAVIS, also known as BIG BLOOD, TYQUAN HENDERSON, also known as GUN PLAY, MICHAEL MILES, also known as MENACE, AVERY MITCHELL, also known as SLAV, NAHJUAN PERRY, also known as NAS, PIERRE RAYMOND, also known as LEEKY, JAMES ROBERSON, also known as LITTLES, SHAWN SILVERA, also known as DUM OUT, SHAMEL SIMPKINS, also known as SHA BANG, RASHAWN SMITH, also known as SHAWN, KIMBERLY THOMPSON, also known as KIMMY, LAWRENCE WOODS, also known as LAZO, KAHMEL GRANT, also known as ORNELLY,

*Defendants*,

MATTHEW ELIAS, also known as HEDDIS,
LATIFF THOMPSON, also known as LABANGA,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendants-Appellants Matthew Elias and Latiff Thompson appeal from judgments entered on June 7, 2023 and May 18, 2023,

respectively, in the United States District Court for the Eastern District of New York (Garaufis, J.), convicting them, after a joint jury trial, on one count each of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and unlawful use of a firearm, in violation 18 U.S.C. § 924(c)(1)(A) ("§ 924(c)").  Elias and Thompson were sentenced principally to 120 months' and 130 months' imprisonment, respectively, and each was ordered to forfeit $10,000 in robbery proceeds.

The following arguments are presented on appeal: (1) the evidence was insufficient to establish Elias's accessorial liability under the Hobbs Act and § 924(c); (2) the district court made erroneous evidentiary rulings at trial; (3) the district court erroneously ordered Elias to forfeit robbery proceeds; (4) Thompson's sentence was substantively unreasonable; (5) the district court failed to orally pronounce Elias's special conditions of supervised release at his sentencing; and (6) completed Hobbs Act robbery is not a qualifying crime of violence for purposes of § 924(c).

As explained below, these arguments lack merit and the judgments should be affirmed in their entirety.

3

STATEMENT OF FACTS

## I.   The Charges

On July 11, 2019, a grand jury in the Eastern District of New York returned a superseding indictment charging seventeen defendants, including Elias and Thompson, with various offenses related to a string of violent robberies carried out by members and associates of the Makk Balla Brims set of the Bloods street gang.   (EA:28-52).[1]   Elias and Thompson were charged in Count Three (Hobbs Act robbery) and Count Four (brandishing a firearm during a crime of violence) in connection with the September 7, 2017 armed robbery of a Queens-based drug trafficking organization.

## II.   The Trial

Elias and Thompson proceeded to trial on March 17, 2022. The trial evidence established that on September 7, 2017, both men,

---

[1]   Parenthetical references to "DE" are to the district court docket in *United States v. Hytmiah, et al.*, No. 18-cr-033.  References to "EBr," "TBr," "EA," "TA," "SPA" and "GA" are to Elias's brief, Thompson's brief, the appendices filed by Elias and Thompson, respectively, Thompson's Special Appendix, and the government's appendix. References to "GX" are to government exhibits admitted at trial and "PSR" refers to Elias's Presentence Report, which was submitted to the Court under seal.

4

together with multiple confederates, planned and executed an armed robbery at a Queens apartment they believed was used as a "stash house" to store and safeguard drugs (the "Stash House"). (GA:4, 22, 30-31, 80-81, 158, 159). In addition to Elias and Thompson, the robbery crew included Shamiek Hytmiah, Brandon Darby, Dion Atkinson, Lawrence Woods, and Tyquan Henderson. (GA:2, 5-8, 10-11, 26-30, 161-63). The motive for the robbery was the crew's belief that a drug-trafficking organization kept $400,000 and "a lot of marijuana" at the Stash House. (GA:44).

A.  The Planning Phase

On September 6, 2017, the night before the robbery, Shamel Simpkins identified the Stash House as a target for Hytmiah.[2] (GA:43-44, 126-27). Simpkins recommended that Hytmiah enlist Thompson to provide the muscle needed to carry out the robbery. (GA:29, 45-56). The composition of the robbery crew was not accidental; Hytmiah and

_____

[2]  Like several of Elias's and Thompson's other co-defendants, Simpkins was named in the indictment but not specifically charged in connection with the September 7, 2017, robbery. That is because the indictment alleged the existence and gang-related activities of a larger racketeering enterprise, as well as various robberies and firearm offenses. (*See generally* EA:28-52; DE:373).

5

Simpkins, both members of the Makk Balla Brims, convened a group of trusted gang members and associates to execute the Stash House robbery. (*See* GA:5, 21, 24-25 126-28). Hytmiah called Thompson to discuss the robbery. (GA:46-47; *see* TA:490-98). Thompson then coordinated with Elias, Henderson, and Woods. (TA:490-98). In Facebook messages exchanged on the evening of September 6, 2017, Thompson and Henderson discussed meeting Simpkins to "get [us those] jackies," a term referring to firearms. (GA:153-55, 157, 188).

The following night, at around 9:45 p.m., Thompson received a text message from Hytmiah that read, "184-23 Galway," which was the address of a residence used by Hytmiah to plan and carry out robberies (the "Galway Residence"). (GA:17-20). Elias drove Thompson, Woods, and Henderson to the Galway Residence in a rented silver Nissan Altima. (GA:53-54, 57, 172-76; EA:69-70). Hytmiah and Darby were already there. (GA:56-57; EA:159).

In the basement of the Galway Residence, Hytmiah "started telling [the others] about the robbery and what's in there and that it's a stash house." (EA:59). He explained that the Stash House was located on a "busy strip" on Jamaica Avenue and would contain money and

6

marijuana. (EA:60). Hytmiah emphasized the need for safety since the Stash House would contain firearms. (EA:61). In response to that remark, Henderson and Woods lifted their sweatshirts to display handguns. (EA:61; GA:60). Elias and Thompson were "part of the group" during this conversation and there was not "anything distracting" in the room at the time. (EA:61-62).

B.    The Robbery

At around midnight on September 7, 2017, Elias, Thompson, Hytmiah, Darby, Woods, and Henderson departed the Galway Residence in two cars. (GA:67; TA:1749-50). Hytmiah and Darby traveled together in Hytmiah's blue Nissan Maxima; Elias drove Thompson (who carried a black gym bag for collecting robbery proceeds) and Woods and Henderson (who, as noted, carried handguns) in the rented silver Nissan Altima. (GA:63-64, 67-70).

When the robbery crew arrived, Darby, Woods, and Henderson proceeded to the rear of the Stash House, where they climbed through a second-story window into the apartment. (GA:73-75, 164-66; TA:449-51, 453-64). Hytmiah and Elias stayed back in their respective cars, which they parked nearby. (GA:71-73).

7

Upon entering, Darby, Woods, and Henderson encountered a person sleeping on a couch; they tied him up and beat him to such an extent that Darby's clothing was "soaked" in blood when he eventually returned to Hytmiah's car. (GA:82-83, 89, 91-92, 96). While Woods and Henderson searched for drugs and money, Darby opened the front door to let in Thompson, who had had been waiting outside at a nearby bus stop. (GA:76-77, 84, 164; TA:446, 464, 1753).

The robbers stole a quantity of marijuana and a safe before fleeing the location. (GA:88). Around 2:00 a.m., Hytmiah and Darby arrived back at the Galway Residence with the stolen safe, in which they found approximately $20,000 and a gun. (GA:89, 93; TA:1754). About 20 minutes later, Elias and Thompson arrived at the Galway Residence. (TA:1756).

C.    The Aftermath

Hytmiah began to suspect that Woods and Henderson, having not returned from the Stash House, had secreted additional robbery proceeds for themselves. After all, the money found inside the safe was "nowhere near" the expected payout from the robbery. (GA:93-94). So, armed with the gun he had found in the stolen safe, Hytmiah, along with

8

Elias, Thompson, and Atkinson, went looking for Woods and Henderson at a residence used by Woods and his girlfriend at 150-81 116th Road ("Woods's Residence"). (GA:95-96, 170-79; TA:1758). Darby stayed behind since, as noted, his clothes were "soaked" with the robbery victim's blood. (GA:96).

En route to Woods's Residence, Elias and Thompson each attempted to call Woods. (GA:152, 172, 177-79, 180-83; TA:488-89, 1757-58, 1838-44). Around 2:40 a.m. the group arrived—again in two cars driven by Elias and Hytmiah—in the vicinity of Woods's Residence. (GA:138-39; TA:1838-44).

Hytmiah carried a gun as he entered Woods's Residence, where he encountered Woods and Henderson—like Darby, Henderson's sweatshirt was blood-stained—along with Elias and Thompson who, by then, had also gone inside; the stolen marijuana was "spread out." (GA:98-99). The men had about forty one-pound packages of marijuana, which were contained in compressed plastic. (GA:98-99, 106).

Hytmiah took the marijuana and demanded that everyone return to the Galway Residence to divide up the robbery proceeds. (GA:99-102). Shortly before 3:00 a.m., Hytmiah and Atkinson left

Woods's Residence in Hytmiah's blue Nissan Maxima. (GA:102-03, 142, 172, 174-75, 177-79; TA:1758). Elias, Thompson, Henderson, and Woods followed behind in Elias's rented Nissan Altima. (*Id.*).

D.   <u>The Traffic Stop and Arrest</u>

Also in the vicinity of Woods's Residence that night was Lieutenant Javier Rodriguez of the New York City Police Department ("NYPD"), who, moments before, had watched as Elias's rented Altima sped past his vehicle, ran a stop sign, and then pulled over near Woods's Residence. (GA:130-31). Rodriguez had also watched Hytmiah's blue Maxima arrive in the area (GA:132, 177), and multiple people gather outside the cars in the vicinity of Woods's Residence (GA:132-34). He then watched as both cars sped by on their way back to the Galway Residence. (GA:134). Rodriguez radioed other officers, who stopped Elias's car, arrested the four occupants, and recovered a firearm and other contraband. (GA:142-45, 184-87, 197, 202-03).

While in pretrial detention, Elias and Thompson used monitored phone lines to discuss selling the stolen marijuana, dividing up the robbery proceeds, and the use of guns during the robbery. (GA:244; TA:1783). In one such call, Thompson told his brother, James

Roberson (who used the nickname "Littles"), that Henderson believed he was entitled to a larger share of the proceeds since he had carried a firearm into the Stash House. (GA:196; TA:1783). In another call with Roberson, Thompson worried that Henderson may have received Thompson's share of the proceeds. (TA:1783). He relayed the same concern to Elias: "That's what I'm tryna tell Littles, just make sure [Henderson] don't got it . . ." (GA:192; TA:1783). In several of the calls, Thompson discussed selling the stolen marijuana for profit. (TA:1783). Elias, meanwhile, told his girlfriend that he should have insisted his confederates not bring a gun into his car, just as he had insisted they "take all th[e] drugs in the other car." (TA:1783).

Thompson also made post-arrest statements to federal agents, including an admission that he had helped plan and execute the Stash House robbery. (TA:1821). Thompson admitted that the robbers expected to find $400,000 and "80 pounds of weed" in the Stash House. (*Id.*). And he admitted that he had helped assemble the crew that committed the robbery. (*Id.*). Thompson acknowledged that he and his confederates went into the Stash House with multiple guns and that the victim they found inside had gotten "fucked up in there." (*Id.*).

11

The jury convicted Elias and Thompson on both counts. (GA:233-36).

III.   Sentencing Proceedings

   A.   Elias's Sentencing

On May 18, 2023, Elias appeared for sentencing. (DE:865). The parties agreed that Elias's effective sentencing range was 181 to 211 months' imprisonment. (EA:96-97). Elias nevertheless recommended a below-Guidelines sentence of 108 months, based partly on the notion that Elias was similarly situated to co-defendant Kimberly Thompson, who, in connection with different robberies committed on September 23, 2017, and October 11, 2017, had pled guilty to Hobbs Act robbery (Count Five) and Attempted Hobbs Act Robbery (Count Twelve) and was sentenced to five years' probation. (*See* GA:238). In that regard, although Elias's sentencing memorandum had made no mention of Kimberly Thompson (*see* DE:758), at the sentencing hearing Elias's counsel contended that, like Elias, Kimberly Thompson had been a mere getaway driver (EA:102), a comparison the district court flatly rejected:

> [Kimberly Thompson] didn't have a rich criminal history that [Elias] has[3] . . . So I'm not going to allow you to make comparisons that are inappropriate. So don't do it. There are comparisons that you make in your letters, in your letter, that may[ ]be appropriate to make. But that's not an appropriate one in my opinion, and I'm—having sentenced Ms. Thompson, you know, I'm familiar with her record too. So I've got 20 defendants in this case and I'm going to attempt to be balanced in sentencing, which is my obligation, but let's not let's talk about people where there are comparisons that are apples to apples, not apples to watermelons or cucumbers.

(EA:102-03). Aside from their supposedly similar roles as getaway drivers in different robberies, Elias did not draw any other comparisons to Kimberly Thompson.

The district court varied downwardly from the advisory Guidelines range and sentenced Elias principally to 120 months' imprisonment. (EA:108-12).

---

[3] At the age of seventeen, Elias was sentenced to eighteen months' custody for an attempted robbery, during which he threatened a store clerk at gunpoint. (PSR:91). During the custodial sentence for that offense, Elias incurred multiple disciplinary infractions, including violent conduct and harassment. (*Id.*). At the age of nineteen, Elias was sentenced to ten years' imprisonment for attempted murder after firing at least ten rounds at a victim, hitting the victim in the chest and abdomen. (PSR:92). While on parole for the attempted murder charge, Elias absconded twice and was arrested three times. (*Id.*).

The court also imposed five years of supervised release, with special conditions prohibiting Elias from possessing a firearm, associating with gang members and other criminals, and contacting victims of his crimes. (EA:112, 118). A fourth special condition reiterated Elias's need to comply with a forfeiture order requiring him to disgorge $10,000 in robbery proceeds. (*Id.*). At sentencing, the court advised Elias that such an order would accompany the judgment and that Elias's attorney should "advise the [c]ourt when you have seen it, if you have any concerns about it. Within the next several days." (EA:93-94).

Following sentencing, on May 25, 2023, Elias (acting pro se) and his trial counsel each filed a letter with the district court. (EA:125, 131). Elias's letter purported to object to the forfeiture amount, which Elias mistakenly referred to as "restitution," on the grounds that there had been no identifiable victim to establish the loss amount (apparently another mistaken reference to restitution) and that Elias lacked the ability to satisfy a forfeiture money judgment in any event. (EA:125). Elias's letter said nothing about Kimberly Thompson or any other co-defendant's forfeiture obligation.

For his part, Elias's attorney memorialized Elias's consent to the non-association conditions of supervised release (*i.e.*, prohibiting Elias from associating with criminals and contacting victims). (EA:131).

About three weeks after sentencing, on June 7, 2023, over Elias's partial objection, the district court entered judgment and an accompanying forfeiture order against Elias. (EA:114-24).

B.   Thompson's Sentencing

Thompson also appeared for sentencing on May 18, 2023. (DE:861). The parties agreed that Thompson's effective sentencing range was 200 to 235 months' imprisonment. (SPA:11).

Among other arguments favoring leniency, Thompson's attorney requested Thompson receive credit for time he served in custody on an overlapping state charge that was ultimately dismissed. (SPA:20-21; *see* TA:1937-55). In particular, in connection with the same traffic stop that led to the September 7, 2017 arrests of Elias and Thompson, Thompson was also charged with criminally possessing a weapon in violation of state law and served nine months and 24 days on that charge before a New York state judge suppressed the firearm and Thompson's local case was dismissed. (TA:278; SPA:33-34). Against that backdrop,

15

Thompson's attorney argued that the conduct underlying the state and federal charges—*i.e.*, Thompson's illegal possession of a firearm—was related, so that Thompson should be credited for the time he served in state custody pursuant to § 5G1.3 of the Guidelines. The government opposed any such credit, partly on the ground that Thompson had disclaimed any possessory interest in the gun and had denied that it was used in the robbery. As such, the government argued, Thompson's illegal possession of that firearm under state law was unrelated to his participation in the Stash House robbery. (SPA:34-35).

The district court declined to specifically credit Thompson for the time he spent in state custody but, as it had with Elias, nevertheless varied downwardly from the advisory Guidelines range and sentenced Thompson principally to 130 months' imprisonment. (SPA:31, 35). That 70-month variance was more than seven times greater than the length of the credit Thompson had sought.

This appeal followed.

## SUMMARY OF ARGUMENT

The jury was justified in concluding that Elias understood the nature of the crimes he was aiding and abetting, including the fact that firearms would be used. The evidence established Elias's presence at a preparatory meeting where the robbery was discussed and firearms were displayed, and he repeatedly interposed himself as a crucial member of the robbery's execution by ferrying around blood-covered confederates and contraband from the robbery. The jury specifically rejected the suggestion that Elias was unaware of his surroundings and no basis exists to second-guess that judgment here.

Nor did the district court err in its evidentiary rulings. The record makes clear that each of the disputed items of evidence took on fresh relevance after Elias and Thompson perjured themselves at trial, opening the door for evidence the government otherwise refrained from introducing during its case-in-chief. NYPD Detective Adam Georg's testimony and accompanying visual aids were typical of summary witness testimony under Federal Rule of Evidence 1006 and the mere fact that he interpreted evidence introduced through other custodians does not render the testimony improper. In any event, given the

17

overwhelming other evidence of Elias's and Thompson's guilt, any evidentiary error was harmless.

Elias's reliance on *Honeycutt v. United States*, 581 U.S. 443 (2017), to challenge his restitution order fails at the threshold because this case did not involve a charged conspiracy and Elias was not made jointly and severally liable for the full robbery proceeds. His unpreserved challenge to the supervised release conditions—including those to which his counsel below expressly consented—similarly fails to demonstrate any error, let alone plain error.

Thompson's below-Guidelines sentence was substantively reasonable. The district court was under no obligation to credit the time Thompson spent in pretrial detention on a state charge and, in any event, the 70-month downward variance Thompson ultimately received was substantially greater than the credit he sought. Lastly, the proposition that completed Hobbs Act robbery is not a "crime of violence" under the elements clause of 18 U.S.C. § 924(c)(A)(3) has been foreclosed by the Court's recent decision in *United States v. Barrett*, 102 F.4th 60 (2d Cir. 2024).

## ARGUMENT

## POINT ONE

## THE EVIDENCE WAS SUFFICIENT TO
## SUSTAIN THE VERDICT AGAINST ELIAS

Elias first argues that the trial evidence was insufficient to establish his accessorial liability under the Hobbs Act and § 924(c). (EBr.17-22). In that regard, Elias contends that even if he knew his confederates "were committing *some* crime," the government failed to prove that Elias specifically knew they intended to commit an armed robbery. (EBr.19). This argument is baseless.

## I.  Standard of Review

"[A] defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).[4] This Court will "sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, any

---

[4]  Unless otherwise noted, all case quotations omit internal quotation marks and citations, and accept alterations.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021). This Court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Moreover, "it is well-settled" that this Court will "defer to the jury's assessment of witness credibility." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

II.    The Trial Evidence Established Elias's Accessorial Liability

Elias does not materially dispute his participation in the crimes that occurred on September 7, 2017. Nor can he credibly do so. Instead, he challenges only the evidence establishing he *knew* what crimes he was aiding and abetting. According to Elias, the government did not prove that he entered the Stash House; knew anyone inside had been beaten; or paid attention during the planning meeting at which the use of firearms was discussed. (EBr.19-20). As such, the argument goes, no rational jury could have concluded beyond a reasonable doubt that he intended to participate in an armed robbery. (*Id.*). This argument strains credulity.

*First*, the fact that Elias—the robbers' getaway driver—did not enter the Stash House is hardly proof that he was unaware what his confederates were doing there. Elias does not, and cannot, seriously contend that accessorial liability requires the aider and abettor to be physically present for all aspects of the substantive offense. *See United States v. Tzakis*, 736 F.2d 867, 873 (2d Cir. 1984) ("An aider and abettor need not have participated in every phase of the criminal venture").

*Second*, Elias's suggestion that he was somehow unaware that "an occupant was encountered at that location or that force was used" is most implausible. (EBr.19). Immediately after the robbery, Elias drove Thompson to the Galway Residence where they, along with Hytmiah and a blood-soaked Darby, broke into the stolen safe and accounted for the robbery proceeds. (GA:91-93). Even assuming that the image of a blood-covered Darby was the first indication Elias received that a forceful robbery had taken place, the evidence made clear that Elias did nothing to thereafter cease his participation in the criminal episode. *See United States v. Rivera*, 679 F. App'x 51, 54 (2d Cir. 2017) (requisite intent for aiding and abetting § 924(j) conviction shown where defendant "did not cease his participation in the robbery, despite knowing that his associates

21

possessed a firearm"). Rather, even after observing a blood-covered Darby, Elias drove himself and Thompson to Woods's Residence, where they, together with Atkinson and a gun-wielding Hytmiah, planned to confront Woods and Henderson over purportedly missing robbery proceeds. (GA:95-96; TA:1757-58). Further still, during that confrontation, Henderson's own sweatshirt was visibly covered in blood (GA:148-51); Elias nevertheless drove Thompson (himself carrying a pair of bloody gloves), Henderson, and Woods back to the Galway Residence, where Hytmiah indicated the crew would divide up the proceeds. (GA:145, 184, 186, 206). At the time of Elias's arrest, a blood-stained Henderson was riding in the back of his rental car. Under those circumstances, a rational juror could easily have concluded that Elias was fully aware that an occupant was forcefully encountered during the Stash House robbery.

*Third*, Elias challenges the proof that he was "listening" or "paying attention" during the planning meeting, when Hytmiah warned members of the crew, including Elias, that they needed to be careful when entering the Stash House because there were likely to be guns inside and, in response, Henderson and Woods displayed handguns. (EBr.19-22). In

that regard, Elias claims that because Hytmiah was speaking directly to Thompson and the gesture by Woods and Henderson was nonverbal (*i.e.*, lifting their sweatshirts to display firearms), no rational juror could have found that Elias knew his confederates were armed. (*See* EBr.21 (nonverbal gesture was "the sole occasion when" Elias might have learned the others "were armed")). The absurdity of this argument is self-evident. Elias admits he was present for the discussion regarding firearms (EBr.19) and that no background noise obscured the conversation (EBr.20). Hytmiah likewise testified that Elias was "part of the group" during this conversation and there was not "anything distracting" in the room at the time. (EA:61-62). Nor does Elias make any effort to explain why, if Hytmiah directed his remarks only to Thompson, it was Henderson and Woods who reacted by displaying firearms. The answer, as determined by the jury, is simple: the group—several members of which were related by a shared gang affiliation—knew and understood that what they were carrying out was an armed robbery of drug dealers.

Elias's reliance on *Rosemond v. United States*, 572 U.S. 65, 81-82 (2014), to support a contrary conclusion is unpersuasive. (EBr.22).

23

*Rosemond* held that accessorial liability under § 924(c) requires proof that the aider and abettor knew one of his confederates would carry a gun. *Id.* at 78. In reaching that conclusion the Supreme Court explained, by way of example, that:

> the unarmed driver of a getaway car ha[s] the requisite intent to aid and abet armed bank robbery if he 'knew' that his confederates would use weapons in carrying out the crime . . . So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission.

*Id.* at 77.

Nothing about Elias's convictions offends *Rosemond*. Viewing the trial evidence in the light most favorable to the government and resolving all inferences and issues of witness credibility in its favor, the proof was sufficient to establish that Elias knew the specific nature of the crimes he was aiding and abetting, including that firearms would be used. The facts outlined above make that point clear. And Elias gives away the game when, elsewhere in his brief, he admits the jury heard testimony placing him at the pre-robbery meeting where "Woods and Henderson briefly raised their hoodies to reveal that they had guns," and

24

simply calls that evidence "far from overwhelming." (EBr.33; *see id.* at 32). In other words, Elias does not seriously contend that the evidence establishing his knowledge of the underlying crime was "nonexistent or so meager" as to preclude a rational verdict. *United States v. Vanhise*, 797 F. App'x 618, 620 (2d Cir. 2020). Rather, he simply invites this Court to second-guess the jury's evaluation of the evidence because, in his subjective assessment, it was not "overwhelming." But the "exceedingly deferential" standard for a sufficiency challenge, *id.*, plainly does not require evidence to be "overwhelming." And armed with the very testimony Elias concedes was offered, the jury permissibly resolved any competing inferences in favor of guilt. Indeed, Elias's attorney expressly argued to the jury that Elias did not meaningfully participate in the pre-robbery meeting (*see* GA:223-24 ("All [Hytmiah] said to Mr. Elias was, hey")). But the jury was free to, and did, discredit that argument.[5]

---

[5]     That is especially true since, at the trial, Elias falsely denied being present for the meeting at all. (GA:223 ("Mr. Elias testified that he was never at a pre-robbery meeting in Mr. Hytmiah's aunt's basement. Mr. Elias testified that he was never at this robbery. Mr. Elias testified he was never at a post-robbery meeting")).

At a minimum, moreover, the jury was entitled to conclude that, even if he lacked advance knowledge that guns would be used, Elias quickly gained knowledge of the nature and extent of the crimes he was aiding and abetting and continued to interpose himself as a vital participant despite numerous opportunities to walk away. *See Rivera*, 679 F. App'x at 54 ("A factual basis exists for the requisite intent if the 'defendant has prior knowledge that a firearm will be used' and an opportunity to 'to walk away'") (quoting *United States v. Robinson*, 799 F.3d 196, 200 (2d Cir. 2015)). Indeed, in post-arrest jail calls, Elias expressed regret over ferrying around an armed Thompson after the robbery. (TA:1783).

## POINT TWO

## THE DISTRICT COURT DID NOT
## ERR IN ITS EVIDENTIARY RULINGS

Elias and Thompson next raise various challenges to the district court's evidentiary rulings at trial. Elias argues that evidence of his gang affiliation was wrongly admitted. (EBr.23-33). Thompson argues the district court should have disallowed evidence of bloody gloves he possessed after the robbery and a security camera found in Elias's car (TBr.38-48), as well as the summary testimony of a police detective (TBr.49-51). As explained below, each of these arguments lacks merit.

## I. Standard of Review

District "[j]udges are entrusted with considerable discretion when deciding which evidence to admit or exclude at trial." *United States v. Dawkins*, 999 F.3d 767, 788 (2d Cir. 2021); *see United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023) (district court "ruling[s] as to the relevancy and unfair prejudice of proffered evidence" is accorded "great deference," as it is "in a superior position to evaluate the likely impact of the evidence"). Reversal under this deferential abuse-of-discretion standard is warranted "only when an evidentiary ruling is manifestly erroneous or arbitrary and irrational." *Dawkins*, 999 F.3d at

788. And even if a decision was manifestly erroneous, this Court will affirm if the error was harmless. *See United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018). "[An] error [is] harmless if it is not likely that it contributed to the verdict." *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015). In determining whether an error was harmless, the primary factor to consider is the strength of the government's case. *See United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009); *United States v. Colombo*, 909 F.2d 711, 714 (2d Cir. 1990) ("[t]he strength of the government's case against the defendant is probably the most critical factor" in evaluating harmlessness).

## II. Evidence of Elias's Gang Affiliation Was Properly Admitted

Elias contends the district court misapplied the balancing test under Federal Rule of Criminal Procedure 403 when it allowed him to be cross-examined about his gang affiliation. (EBr.24). Specifically, without disputing his membership in the Bloods, Elias argues that the prejudice flowing to him from an association with that enterprise exceeded any probative value to the case. (EBr.26-32). And he asserts, albeit in a conclusory manner, that evidence concerning his own

"notorious gang" may have "sway[ed] one or more jurors" to convict him. (EBr.33).

A.    Relevant Factual Background

As noted above, the charges against Elias and Thompson were part of a broader indictment charging seventeen defendants with gang-related offenses. *See supra* 3 and n.2. Hytmiah, Elias, Thompson, and the other participants in the Stash House robbery were members and associates of the Makk Balla Brims set of the Bloods. (*See* GA:13-16, 21, 24-25, 126-28). As such, prior to trial, the government moved in limine to admit, *inter alia*, social media posts in which Elias represented himself as affiliated with that gang. (EA:55). That evidence, the government argued, would help explain why Elias was recruited to participate in the Stash House robbery and corroborate the testimony of Hytmiah, the robbery's organizer, that (a) he (Hytmiah) was a member of the Makk Balla Brims and (b) Elias and Thompson were knowing and voluntary participants in the armed robbery, both of which are permissible non-propensity uses under Federal Rule of Criminal Procedure 404(b). (TA:268, 284-86).

29

While agreeing that the evidence of Elias's gang membership would go toward these valid non-propensity purposes, the district court nevertheless found those purposes outweighed by the risk of unfair prejudice, upsetting the balance required under Rule 403. (EA:56). This was so, the court reasoned, because Elias and Thompson had not been charged with racketeering or conspiracy, meaning evidence of their relationship to one another and the other members of the Stash House robbery crew was not necessary to establish the elements of the substantive Hobbs Act and § 924(c) counts. (EA:56-57). Consistent with that ruling, the government did not offer evidence of either defendant's gang affiliation during its case-in-chief.

But then Elias testified in his own defense, offering testimony that the district court would later describe as "absurd." (EA:109 ("That you believe that 12 jurors were going to believe what you had to say. It's very troubling.")). As relevant here, during his testimony, Elias denied the existence of any relationship between himself and the other Stash House robbers, especially Hytmiah. Elias emphatically disclaimed any prior relationship to Hytmiah (EA:82 ("I never met him a day in my life"))

and testified that he only became aware of Hytmiah's identity through the government's pretrial disclosures (*id.*).

In the light of that testimony, the government (outside the presence of the jury) renewed its request to introduce Elias's social media posts during cross-examination, arguing that Elias had opened the door to such evidence by choosing to subject himself to cross-examination and offering misleading testimony about the reason for his involvement in the Stash House robbery. (EA:84-85). After all, the jury had heard about other robbers' association with the Makk Balla Brims throughout the trial, so allowing Elias's unqualified disclaimer of any relationship to the robbery's organizer to go unchallenged would, as the district court agreed, risk misleading the jury.[6] (*Id.*). Under questioning by the government, Elias eventually told the jury that he had, in fact,

---

[6]     Hytmiah testified he was a member of the Makk Balla Brims and the robberies to which he pled guilty, including the Stash House robbery, were committed with other gang members. (GA:24-25). During his cross-examination of Hytmiah, moreover, Thompson's attorney elicited that Simpkins, who helped Hytmiah recruit the members of the Stash House robbery crew, was a Makk Balla Brim and that Thompson's brother, with whom Hytmiah committed many robberies, was a Makk Balla Brim. (GA:126-28). Elias does not raise any evidentiary challenges to the admission of that evidence on appeal.

represented himself as a Makk Balla Brim in 2019 (*i.e.*, years after the Stash House robbery), including through references on his Instagram account. (EA:86-89).

In its final instructions to the jury, the district court clarified the limited purpose for which such evidence could be considered:

> You have also heard testimony in this case concerning the defendants' and others' association with members of the Makk Ballas street gang. The government contends that the association with members of the Makk Ballas is relevant to proving relationships among people involved in this case. You may consider the evidence only for that purpose. You may not infer that the defendants were guilty of participation in criminal conduct merely from the fact that they had relationships with people who were associated with, or were associated with themselves, members of the Makk Ballas street gang.

(GA:230-31).

## B. The District Court Did Not Abuse Its Discretion by Admitting Evidence of Elias's Gang Affiliation

The district court did not abuse its discretion in permitting Elias to be cross-examined about his gang affiliation. In urging a contrary conclusion, Elias principally contends the district court failed to conduct a proper analysis under Rule 403. But in doing so, Elias casts aside the deferential abuse-of-discretion standard and invites this Court

to weigh the probative versus prejudicial value of the gang evidence anew, and then substitute its judgment for that of the court below. (EBr.26-27). This argument suffers from numerous defects.

For one, Elias ignores the procedural posture in which the challenged ruling arose. Indeed, Elias purports to measure the probative value of the gang evidence by reference to the government's case-in-chief. (*E.g.*, EBr.26 (a relationship between Elias and Hytmiah "played no part in the government's theory of the case"), 27 (relationship "add[ed] nothing of value to the government's case")). And while that may have been an appropriate metric to use *before* trial, when the issue was being litigated on a motion in limine, the gang evidence was admitted *after* the government had rested and Elias opted to testify. Thus, Elias's argument that "the balance of prejudice against probative value had not shifted in favor of admission since the time of the pretrial ruling" (EBr.24) is a red herring. By the time of the challenged ruling, the question ceased to be whether the evidence tended to prove an element of the government's case and became whether the evidence was necessary to correct the defendant's false or misleading testimony. *See United States v. Beverly*, 5 F.3d 633, 639-40 (2d Cir. 1993) (defendant who "opened the door" by

33

falsely claiming "he had nothing to do with guns" properly cross-examined about prior shooting incidents); *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993) (trial court has "discretion to permit a party to introduce otherwise inadmissible evidence on an issue . . . when it is needed to rebut a false impression that may have resulted from the opposing party's evidence").[7]

Applied here, the district court acted within the permissible bounds of its discretion by allowing Elias to be cross-examined about his gang membership. By the time Elias took the stand, he was fully aware that the government had abided by the court's pretrial ruling and refrained from introducing evidence of his gang affiliation to establish his relationship to the other Stash House robbers. He was also fully aware that the jury had heard evidence connecting *other* members of the robbery crew to one another through *their* shared gang affiliation. Thus,

---

[7]    *Accord Gonzales v. Graham*, No. 17-cv-1321 (JKS), 2020 WL 7397529, at *4 (N.D.N.Y. Dec. 17, 2020) ("A trial court should decide 'door-opening' issues in its discretion, by considering whether, and to what extent, the evidence or argument said to open the door is incomplete and misleading, and what if any otherwise inadmissible evidence is reasonably necessary to correct the misleading impression").

the district court properly assessed Elias's testimony to reflect a tactical attempt to distance himself from the other robbers by driving home the (false) impression that he was an outsider, lacking the same relational ties the others shared. (*Cf.* EA:85 (expressing skepticism that Elias "doesn't remember anything except what he wants to remember")). But because this impression was plainly incomplete and likely to mislead the jury about central issues in dispute—namely, Elias's reason for participating in the events in question and his knowledge of the nature and scope of the crime he was aiding and abetting—the district court reasonably permitted the government to confront Elias with evidence that impeached the credibility of his prior testimony and tended to link him to the other participants in the crime. This can hardly be called an abuse of discretion.[8]

---

[8] Elias suggests that, upon the government's renewed motion, the district court failed to perform a proper Rule 403 analysis. (EBr.24 (the district court "threw its concerns about prejudice to the side")). It is unclear from Elias's brief, however, what he contends the district court should have done differently to comply with Rule 403's mandate. It is undisputed that the court was fully familiar with the gang evidence in question and, prior to trial, thoroughly balanced its probative value against its risk for prejudice. (TA:335-55). To suggest that Rule 403 required the court to repeat that analysis at a sidebar mid-trial would exalt form over substance, particularly given the court's impression of

35

Finally, Elias's suggestion that the gang evidence may have "sway[ed] one or more jurors" to convict him (EBr.33), is entirely divorced from the record. As explained above, the jury heard evidence of other robbers' gang ties and the violent armed crime in which they and Elias participated. In the context of the record as a whole, it is implausible to think the jury might have believed Elias to be innocent of aiding and abetting the Stash House robbery but voted to convict him anyway because he self-identified as a Makk Balla Brim in a social media post two years after the robbery. *See United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995).

III.  Evidence of Thompson's Bloody Gloves Was Properly Admitted

Next, Thompson contends the district court erred by allowing him to be cross-examined about a pair of bloody gloves that was recovered from his pants pocket on the night of the Stash House robbery. (TBr.44-48). According to Thompson, the government's late disclosure of the gloves had prevented the defense from forensically testing them, in

---

Elias's door-opening testimony described above. *See United States v. Dupree*, 870 F.3d 62, 77 (2d Cir. 2017) (a "mechanical recitation of the Rule 403 analysis is not required").

36

violation of Federal Rule of Criminal Procedure 16. (TBr.46). In the absence of such testing, he claims, evidence concerning the gloves was insufficiently reliable to justify its admission at trial. (*Id.*). So too, he says, did the lack of testing render the gloves' probative value minimal compared to the potential prejudice they introduced, in violation of Rule 403. (TBr.47).

A. <u>Relevant Factual Background</u>

On December 21, 2021, the government disclosed to Thompson in discovery a NYPD Property Clerk Invoice (the "Voucher") indicating that, at the time of his arrest following the Stash House robbery, police recovered a pair of bloody gloves from his pants pocket. (TA:368).

On March 15, 2022, with jury selection underway, Thompson filed a motion to suppress evidence of the gloves, contending that they were obtained in violation of the Fourth Amendment and, in any event, were more prejudicial than probative. (TA:356-60). Because litigation surrounding the admissibility of other evidentiary items recovered at or around the time of Thompson's arrest had concluded by the time of the Voucher's disclosure, moreover, Thompson claimed he had effectively

been deprived of an opportunity to challenge or test the reliability of that evidence. In a Memorandum and Order entered on March 16, 2022, the district court agreed, principally finding that the government's late disclosure of the gloves had violated Rule 16 and warranted their suppression at Thompson's trial, which was scheduled to begin the following day. (TA:361-72).

Consistent with that ruling, the government did not offer the Voucher or other evidence of the bloody gloves during its case-in-chief.

But like Elias, Thompson testified in his own defense and offered perjurious testimony that the district court later remarked was "so unbelievable that it's hard to think that anyone would have taken [it] seriously." (SPA:29). As relevant here, the question was squarely put to Thompson whether, at the time of his arrest, police seized from him a pair of bloody gloves.[9] (GA:206). And despite knowing about the

_____

[9] Thompson says the district court allowed him to be cross-examined about the gloves "without warning." (TBr.45). That is false. Immediately prior to the challenged line of questioning, the government stated at sidebar its intention to cross-examine Thompson using the gloves and defense counsel offered no objection, instead asking only for an unrelated curative instruction regarding the earlier introduction of a firearm. (GA:204). Not only was Thompson "warn[ed]" of what was to come, but his failure to offer a timely objection arguably waived his

existence of the Voucher—Thompson's motion to suppress had been filed just eight days earlier—Thompson falsely answered, "No, that's not right." (*Id.*). When the government attempted to refresh Thompson's recollection using the Voucher and evidence bag containing the gloves, he doubled down: "I never seen those gloves in my life." (*Id.*). Eventually Thompson acknowledged that the Voucher did, in fact, reflect the seizure of bloody gloves from his pants pocket. (*Id.*). And only then did the district court admit the Voucher and gloves into evidence. (*Id.*; GX1002).

## B. The District Court Did Not Abuse Its Discretion by Admitting Evidence of Thompson's Bloody Gloves

The district court did not abuse its discretion in permitting Thompson to be cross-examined about the bloody gloves. The Voucher and gloves were admitted in direct response to Thompson's perjurious testimony, in which he denied that the gloves were recovered from him following the Stash House robbery. Although the district court acted within its discretion to suppress the gloves before trial as a discovery remedy, the court was equally within its discretion to reconsider that

_____

current argument. *See United States v. Jimenez*, 586 F. App'x 50, 53 (2d Cir. 2014) (unobjected-to evidentiary rulings are reviewed for plain error).

ruling in the light of Thompson's flagrantly false testimony. Contrary to Thompson's contention, nothing about this was "[i]nexplicabl[e]." (TBr.46).

To be sure, in initially deciding to suppress the gloves, the district court explained that the government's discovery violation had stemmed from its failure under Rule 16(a)(1)(E) to permit Thompson to inspect evidence "the government intends to use . . . in its case-in-chief at trial." (TA:371). And, as a proportionate punishment for that violation the government was, indeed, precluded from using the gloves during its case-in-chief. But the court's pretrial ruling could not have anticipated that Thompson would, when the time came, give sworn testimony falsely denying his possession of the gloves, and the court acted reasonably in response to such perjury by allowing him to be impeached with them. Indeed, as explained above, by the time of that ruling, the question ceased to be whether the evidence could be used to support the government's case-in-chief and became whether the evidence was necessary to correct Thompson's false or misleading testimony. *See Beverly*, 5 F.3d at 639-40; *Rosa*, 11 F.3d at 335.

40

Thompson further claims the district court's ruling "ignored" the prejudice he suffered from the underlying discovery violation. (TBr.45-47). But as Thompson concedes, the district court was not required to make any finding of prejudice in connection with its Rule 16 determination and, in fact, did not do so. (*Id.*). Although Thompson says the district court "recognized" that the discovery violation prevented the defense from forensically testing the gloves, he cites to no place in the record where the court below did so. (TBr.46). And as noted above, *supra* n.9, when the government previewed its intention to cross-examine Thompson about the gloves, defense counsel made no objection at all, let alone one that would have established prejudice.

Nor is there a Rule 403 problem based on the lack of forensic testing. Thompson claims the gloves lacked sufficient probative value to overcome the potential for prejudice because "apart from their color, there was [no] reason to believe the stains on the gloves were human blood at all, much less that the stains were fresh when the gloves were recovered. And even if there were such evidence, it was unknown whether the blood was that of the victim, or of Mr. Thompson, or of someone else." (TBr.47). But as Thompson's attorney below

acknowledged, those open questions went to the weight to be accorded the gloves, not their admissibility. Indeed, during his closing argument, counsel urged the jury to discount the gloves because:

> [The government] didn't test it. Nobody tested it for blood. They could have tested it. His blood could have been on it or somebody else's blood could have been on it. They never tested it. So you take that for what it's worth. You take that for what it's worth. And I submit to you, it ain't worth much. Not much at all.

(GA:222).

The jury was entitled to evaluate this argument in the context of the record as a whole, including Thompson's own "unbelievable" testimony about the events of September 7, 2017, and conclude, as it did, that the argument lacked merit. Given that the Voucher and gloves were introduced to contradict Thompson's own false testimony, and given that the jury had already heard evidence of the severe beating that occurred in the Stash House and of the blood-soaked clothing worn by Darby and Henderson, it is not credible to conclude the jury might have believed Thompson to be innocent of committing the Stash House robbery but voted to convict him anyway based on the admission of the Voucher and gloves. *See Valenti*, 60 F.3d at 946.

IV.    Evidence of the Arlo Home Security
       <u>Camera Was Properly Admitted</u>

Thompson further contends the district court erred by admitting evidence that an Arlo-brand home security camera was recovered from Elias's car following the Stash House robbery and a camera by the same brand was mounted in a common area outside the Stash House at the time of trial.  (TBr.39-44).  In that regard, Thompson contends this evidence was not relevant because the camera seized from Elias's car had not been shown to be connected to the camera outside the Stash House.  (TBr.39).  For substantially the same reason, he contends the camera's probative value was outweighed by the "appearance of a connection" to the robbery scene, in violation of Rule 403.  (TBr.43).

A.    <u>Relevant Factual Background</u>

During the government's case-in-chief, Hytmiah testified that the Stash House had contained a security camera, though he did not specify its brand or provide further details.  (GA:124-25).

Subsequently, while under cross-examination, Elias was asked about the camera and specifically denied that any such home security camera had been in his car on the night of his arrest.  (GA:198-

43

99). Like Elias's other testimony, this denial was false. As Elias knew, among the property recovered from his car following the Stash House robbery was, in fact, an Arlo-brand home security camera in the center console. (GA:217). Elias unequivocally stated that he was unaware of any such camera having been in his car that night and, further, that any property recovered by police must have been brought into his car by his passengers, *i.e.*, Thompson, Woods, and Henderson. (GA:198-99).

In response to this false testimony, the government sought leave to present rebuttal evidence, namely, the testimony of an investigator who had visited the Stash House one day earlier, on March 21, 2022. (GA:207-16). As proffered by the government, the witness would authenticate a photograph he took on that date depicting an Arlo-brand home security camera installed in the lobby of the Stash House. (*Id.*). The government explained that this evidence (like so many of the other evidentiary items Elias and Thompson challenge on appeal) had taken on fresh relevance in the light of perjurious defense testimony:

> I asked Mr. Elias to explain why there was an Arlo security camera in his vehicle. He said he had no knowledge of the Arlo camera in his vehicle and of any contents in his vehicle.

44

> We now have testimony there was a gun in the vehicle, there were bloody clothes in the vehicle. The fact there was a security camera that matches the security camera still at this premise[s], is probative to the fact that the vehicle contained all sorts of contraband of a robbery.

(GA:214).

Over a defense objection, the district court agreed, concluding that, notwithstanding the passage of time between the date of the robbery and the date the photograph was taken, it would be fair for the jury to infer that the similarity of the camera found in Elias's car and the camera then-presently mounted in the Stash House lobby made it more likely that Elias and Thompson had been involved in a robbery there.[10] (GA:213). And particularly given Elias's "failure to address" the camera

---

[10]  Thompson incorrectly asserts that the district court's evaluation of the camera's probative value was based on an "assumption" that "the security video system of a particular brand is always compatible only with a security camera of the same brand," such that "if there was an Arlo security camera at the stash house at the time of trial, the security camera Hytmiah said was there at the time of [the robbery] must also have been an Arlo security camera." (TBr.40). As the record shows, however, the court indulged no such "assumption" and did not rest its evidentiary ruling on any finding regarding the compatibility of the Arlo camera hardware. Rather, the court simply observed "it could be argued" that the compatibility of the hardware permitted an inference of guilt and while the government had "the right to make the inference," the defendants had "the right to rebut the inference." (GA:213).

45

during his testimony, the court found that any prejudice from the rebuttal evidence did not outweigh that probative tendency.  (GA:216).

   B.   The District Court Did Not Abuse Its Discretion
        by Admitting Evidence of the Arlo Security Camera

The district court did not abuse its discretion in admitting evidence that the same brand home security camera that was seized from Elias's car on the night of the robbery was also mounted in a common area outside the Stash House at the time of trial.

The gravamen of Thompson's argument is that the brand of the cameras alone formed an insufficient basis to reasonably permit an inference of guilt.  But once again, this argument is baseless (i) because of Elias's false testimony opening the door to rebuttal evidence about the camera and (ii) because the linkage between the two cameras (the one seized from Elias's car and the one later seen mounted at the Stash House) went to the weight of that evidence, not its admissibility.

As to the first of these points, the record makes abundantly clear the government only sought to introduce rebuttal testimony connecting Elias and Thompson to the Stash House robbery through the Arlo camera after Elias, knowing that such a camera had been seized

46

from his car, falsely denied that fact.  Aside from its tendency to clarify

the misleading impression with which Elias sought to leave the jury, the

standalone relevance of the evidence was self-evident: the jury had not

only heard Hytmiah testify as to the presence of a home security camera

in the Stash House on the night of the robbery, but had also learned that

other items of contraband from the robbery were subsequently found in

Elias's car.  The government argued exactly that point in its summation:

> Elias and Thompson both arrested an hour later in
> a car.  And what was found in that car?  An Arlo
> camera, a loaded firearm, a bloody sweatshirt,
> bloody gloves, and the four people that Shamiek
> Hytmiah told you he conducted that robbery
> with . . .
>
> Let's talk about what was found in the car.  A gun,
> bloody gloves, a bloody sweatshirt and a security
> camera.

(GA:221, 227).

Based on the record as a whole, it cannot seriously be argued

that the similarity between the cameras seized from Elias's car and

mounted in the Stash House building did not have "any tendency" to

make Elias's and Thompson's participation in the robbery "more or less

probable than it would be without the evidence."  Fed. R. Evid. 401.

47

As to the second point, Thompson does not meaningfully contend that any prejudice flowing from the admission of this evidence was "unfair prejudice," as required by Rule 403. Instead, as supposed evidence of legal error, he notes the obvious fact that the "camera evidence created the appearance of a connection between the camera in Elias's car and the camera at the scene of the robbery." (TBr.43). That is precisely why it was relevant. And the mere tendency of evidence to inculpate a defendant is obviously not unfairly prejudicial under Rule 403. *See United States v. Robinson*, 544 F.2d 611, 618 (2d Cir. 1976) ("Rule 403 proscribes only unfair prejudice, a term defined by the Advisory Committee as involving an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"); *accord United States v. Mack*, No. 20-376, 2021 WL 4851391, at *3 (2d Cir. Oct. 19, 2021) ("Rule 403 does not require the exclusion of prejudicial evidence—only evidence whose probative value is *substantially outweighed* by a danger of *unfair* prejudice").

In admitting the Arlo camera evidence, the district court specifically noted that the parties were free to urge the jury to draw inferences about its probative value in their respective favors. (GA:213).

48

To that end, defense counsel cross-examined the rebuttal witness about the plausibility of the government's theory, including by exploring the lack of evidence that a camera had been stolen on the night of the robbery and the logistical difficulties the robbers would have experienced in attempting to do so. (GA:219-20). Likewise, in summation, Elias's counsel argued that "[t]here was testimony regarding a gun found, bloody clothing, *a camera*, all seemingly connected to the Nissan [A]ltima. However, Matthew Elias had nothing to do with any of those things and there is no evidence to show that he does." (GA:225-26) (emphasis added). The jury was free to, and did, reject these arguments, and no basis exists to second-guess that judgment now.

Thompson's reliance on the Eleventh Circuit's opinion in *United States v. Moore*, 189 F. App'x 915 (11th Cir. 2006) (per curiam), is puzzling. (TBr.42). There, as here, an item of evidence found in the defendant's car (an air pistol) was admitted as proof that he committed a bank robbery during which the bank teller saw a gun. Like Thompson, Moore had argued that since the bank teller was unable to identify the gun, the air pistol in his car bore an insufficient nexus to the crime to justify its admission at his trial. And like here, the defendant was wrong:

49

"the fact that his fingerprint [was] on an item left in the getaway car [wa]s probative evidence that he was in fact the person driving the getaway car" at the time of the robbery. *Id.* at 918. In fact, the case for admission is stronger here because unlike in *Moore*, where the government "did not produce evidence that the weapon used in the robbery resembled the air pistol" found in the defendant's car, *see id.*, the proof in this case was that the same brand of security camera located at the Stash House was found in Elias's car.

V.  The District Court Properly Admitted
    Detective Georg's Summary Testimony

Thompson further contends that the district court should have disallowed summary testimony by NYPD Detective Adam Georg because it was cumulative of other evidence in the record. (TBr.49-51). Contrary to this contention, summary testimony, including that which examines evidence already in the record and analyzes the evidence in charts and spreadsheets, is properly admitted under Federal Rule of Evidence 1006. *See United States v. Lemire,* 720 F.2d 1327, 1348 (D.C. Cir. 1983) (collecting cases). The court in *Lemire* found that non-expert summary testimony "can help the jury organize and evaluate evidence

50

which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial." *Id.* This Court has reached the same conclusion. *See, e.g.*, *United States v. Mensah*, 110 F.4th 510, 520 (2d Cir. 2024) (affirming investigative analyst's summary testimony, which "examined six types of evidence," all introduced through prior witnesses, and "summarized her findings in a spreadsheet, admitted into evidence, that used the data from these various sources to" draw conclusions about the defendant's guilt).

As outlined above, the Stash House robbery involved multiple participants moving between various locations and communicating over multiple devices for several hours. The summary exhibit about which Georg testified synthesized thousands of pages of exhibits, including call-detail records, subscriber information, cell-site information, and other data collected from voluminous cellphone extractions. (TA:1765-82). The district court's assessment that this testimony would "help the jury organize and evaluate" other evidence that was "factually complex and fragmentally revealed" through prior witnesses, *Lemire*, 720 F.2d at 1348, can hardly be called an abuse of discretion.

Thompson's argument fails for the additional reason that Georg's testimony was not purely cumulative, such that it amounted to a "summation in advance of summation." (TBr.49). Rather, Georg testified about the investigation itself and introduced videos, photographs, and maps that were not otherwise in evidence. (*E.g.*, TA:434-40, 442, 448-53, 464-65, 477). Georg also authenticated and introduced rental car records establishing Elias's use of the silver Nissan Altima and Thompson's post-arrest statement, and interpreted license-plate-reader ("LPR") data establishing the locations of the robbers' cars and recorded jail calls incriminating Elias and Thompson. (*See* GA:177-79, 189, 197; GA:244; TA:1783).

Other than likening Georg's analysis to a summation (TBr.51), Thompson does little to establish a problem with this procedure. For example, Thompson does not contend that the data underlying Georg's summary exhibit was not "voluminous" or could "be conveniently examined in court." *See* Fed. R. Evid. 1006. Nor does he dispute that the underlying data was available for inspection and copying, and indeed was received into evidence for the jury's examination. *See id.* Rather, ignoring that he and Elias had a full and

fair opportunity to cross-examine Georg about his methods and conclusions, Thompson simply likens this testimony to government argument. That is plainly insufficient to satisfy his burden on appeal.

## VI.   Any Evidentiary Error Was Harmless

Even if the district court erred in admitting some of, or all, the challenged evidence, any error was harmless given the strength of the government's case. The record shows that Hytmiah—an avowed gang member and admitted architect of the Stash House robbery—testified to the planning, execution, and aftermath of the crime, which implicated Elias and Thompson, among other gang members and associates, in all critical phases. (GA:3-5, 13-16, 21, 24-25, 30-125, 126-28; EA:59-63). That testimony alone was sufficient to justify the jury's verdict.

But the jury had more. Hytmiah was broadly corroborated by phone records and text messages reflecting communications among the participants prior to, during, and after the robbery (TA:480-718), as well as cell-site location data placing the robbers in the vicinity of the locations Hytmiah described (TA:1735-63). Rental car records tied Elias to the getaway car (GA:53-54, 201; EA:69-70; TA:1845-49) and LPR data confirmed the vehicle's movements were consistent with the unfolding

crime (GA:132-34, 138-39, 177-79). Data recovered from the "Health" application on Thompson's cellphone reflected his ascent up the staircase into the Stash House (TA:480-718, 1735-63) and the jury heard how the altercation that ensued inside the apartment left Darby and Henderson splattered with the victim's blood (GA:91, 96). Lieutenant Rodriguez testified to having witnessed the robbers outside Woods's Residence following the robbery, as Hytmiah claimed (GA:132-34), and the jury learned that, when Elias's car was eventually stopped by police, it contained apparent contraband from the robbery, including a gun and bloody clothing. The jury heard Thompson's post-arrest statements to police implicating himself in the Stash House robbery, including the use of violence and a gun (TA:1821), and jail calls following Elias's and Thompson's arrest, in which they discussed their involvement in the robbery and the distribution of proceeds (GA:244; TA:1783).

Other than generally noting the incriminating nature of the challenged evidence (*e.g.*, TBr.44, 46), neither Elias nor Thompson makes any compelling argument to undermine a harmlessness finding. Elias suggests that admitting the evidence of his gang affiliation was not harmless because questions concerning biases toward gang members

54

could have been, but were not, asked of prospective jurors during voir dire. (EBr.29-30). But Elias does not (and cannot) point to any fact in the record evincing any such bias. Rather, he essentially invites the Court to speculate that since gang membership is an inflammatory topic, at least some members of the jury would have been removed for cause under appropriate questioning. But as noted above, the decision to admit the gang evidence was made only after, and in response to, Elias's testimony denying any relationship to Hytmiah—a circumstance the district court could not have anticipated prior to jury selection.

That is a far cry from *United States v. Nieves*, 58 F.4th 623, 628 (2d Cir. 2023), which involved allegations that the defendants engaged in witness tampering and related offenses against a government cooperator, on the theory that cooperation violated a core tenet of the defendants' street gang, the Trinitarios. (*See* EBr.29-30). Notwithstanding the subject matter of the trial, and over the repeated and strenuous objections of the parties, the court in *Nieves* refused to ask any voir dire questions aimed at discerning prospective jurors' attitudes toward gangs. *See id.* at 628-30. That case provides no analogue to this one. And in the light of the other evidence establishing Elias's guilt,

55

together with the evidence that Hytmiah and other Stash House robbers had gang ties, Elias's social media posts from 2019 cannot themselves suffice to undermine the verdict.

56

## POINT THREE

### THE DISTRICT COURT PROPERLY ORDERED ELIAS TO FORFEIT ROBBERY PROCEEDS

Relying on *Honeycutt v. United States*, 581 U.S. 443 (2017), Elias contends he was erroneously ordered to forfeit $10,000 since, according to him, the evidence did not establish that he personally obtained proceeds of the Stash House robbery. (EBr.33-41). This argument is meritless.

### I.   Applicable Legal Standards

#### A.   Standard of Review

This Court reviews a district court's legal determinations regarding forfeiture de novo and its underlying factual findings for clear error. *See United States v. Rainford*, 110 F.4th 455, 488 (2d Cir. 2024).

#### B.   Criminal Forfeiture

Criminal forfeiture is a part of sentencing. *See Libretti v. United States*, 516 U.S. 29, 41 (1995). Because its purpose is "punitive rather than restitutive, . . . district courts are not required to conduct an investigative audit to ensure that a defendant is not deprived of a single farthing more than his criminal acts produced." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). Rather, the government must establish

57

the forfeitability of property or money by a preponderance of the evidence, and sentencing courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations therefrom.  *See Rainford*, 110 F.4th at 488.

The forfeiture statute pertinent to Hobbs Act robberies—and the one upon which Elias's forfeiture order was predicated—provides for the disgorgement of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the robbery or a conspiracy to commit the robbery.  *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(B)(ii). "Proceeds" means "property of any kind obtained directly or indirectly, as a result of the commission of the" robbery, *id.* § 981(a)(2)(A), and has been interpreted to mean "gross proceeds" rather than profits alone, *see United States v. Guerrier*, No. 20-3469, 2022 WL 610338, at *2 n.1 (2d Cir. Mar. 2, 2022) ("proceeds" are not limited to profits); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009).[11]

_____

[11]    Such proceeds are recoverable as part of the sentence in a criminal case consistent with the methods set forth in 21 U.S.C. § 853. *See* 28 U.S.C. § 2461(c).  One such method is the forfeiture of substitute property up to the value of the criminal proceeds.  *See* 21 U.S.C. § 853(p).

In *Honeycutt*, the Supreme Court held that, for purposes of 21 U.S.C. § 853—the forfeiture statute applying to certain drug crimes—a defendant may not be held jointly and severally liable for criminal proceeds obtained by a co-conspirator that the defendant himself did not personally acquire. *See* 581 U.S. at 445. It remains an open question in this Circuit whether *Honeycutt* applies to cases, like this one, involving proceeds forfeitable under § 981, and our sister circuits are split on the issue. *See United States v. Kenner*, 443 F. Supp. 3d 354, 367-68 (E.D.N.Y. 2020) (Bianco, J.) (describing circuit split and noting that this Court "has yet to rule on the issue"). Even assuming it does, however, *Honeycutt* only applies in cases, unlike this one, involving a charged conspiracy. *See United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019) ("*Honeycutt*'s limitation on forfeiture orders does not apply here because there is no conspiracy charge, no joint and several liability, and Khan was ordered to pay only proceeds he himself acquired"); *United States v. Papas*, 715 F. App'x 88, 89 (2d Cir. 2018) (*Honeycutt* pertained to forfeiture following a conviction "to a conspiracy charge").

59

II.  The District Court Did Not Err in Ordering
     <u>Elias to Forfeit a Share of the Robbery Proceeds</u>

Applying these standards, it is clear Elias's challenge to his forfeiture order is a nonstarter.  To begin with, the order was entered pursuant to 18 U.S.C. § 981(a)(1)(C), not 21 U.S.C. § 853, and it remains an open question in this Circuit whether *Honeycutt* applies to such orders.  *See Kenner*, 443 F. Supp. 3d at 368.  Even assuming it does, however, *Honeycutt* is inapplicable because there was no conspiracy charge and no joint and several liability ordered.  *See Khan*, 761 F. App'x at 47.  Indeed, as the district court specifically explained, the primary reason why evidence of Elias's gang affiliation was initially deemed unnecessary was because "there is no [] conspiracy charge in this case." (TA:336).  Rather, Elias was tried and convicted on substantive counts of Hobbs Act robbery and § 924(c).  For that reason, his reliance on *United States v. McIntosh*, No. 14-1908(L), 2023 WL 382945 (2d Cir. Jan. 25, 2023), is unavailing since the defendant in that case had been convicted of Hobbs Act robbery *conspiracy*.  (EBr.38).

Nor was Elias made jointly and severally liable for the full amount of the robbery proceeds, placing this case beyond *Honeycutt*'s core

holding. On the contrary, the district court ordered each of the participants, including Elias (EA:121-24) and Thompson (TA:1990-93), to pay a proportionate share of the overall proceeds.[12] Under those circumstances, *Honeycutt*'s concern about low-level members of a conspiracy shouldering an outsized share of the proceeds derived by more culpable and higher-ranking members is simply irrelevant. *See S.E.C. v. Metter*, 706 F. App'x 699, 702 n.2 (2d Cir. 2017) (*Honeycutt* "protects incidental figures from forfeiture of amounts far beyond what would be justified by their role in the offense").

And even if there *had* been a charged conspiracy here (there was not) and Elias *had* been made jointly and severally liable for the full amount of robbery proceeds (he was not), the forfeiture order was still appropriate because the trial evidence proved that all participants in the Stash House robbery intended to share in the proceeds. During the planning meeting at the Galway Residence, for example, the robbers discussed what they expected to find in the house, understanding that

---

[12] Woods and Henderson were likewise ordered to forfeit $10,000 apiece. (DE:774, 827).

the proceeds would be divided among them. (GA:51-52). Following the robbery, Elias and Thompson were among several participants to return to the Galway Residence, where they broke into the stolen safe and took account of the proceeds. (GA:93). Upon realizing that the haul was "nowhere near" the expected payout, Elias and Thompson were again among the individuals who went searching for Woods and Henderson, as they were suspected of secreting some of the proceeds for themselves. (GA:93-95, 170-79). And upon arriving at Woods's Residence, Hytmiah ordered the crew back to the Galway Residence specifically to divide up the full proceeds. (GA:98, 102).

In other words, for his role in the robbery, Elias intended and expected that he would receive his pro rata share of the proceeds and took affirmative steps to do so. The sole intervening event that spoiled this plan was his arrest en route to the Galway Residence. For that reason, Elias's assertion that he "never received proceeds or exercised control over them" (EBr.40) is misleading because it suggests that his lesser role in the scheme—rather than his arrest—is the reason he did not receive

the criminal proceeds.[13]  Perhaps nowhere is that clearer than in his post-arrest jail calls, in which Elias continued to eagerly seek out his share of the proceeds.  (GA:244; TA:1783 (referring to "our" robbery proceeds)).

Elias's renewed self-comparison to Kimberly Thompson remains inapt.  (EBr.39-40).  The preliminary order of forfeiture entered against Kimberly Thompson made her liable for the full amount of proceeds from the two robberies she aided and abetted.  (GA:241-42, 244).  Although the district court purported to find that the order violated *Honeycutt* insofar as Kimberly Thompson did not personally receive the robbery proceeds (DE dated 3/28/2022), in actuality, the order likely violated *Honeycutt* because it countermined *Honeycutt*'s core holding by imposing upon a getaway driver joint and several liability for the full criminal proceeds derived by the robbery crews.[14]  By contrast, because Elias was proven to have intended, expected, and affirmatively sought to

---

[13]    As Thompson himself admits, he and Elias "were arrested in the hours after the robbery when, *since the proceeds had not yet been distributed*, the robbery transaction was ongoing."  (TBr.54).

[14]    Although the issue was not raised at Kimberly Thompson's sentencing, the district court's reliance on *Honeycutt* was apparently incorrect since Thompson, like Elias, was not convicted of a conspiracy count.

63

receive a share of the Stash House robbery proceeds; was prevented from

obtaining those proceeds only by virtue of his intervening arrest; and was

ordered to pay only his share of those proceeds, the comparison is, as the

district court noted, akin to comparing apples and watermelons.

(EA:103).

POINT FOUR

THOMPSON'S SENTENCE WAS REASONABLE

Thompson next argues that his below-Guidelines sentence was substantively unreasonable because it did not include credit for an approximately nine-month period he was incarcerated awaiting trial on a state charge. (TBr.52-55). To reach that conclusion, he contends that the firearm possession which led to the state charge constitutes "relevant conduct" to the offense of conviction in this case. From that premise, he argues that the time he served in pretrial detention in the state constitutes an "undischarged" sentence for which he should have received a sentence reduction under U.S.S.G. §§ 5G1.3(b) and/or 5K2.23. (*Id.*). He is wrong on both points.

I.   Standard of Review

This Court's substantive review of a sentence is for reasonableness. *See United States v. Ryan*, 406 F. App'x 565, 566 (2d Cir. 2011). In this context, "'reasonableness' is inherently a concept of flexible meaning, generally lacking precise boundaries," *United States v. Crosby*, 397 F.3d 103, 115 (2d Cir. 2005), and this Court's review "should exhibit restraint, not micromanagement," *United States v. Fleming*, 397 F.3d 95,

65

100 (2d Cir. 2005). Thus, a sentence is only substantively unreasonable when it is "so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).

In making that determination, the reviewing court does not "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the [18 U.S.C.] § 3553(a) considerations in any particular case but will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Ingram*, 721 F.3d 35, 37 (2d Cir. 2013). And "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Ryan*, 806 F.3d 691, 695 (2d Cir. 2015).

II. Thompson's Sentence was Substantively Reasonable

As outlined above, throughout the proceedings below, Thompson disclaimed any possessory interest in the gun recovered from

Elias's car at the time of his arrest, as well as the fact that the gun was used in the Stash House robbery. For that very reason, Thompson's attorney requested curative instructions making clear to the jury that the admission of the gun was to be considered for impeachment purposes only. (*E.g.*, GA:204 ("The defense wants a curative that the gun that was just put into evidence is not the gun that is talked about [in] this robbery")). By his own logic, then, Thompson's illegal possession of the firearm under state law cannot be considered "relevant conduct" to the robbery for which he was convicted in this case. *See* U.S.S.G. § 1B1.1 (defining relevant conduct).

Yet Thompson now refers to his own trial strategy as embracing a "legal fiction"; he suggests the firearm found in Elias's car was *obviously* the same gun used in the Stash House robbery because "there was no opportunity for [him] to have gone on a frolic and detour from that transaction to obtain another gun." (TBr.54). But that fact was never proven, either at trial or at a sentencing hearing, so it can hardly be called an abuse of discretion that the district court declined to rely on it at sentencing. On the contrary, Thompson successfully *precluded* the government from introducing at trial evidence or argument

implicating that gun in the Stash House robbery. Under those circumstances, Thompson's belated assertion of a possessory interest in the firearm cannot justify a sentencing credit.

But even if Thompson's illegal gun possession constituted relevant conduct (it does not), the remainder of his argument is baseless. For to consider a period of pretrial detention an "undischarged sentence" requires stretching that term beyond all recognition. *See United States v. Stebbins*, 523 F. App'x 1, 4 (1st Cir. 2013) (Souter, J.) (no plain error where district court declined to give credit under § 5G1.3(b) because "at the time of his sentencing in this case, Stebbins was merely detained on pending state charges in Massachusetts; he was not serving an undischarged 'term of imprisonment'"). The same reasoning is fatal to Thompson's suggestion that the district court should have exercised its discretion to depart downwardly under § 5K2.23. (TBr.54). That section not only incorporates the same requirements of § 5G1.3(b) described above, but additionally requires that the defendant have "completed [a] term of imprisonment," which courts have understood to mean "a criminal sentence *stemming from a conviction* on a crime which is relevant conduct to the current offense." *Amato v. United States*, No. 19-

68

cv-19449 (MAS), 2021 WL 5578850, at *5 (D.N.J. Nov. 29, 2021)
(emphasis added). Thompson's period of pretrial detention clearly does
not fit this definition.

In the end, Thompson can point to nothing in the record that
would warrant this Court in finding that his sentence was "so shockingly
high, shockingly low, or otherwise unsupportable as a matter of law that
allowing [it] to stand would 'damage the administration of justice."
*Broxmeyer*, 699 F.3d at 289. Such a finding would be wholly inconsistent
with the court's decision to grant a 70-month downward variance from
the advisory Guidelines range, situating it "comfortably within the broad
range of sentences that" were reasonable under the circumstances. *Ryan*,
806 F.3d at 695.

69

## POINT FIVE

### THE DISTRICT COURT DID NOT PLAINLY ERR IN IMPOSING SPECIAL CONDITIONS OF SUPERVISED RELEASE

Elias next contends that the district court erred by failing to orally pronounce the special conditions of supervised release at his sentencing. (EBr.42-46).

I. Standard of Review

"This Court ordinarily reviews a district court's decision to impose conditions of supervised release for abuse of discretion." *United States v. Rodriguez*, No. 22-1820, 2023 WL 8432697, at *3 (2d Cir. Dec. 5, 2023). "But where, as here, a defendant did not object at sentencing, [the Court] review[s] for plain error." *Id.*

"Plain error is error that (1) is plain, (2) affects substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Robinson*, 697 F. App'x 732, 734 (2d Cir. 2017).

II. Applicable Law

"Both the Constitution and the Federal Rules of Criminal Procedure grant a criminal defendant the right to be present during

70

sentencing." *United States v. Jacques*, 321 F.3d 255, 262 (2d Cir. 2003).

As a general matter, then, "where an unambiguous oral sentence conflicts

with the written judgment . . . the oral pronouncement of sentence must

control." *Id.* at 263.

This rule is not absolute, however, and the Court has

repeatedly affirmed the imposition of supervised release conditions that,

while not announced in a defendant's presence at sentencing, did not

directly conflict with the oral pronouncement of sentence. *See United

States v. Handakas*, 329 F.3d 115, 117 (2d Cir. 2003) ("[W]e have not

rigidly disregarded all conditions of supervised release later included in

a judgment but omitted from the oral pronouncement of sentence"). For

example, as the Court recently explained:

> explicit reference to each and every standard
> condition of supervision set forth in § 5D1.3(c) of
> the United States Sentencing Guidelines . . . is not
> essential to the defendant's right to be present at
> sentencing. Rather, even the most general
> allusion to the standard conditions of supervised
> release during the oral imposition of sentence is a
> sufficient basis on which to predicate the
> imposition of each of the conditions normally
> regarded as standard.

71

*United States v. Genao*, No. 23-6710, 2024 WL 4404042, at *1 (2d Cir. Oct. 4, 2024).

III.  The District Court Did Not Plainly Err in
      <u>Imposing Special Conditions of Supervised Release</u>

As explained above, the district court sentenced Elias to five years of supervised release with four special conditions. (EA:112, 118). The first prohibits Elias from possessing a firearm—a standard condition contained in § 5D1.3(c)(10), which need not be orally pronounced. *See Genao*, 2024 WL 4404042, at *1. The second prohibits Elias from associating with gang members and other criminals, another standard condition contained in § 5D1.3(c)(8). *See id.* A third merely reiterates and clarifies Elias's need to comply with his forfeiture obligation, which *was* orally pronounced at sentencing. (EA:112-13). *See United States v. Rosado*, 109 F.4th 120, 124 (2d Cir. 2024) (additions in the written judgment that merely "clarify the terms of the spoken sentence" are permissible). To be sure, the special condition of supervised release reiterating Elias's compliance with an independently enforceable forfeiture order did not "impose new burdensome punishments or restrictions" upon him. *Id.* at 124-25.

It is true that the special condition prohibiting Elias from contacting victims of the Stash House robbery should have been, but was not, announced at sentencing. However, because Elias did not object to this condition below—as noted above, his attorney filed a letter memorializing his *consent* to this condition—the district court's decision to include it in the written judgment was not plain error.[15] Simply stated, Elias does not, and cannot, credibly argue that a five-year prohibition against contacting the victims of an armed robbery that the district court described as "brutal" (SPA:29) in nature prejudiced the outcome of his

---

[15]     Elias argues that his attorney's letter consenting to this supervised release condition should be discounted, and the instant challenge be deemed preserved, because the letter post-dated sentencing. (EBr.44 n.11). On the contrary, however, Elias's explicit consent to the challenged condition *after* sentencing and before the judgment issued clearly signifies a waiver sufficient to trigger plain error review. *See United States v. Sabin*, No. 23-6507, 2024 WL 4763930, at *2 (2d Cir. Nov. 13, 2024). Elias also says that the letter should be discounted because it bears "no indication that [he] was consulted prior to" its filing. (EBr.44 n.11). But that is different than saying he was not so consulted. And while true that "[t]he sentencing context offers defendants a less rigorous plain error review if the defendant lacked sufficient notice of the challenged conditions," *United States v. Rakhmatov*, No. 21-151(L), 2022 WL 16984536, at *2 (2d Cir. Nov. 17, 2022), Elias's reliance on innuendo alone falls well short of establishing that he lacked prior notice, *cf. Sabin*, 2024 WL 4763930, at *2 n.1 (waiver effected through counsel does not impact its enforceability).

73

sentencing, represented a "burdensome punishment[] or restriction[]" on his liberty, *United States v. Rosario*, 386 F.3d 166, 168 (2d Cir. 2004), or otherwise seriously affected the fairness, integrity, or public reputation of judicial proceedings, *Robinson*, 697 F. App'x at 734.

## POINT SIX

## HOBBS ACT ROBBERY IS A CRIME OF VIOLENCE

Finally, Thompson's argument that completed Hobbs Act robbery is not categorically a "crime of violence" for purposes of § 924(c) (TBr.34-38) has been foreclosed by this Court's decision in *United States v. Barrett*, 102 F.4th 60 (2d Cir. 2024), *petition for cert. filed*, No. 24-5774 (Oct. 15, 2024). After *Barrett*, Thompson's stated ability to imagine "two realistic hypothetical cases in which a Hobbs Act Robbery would not constitute a 'crime of violence'" (TBr.38) is immaterial: the Court cannot "disregard precedent that squarely rules on an issue simply because an earlier panel may not have considered additional arguments now proffered by a party." *Barrett*, 102 F.4th at 82. Thus, the Court's "settled understanding"—that completed Hobbs Act robbery is a qualifying crime under § 924(c)(3)(A)'s elements clause—defeats Thompson's argument here. *United States v. McCoy*, 58 F.4th 72, 74 (2d Cir. 2023).

## CONCLUSION

For the reasons stated above, judgments should be affirmed.

Dated:     Brooklyn, New York
           December 4, 2024

                              Respectfully submitted,

                              BREON PEACE,
                              *United States Attorney,*
                              *Eastern District of New York.*

                    By:  _____
                                    /s/
                         DANA REHNQUIST
                         Assistant U.S. Attorney

ANTHONY BAGNUOLA,
DANA REHNQUIST,
*Assistant United States Attorneys*,
     (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 13,743 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: Brooklyn, New York
December 4, 2024

/s/ ANTHONY BAGNUOLA
ANTHONY BAGNUOLA
Assistant U.S. Attorney

APPENDIX

## TABLE OF CONTENTS

Page

Trial Transcripts,
   *United States v. Hytmiah, et al.*, No. 18-CR-033 (NGG)

   March 17, 2022....................................................................GA1

   March 18, 2022................................................................GA129

   March 21, 2022................................................................GA156

   March 22, 2022................................................................GA160

   March 23, 2022................................................................GA200

   March 24, 2022................................................................GA229

   March 25, 2022................................................................GA232

Judgment as to Co-Defendant Kimberly Thompson,
   *United States v. Hytmiah, et al.*, No. 18-CR-033 (NGG)
   May 16, 2022..................................................................GA237


### Submitted Separately On Disc

Trial Exhibit,
   *United States v. Hytmiah, et al.*, No. 18-CR-033 (NGG)

   GX513..........................................................................GA244

1

<pre>
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF              :  18-CR-33(NGG)
AMERICA,                      :
                              :
                              :
                              :  United States Courthouse
                              :  Brooklyn, New York
     -against-                :
                              :
                              :
                              :  Thursday, March 17, 2022
                              :  9:00 A.M.
MATTHEW ELIAS, ALSO           :
KNOWN AS "HEDDIS", AND        :
LATIFF THOMPSON, ALSO         :
KNOWN AS "LA BANGA",          :
                              :
        Defendants.
- - - - - - - - - - - - - - - -X
</pre>

          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
        BEFORE THE HONORABLE JUDGE GARAUFIS
                  SENIOR JUDGE

               A P P E A R A N C E S :

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                      BY: JAMES MCDONALD, ESQ.
                          DANA RENHQUIST, ESQ.
                          Assistant United States Attorney

For the Defendant:    GARY S. VILLANUEVA, ATTORNEY AT LAW
                      Attorney for the Defendant -
                      MATTHEW ELIAS
                      11 Park Place
                      Suite 1601
                      New York, New York 10007
                      BY: GARY S. VILLANUEVA, ESQ.

Hytmiah - Direct - McDonald                          62

1    A    Heddis.

2    Q    And how would you spell Heddis?

3    A    I would spell it like H-E-D-D-I-S, something like that.

4    Q    H-E-D-D-I-S?

5    A    Yeah.

6    Q    All right.  Now, you identified the defendants because

7    you said that you committed a burglary or a robbery with

8    them.

9    A    Yeah.

10   Q    Do you remember if you committed a burglary or a

11   robbery with them?

12             THE COURT:  Can you identify --

13             You have to specify which individual we're talking

14   about here.

15             MR. MCDONALD:  Thank you, Your Honor.

16   Q    With respect to both defendants, did you ever

17   participate in a robbery or a burglary with both of these

18   defendants?

19   A    Yes.

20   Q    And how many times did you do that?

21   A    Once.

22   Q    Were there any other burglaries of robberies that you

23   remember participating in with just Defendant Thompson?

24   A    No.

25   Q    Okay.  And were there any other burglaries or robberies

Hytmiah - Direct - McDonald                    63

1   that you remember you participating in with just

2   Defendant Elias?

3   A    No.

4   Q    So the one event we're talking about, do you remember

5   when that was?

6   A    Not exactly.

7   Q    Do you remember what year it was?

8   A    2017.

9   Q    And you were arrested in December of 2017; is that

10  correct?

11  A    Yes.

12  Q    And do you remember approximately how many months or

13  weeks, or whatever it was, before your arrest it would have

14  been?

15  A    Just say around October or November.

16  Q    And do you remember what the crime was that you had

17  participated in with them?

18  A    Yeah.

19  Q    Could you describe what it was?

20  A    It was a home invasion.

21  Q    Do you remember where it was?

22  A    Yes.

23  Q    Where was it?

24  A    In Wood Hall.  That's in Jamaica, New York.

25  Q    In Wood Hall?

Hytmiah - Direct - McDonald                    64

1    A    Yeah.

2    Q    Do you remember the approximate streets or location or

3    something in that area that could help identify what part

4    you're talking about?

5    A    Yeah.  It's between 191 and 194 Jamaica Avenue.

6    Q    Okay.  And --

7         THE COURT:  Okay.  And when you say "191 to 194,"

8    is that street?

9         THE WITNESS:  Yes.

10        THE COURT:  Go ahead.

11        MR. MCDONALD:  Thank you, Your Honor.

12   Q    And could you describe what was at that location that

13   was part of the robbery, what the location was?

14   A    It was a stash house.

15   Q    All right.  And do you remember what the building

16   looked like?

17   A    Yes.

18   Q    Could you describe the building?

19   A    It was like a church.

20        (Continued on the next page.)

21

22

23

24

25

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                65

1  Q    Was the church located on 191 or 194, or on Jamaica
2  Avenue?
3  A    On Jamaica Avenue.
4  Q    Was it just the three of you who committed this
5  robbery?
6  A    No.
7  Q    Do you remember who else participated in this robbery?
8  A    Yes.
9  Q    Can you identify who those individuals were?
10 A    You mean, saying their names?
11 Q    Yes, please.
12 A    It was me, LaBanga.  Lazo.  Heddis.  GP.  Barrack.  And
13 Struck.
14 Q    We'll talk about each of those people.
15        Do you know someone named Sha Bang?
16 A    Yes.
17 Q    Did he have a --
18 A    Pardon me.  I forgot about Sha Bang.
19 Q    Did he have a role in this?
20 A    Just basically told me about the robbery.
21 Q    I would like to walk through some of the people you
22 just named.
23        Could I bring up for the witness Government
24 Exhibit 103, please?  Do you see Government Exhibit -- what
25 has been marked for purposes of identification as Government

Case: 23-6626, 12/04/2024, DktEntry: 76.1, Page 94 of 332

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH          66

1   103 in front of you?

2   A    Yes.

3   Q    Can you describe what you're looking at?

4   A    I'm looking at a picture of Sha Bang.

5   Q    Is that a fair and accurate representation of Sha Bang

6   as he appeared in 2017?

7   A    Yes.

8          MR. MCDONALD:  I offer Government Exhibit 103.

9          MR. VILLANUEVA:  No objection.

10         MR. COMMISSIONG:  No objection.

11         THE COURT:  Government Exhibit 103 is received in

12  evidence.  Published for the jury.

13         (Government's Exhibit 103 received in evidence.)

14         MR. MCDONALD:  Can I bring up for the witness

15  Government Exhibit 104?

16  Q    Do you see Government Exhibit 104 in front of you?

17  A    Yes.

18  Q    What do you recognize it to be?

19  A    It's a picture of Barrack.

20  Q    Is there a fair and accurate representation of Barrack

21  as he looked in 2017?

22  A    Yes.

23         MR. MCDONALD:  I offer Government Exhibit 104.

24         MR. VILLANUEVA:  No objection.

25         MR. COMMISSIONG:  No objection.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                    67

1          THE COURT:  Very well.  Exhibit 104 is published

2    to the jury.

3          (Government's Exhibit 104 received in evidence.)

4          MR. MCDONALD:  Show the witness what has been

5    marked for purposes of identification as Government

6    Exhibit 105.

7    Q    Mr. Hytmiah, do you recognize what is in front of you

8    as Government Exhibit 105?

9    A    Yes.

10   Q    What do you recognize it to be?

11   A    A picture of GP.

12   Q    Is this a fair and accurate picture of GP as he would

13   have appeared in 2017?

14   A    Yes.

15          MR. MCDONALD:  I offer Government Exhibit 105.

16          MR. VILLANUEVA:  No objection.

17          MR. COMMISSIONG:  No objection.

18          THE COURT:  Exhibit 105 received in evidence and

19   published for the jury.

20          (Government's Exhibit 105 received in evidence.)

21          MR. MCDONALD:  I bring up for the witness what has

22   been marked for purposes of identification as Government

23   Exhibit 106.

24   Q    Do you see Government Exhibit 106 in front of you, sir?

25   A    Yes.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                68

1   Q    Do you recognize it?

2   A    Yes.

3   Q    What do you recognize it to be?

4   A    It's Lazo.

5   Q    Is it a photograph?

6   A    Yes.

7   Q    Of Lazo?

8   A    Yes.

9   Q    Is this a fair and accurate picture of Lazo as he would

10  have appeared in 2017?

11  A    Yes.

12          MR. MCDONALD:  I offer Government Exhibit 106.

13          MR. VILLANUEVA:  No objection.

14          MR. COMMISSIONG:  No objection.

15          MR. MCDONALD:  And I bring up Government

16  Exhibit --

17          THE COURT:  Government Exhibit 106 received in

18  evidence and published for the jury.

19          (Government's Exhibit 106 received in evidence.)

20          MR. MCDONALD:  I apologize.  I bring up Government

21  Exhibit 108.

22  Q    Do you have Government Exhibit 108 in front of you?

23  A    Yes.

24          MR. MCDONALD:  Your Honor.

25          PROSPECTIVE JUROR:  Are we supposed to seeing

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH          69

1   pictures?

2          THE COURT:  You should be getting a picture coming

3   up.

4          MR. MCDONALD:  We have not asked to publish any of

5   the pictures, Judge.  I'm going to do that in a minute, your

6   Honor.  I'm just putting them in now so we don't keep taking

7   them up and down and then -- the photos right now are only

8   for the Court, the parties, and the witness.  As soon as

9   we've introduced them, we'll ask them to be exhibited.

10          THE COURT:  Well, let me just understand

11   something.  If I press the publish button, I expect everyone

12   will see it.

13          MR. MCDONALD:  They will all see it.  Yes, your

14   Honor.

15          THE COURT:  But I do press the publish button and

16   they're not seeing it.

17          PROSPECTIVE JUROR:  I see it.

18          THE COURT:  Are you receiving them?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  But they're not receiving them.  Who

21   isn't receiving the pictures?

22          All right.  We're going to have to correct that

23   because my procedure is that once an item is placed into

24   evidence, it's published.  So we're going to deal with that.

25   I don't know what you have done in terms of technology, but

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                70

1   that's the technology that's the Court has used for as long

2   as the Court has used technology.  So I just would like to

3   get clarified to see what you're going to do.

4           Do you have a place you're going to put them up?

5           MR. MCDONALD:  I'm going to put them right there.

6   (Indicating).

7           So I don't think we need to -- I certainly want

8   these jurors to have these exhibits up and able to view the

9   other exhibits, so I do think we should correct that.  But

10  for purposes of the next 10 or 15 exhibits, I can certainly

11  proceed with the photographs.  I'm going to put them up

12  there.

13          THE COURT:  Good.  And once they're admitted to

14  evidence, you can simply show them to the jury.  We'll go

15  old school on that.

16          MR. MCDONALD:  Thank you, your Honor.

17  Q   So just for --

18          THE COURT:  So we're on 108.

19  Q   Do you see Government Exhibit 108?

20  A   Yes.

21  Q   Do you recognize that as a photograph?

22  A   Yes.

23  Q   Who is that a photograph of?

24  A   Struck.

25  Q   Is that a fair and accurate portrayal of struck as he

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                71

1    would have appeared in 2017?

2    A    Yes.

3              MR. MCDONALD:  I offer Government Exhibit 108.

4              MR. VILLANUEVA:  No objection.

5              MR. COMMISSIONG:  No objection.

6              THE COURT:  Exhibit 108 is received in evidence

7    without objection.  Go ahead.

8              (Government's Exhibit 108 received in evidence.)

9    Q    I'm going to put up Government Exhibit 103 on the

10   board.  Who is this?

11   A    Sha Bang.

12   Q    And Government Exhibit 104.

13   A    That's Barrack.

14   Q    And Government Exhibit 105?

15   A    That's GP.

16   Q    And Government Exhibit 106.

17   A    That's Lazo.

18   Q    And Government Exhibit 108?

19   A    That's Struck.

20   Q    You said Struck; is that accurate?

21   A    Yes.

22   Q    I'm going to put up a photograph or a word of Struck.

23   Lazzo, L-A-Z-Z-O, is that accurate spelling?

24   A    Yes.

25   Q    Would you mind standing up, sir?  Would you come

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                72

1   around?  And could you show me which one is Lazo?

2   A    (Indicating).

3   Q    GP; is that correct?

4   A    Yes.

5   Q    Can you show me which one is GP?

6   A    (Indicating).

7   Q    Barrack; is that correct?

8   A    Yes.

9   Q    Can you show me which one is Barrack?

10  A    (Indicating).

11  Q    Sha Bang; is that correct?

12  A    Yes.

13  Q    These are correct spellings, correct?

14  A    Yes.

15  Q    Is that Sha Bang?

16  A    Yes.

17  Q    You can have a seat, sir.  Thank you.

18            So in addition to the defendants, these are

19  the other people you've identified as participating in this

20  robbery; is that correct?

21  A    Yes.

22  Q    I want to ask first about Barrack.

23            Do you know Barrack's real name or government

24  name?

25  A    No.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                73

1  Q    Do you remember when you met Barrack?

2  A    In 2017.

3  Q    And what was your relationship with Barrack?

4  A    I just only chilled with him when I went to do a

5  robbery.

6  Q    Can you pull the microphone a little closer?  I'm still

7  having trouble hearing, I'm sorry.

8  A    I only chilled with him when I went to do a robbery.

9  Q    When you say chill with him, what does that mean?

10 A    Hanging out.

11 Q    And you said you committed robberies with him?

12 A    Yes.

13 Q    In addition to this robbery?

14 A    Yes.

15 Q    GP.  Can you describe, if you remember, when you met

16 GP?

17 A    I probably met him around 2017.

18 Q    What was your relationship, if any, with GP?

19 A    Mutual friends.

20 Q    Who was your mutual friends?

21 A    Sha Bang.

22 Q    And would you also hang with him or chill with him?

23 A    No.

24 Q    Do you know what GP stands for?

25 A    Yes.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                74

1  Q    What is it?

2  A    Gun play.

3  Q    Do you know why he has that name?

4  A    Because he carried guns.

5         MR. VILLANUEVA:  Objection.  Objection.

6         THE COURT:  Overruled.

7  Q    Do you know why he has the name gun play?

8  A    Probably because he carried guns.

9         THE COURT:  Is that a question or an answer?

10        THE DEFENDANT:  It's an answer.

11 Q    And you said you had met him through Sha Bang; is that

12 right?

13 A    Yes.

14 Q    Do you know where GP lived in 2017?

15 A    Not exactly, no.

16 Q    Lazo.  Do you remember when you met Lazo?

17 A    2017.

18 Q    Do you know what was your relationship with him like?

19 A    Mutual friends.

20 Q    Who was your mutual friend?

21 A    Sha Bang.

22 Q    Do you know where Lazo was living at the time in 2017?

23 A    No.

24 Q    Did you commit other robberies with Lazo?

25 A    No.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                75

1  Q    I meant to ask.  Did you know GP's real name or

2  government name?

3  A    Yes.

4  Q    What's that?

5  A    Tyquan Henderson.

6  Q    What about Lazo?  Did you know his real name or

7  government name?

8  A    Yes.

9  Q    What was that?

10  A    Lawrence Woods.

11  Q    And Struck.  Do you remember when you met Struck?

12  A    Yes.

13  Q    When was that?

14  A    2009.

15  Q    Can you describe -- it sounds like you've known him for

16  longer what your relationship with Struck was?

17  A    I used to just chill with him when I go to parties.

18  Hang out.

19  Q    Do you know his real name?

20  A    Yes.

21  Q    What's that?

22  A    Dion Atkinson.

23  Q    Would you see Struck more often than these other

24  people?

25  A    Yes.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH          76

1  Q    Did you commit other robberies or burglaries with

2  Struck?

3  A    No.

4  Q    What was your relationship with Struck like in 2017?

5  A    Meaning?

6  Q    What would you guys do when you would see each other

7  and go to parties?  What was involved in that?

8  A    We would just go to clubs and stuff.

9  Q    I want to ask about the person you know as La Banger;

10  is that correct?

11  A    Yes.

12  Q    And do you know LaBanga real name?

13  A    Yes.

14  Q    What is it?

15  A    Latiff Thompson.

16  Q    Do you remember when you met Latiff Thompson?

17  A    2017.

18  Q    And how did you know Latiff Thompson?

19  A    Mutual friends.

20  Q    And who was your mutual friends?

21  A    Sha Bang.

22  Q    Do you remember how you met Latiff Thompson through Sha

23  Bang?

24  A    Just going to pick up Sha Bang and he would be around.

25  Q    So when you were going to pick up Sha Bang and Latiff

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH      84

1  A    Yes.

2  Q    Who was that?

3  A    My aunts and my nephews.

4  Q    Did you stay at any other houses at that time?

5  A    As far as me living or going to other people's houses?

6  Like, spending the night?

7  Q    Spending the night.

8  A    Yes.  I spent the night at other houses.

9  Q    What other houses did you spend the night at?

10  A    My aunt's house.

11  Q    Sorry, say that again just a little louder.

12  A    My aunt's house.

13  Q    Your aunts house?

14  A    Yes.

15  Q    And where was that?

16  A    184-23 Galway.

17  Q    184-23 Galway?

18  A    Yes.

19  Q    What part of New York City is that in?

20  A    I think that's Saint Albans.  I think.

21  Q    In Queens?

22  A    Yes.

23  Q    Did you stay anywhere else?

24  A    Probably go to my baby mother's house.

25  Q    Did you use any of these locations that you've

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                85

1   mentioned; either your baby mother's house or 184-23 Galway

2   or the Bedell Street for your robberies?

3   A    Yes.

4   Q    Which location, if any, did you use?

5   A    184-23 Galway.

6   Q    How would you use that location in connection with

7   robberies or burglaries?

8   A    Basically if -- basically when I'm robbing somebody at

9   the house that I'm robbing, if it's over there by Galway,

10  I'll go to the house by Galway because that's the nearest

11  house to go to.  Instead of me taking the equipment and

12  driving it across town, and getting pulled over.

13  Q    So at that house, was there any -- you mentioned the

14  word equipment, was there any equipment at the house that

15  you used for robberies?

16  A    Yes.

17  Q    What was there?

18  A    When you say equipment, what do you mean by that?

19  Q    Well, you used the word equipment.  What do you mean by

20  equipment?

21  A    When I said equipment, I mean like the stuff that I

22  took out somebody house that I bring to my aunts house.

23  Q    So when you say equipment, you mean the things that you

24  take out of someone's house after you rob it?

25  A    Yes.

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH          86

1   Q    Did you have any tools for robberies or anything that

2   you had that you kept at 184-23 Galway?

3   A    Yes.

4   Q    What was that?

5   A    A radio.  A flathead screwdriver.

6   Q    We'll start with the radio.

7            What would you use a radio for?

8   A    I use a radio to get the frequency off police stations,

9   whatever neighborhood I'm in, to let me know if a call come

10  through or a silent alarm went off for a house.  Stuff like

11  that.

12  Q    Was this a regular radio or a special type of radio?

13  A    I mean, it was a regular radio, but it did special

14  things.  Because a radio is not supposed to have police

15  stations.

16  Q    How did you get the radio to have police stations on

17  it?

18  A    I don't remember.

19  Q    When you say police stations, what are you referring

20  to?

21  A    All right.  If I'm doing a crime that's on the North

22  Side versus like 184-23 Galway in that area from zip code,

23  that will be the 103rd Precinct.  If I go to South Side,

24  Jamaica Queen, that would be like the 113th Precinct.  If

25  I'm like going across, like, going towards Rosedale, that

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH               87

1  would be the 105th Precinct.  They have all those kinds of

2  frequencies.

3  Q    When would you use the radio, what would you listen for

4  if you were committing a robbery or burglary?

5  A    I would listen for a dispatch saying that somebody is

6  in the house, the alarm is going off, or police is on the

7  way.

8  Q    And what would happen if you heard that one of those

9  things you just indicated?

10 A    I would get up out of there.

11 Q    You also mentioned I think a screwdriver; is that

12 right?

13 A    Yes.

14 Q    What was the screwdriver for?

15 A    To open the door.

16 Q    And where in the house at Galway was the -- these items

17 kept?  The radio and the screwdriver?  Like where,

18 physically, in the house were they?

19 A    It would be in the basement.

20 Q    What else was in the basement; if anything?

21 A    That's it.

22 Q    Were there other people living at 184-23 Galway around

23 the time of this robbery?

24 A    Yes.

25 Q    Who was living there?

DIRECT. MR. MCDONALD. SHAMIEK HYTMIAH                90

1   A    Yes.

2   Q    What names; if any?

3   A    Sha-Balla.  Woody.

4   Q    We'll start with Sha-Balla.  How did you get the name

5   Sha-Balla?

6   A    Because my first name is Shameik, so they would say

7   Sha.  And I'm affiliated with a gang, it's Mac Ballas.  So

8   we took the baller of there and put together Sha-Balla.

9   Q    And what about the name Woody?

10  A    It's just a family name.

11  Q    Which name; Sha-Balla or Woody, did you get first?

12  A    Woody first.

13  Q    And who calls you woody?

14  A    Everybody that's close to me.  That know me well.

15  Q    Did you have any other names?

16  A    Pinky.

17  Q    How did you get that name?

18  A    I actually gave myself that name.  When I be on the

19  phone talking and I was tired of saying my name or I felt my

20  phone was tapped, somebody else's phone was tapped.  So I

21  call myself Pinky.

22  Q    So hide your real name?

23  A    Yes.

24  Q    You mentioned Sha-Balla was because you were part of a

25  gang, the Mac Ballas, correct?

GA022

Hytmiah - direct - McDonald                              100

1    (Continuing)

2    BY MR. McDONALD:

3    Q    You used the term stash house, what's a stash house?

4    A    Stash house is people that when drug dealers stack their

5    money at or stuff that they have that they got that they

6    hiding.

7    Q    And why would you expect there to be guns at a stash

8    house?

9    A    Because you want to protect, protect your benefits, what

10   you stacking up.

11   Q    When you were robbing stash houses, what were you hoping

12   to take from the stash houses?

13   A    Drugs and money.

14   Q    And what would you do with the drugs that you would take

15   from stash houses?

16   A    I would sell it.

17   Q    Who would you sell it to?

18   A    People in the streets or give it away.

19   Q    You talked about people had guns at robberies.

20        Would there be other tools that you would bring to

21   robberies for home invasions?

22   A    Well, if this was a home invasion, we're bringing guns.

23   Q    Did you ever bring zip ties?

24   A    Yes.

25   Q    What were zip ties for?

VB          OCR          CRR

Hytmiah - direct - McDonald                                101

1    A    To contain the person that's in the house.

2    Q    When you're robbing -- are there differences in what you

3    plan for when you rob a stash house versus robbing a

4    residential house?

5    A    Yes.

6    Q    Could you describe what the differences are and how it

7    would affect your plans?

8    A    I mean, basically, if I'm robbing a stash house, it's by

9    any means necessary, meaning as far as if it goes down, it

10   goes down, because they either -- they going to take my life

11   or take your life is what it comes down to it when I'm robbing

12   stash houses.

13             As far as a burglary, I'm not trying to hurt no one,

14   just trying to go in there and take what I got and get out of

15   there.

16   Q    Were there reasons to try to rob stash houses?  Like what

17   were the -- were there benefits to robbing a stash house over

18   a residential house?

19   A    Yes, robbing stash houses, there's a large amount of

20   drugs and money that's in the house.

21   Q    Would you expect the people at a stash house to call the

22   police?

23   A    No.

24   Q    Why not?

25   A    Because they got stuff they not supposed to have.

GA024

Hytmiah - direct - McDonald                                112

1   Q    Did you plead guilty?

2   A    Yes.

3   Q    What crimes did you plead guilty to?

4   A    I pleaded guilty to racketeering, gun trafficking, bank

5   fraud, identity theft, Hobbs Acts, discharging and robberies.

6   Q    I just want to talk about each of the things you pled

7   guilty to.

8         You said you pled guilty to Hobbs Acts.  Are those

9   the robberies that you've been describing so far in your

10  testimony?

11  A    Yes.

12  Q    You said discharge.

13        Did you plead guilty to guns being fired as part of

14  these robberies?

15  A    Yes.

16  Q    You said racketeering.

17        What is racketeering, to you?

18  A    Racketeering to me is when you -- either you with a gang

19  or numerous people committing a crime, organized crime.

20  Q    And you pled guilty to racketeering?

21  A    Yes.

22  Q    And what crimes were you committing as part of the gang?

23  A    Excuse me?

24  Q    What crimes were you committing as part of the gang?

25  A    What do you mean by that?

VB          OCR          CRR

Hytmiah - direct - McDonald                    113

1   Q    Well, you said to you racketeering meant you were part of

2   a gang committing crimes.  That, I think, is what I heard.

3        So I am asking what were the crimes you were

4   committing.

5   A    All the ones I copped out to.

6   Q    The robberies?

7   A    Yes.

8   Q    You were doing those with other gang members; is that

9   correct?

10  A    Yes.

11  Q    And that was Mac Baller gang members; is that correct?

12  A    It's a whole bunch of different gangs, yes.

13  Q    You said firearms trafficking.

14       What was the firearms trafficking?

15  A    What you mean?

16  Q    What crime -- what did you do to commit firearms

17  trafficking?

18  A    I basically sold a gun, committed a crime.

19  Q    Did you make money from selling guns?

20  A    Yes.

21  Q    You also mentioned the fraud crimes, those are the same

22  types of fraud you were discussing earlier?

23  A    Yes.

24  Q    As part of your guilty plea, did you agree to cooperate

25  with the Government?

Hytmiah - Direct - McDonald                    128

1    A    Yes.

2            MR. MCDONALD:  Can I show the witness

3    Government's Exhibit 100, please.

4    Q    Can you see Government's Exhibit 100 in front of you,

5    sir?

6            THE COURT:  I don't see it on my screen.

7            MR. MCDONALD:  My apologies.

8            (Pause in proceedings.)

9            MR. MCDONALD:  Do it the old-fashioned way for

10   now.

11           May I approach the witness?

12           THE COURT:  Yes.

13   BY MR. MCDONALD:

14   Q    I'm going to hand you, Mr. Hytmiah, what have been

15   marked for purposes of identification as

16   Government Exhibits 100, 101, and 102.

17           THE COURT:  All right.  100 is up on the screen.

18           All right.  Exhibit 100.

19   Q    Do you see Exhibit 100 in front of you, sir?

20   A    Yes.

21   Q    Do you recognize it?

22   A    Yes.

23   Q    What do you recognize it to be?

24   A    Heddis.

25   Q    Is it a photograph of Heddis?

Hytmiah - Direct - McDonald                    129

1  A    Yes.

2        MR. MCDONALD:  Offer Government Exhibit 100.

3        THE COURT:  No objection?

4        MR. VILLANUEVA:  No objection.

5        MR. COMMISSIONG:  No objection.

6        THE COURT:  All right.  Exhibit 100 is received in

7  evidence and published to the jury.

8        (Government's Exhibit Number 100 received in

9  evidence.)

10       (Exhibit published to the jury.)

11 Q    May I ask you to look at Government Exhibit 101?

12 A    (Complies.)

13 Q    Do you recognize Government Exhibit 101?

14 A    Yes.

15 Q    What do you recognize it to be?

16 A    A picture.

17 Q    A picture of who?

18 A    LaBanga.

19 Q    Is that a fair and accurate picture of LaBanga as he

20 appeared in 2017?

21 A    Yes.

22       MR. MCDONALD:  Your Honor, offer

23 Government Exhibit 101.

24       THE COURT:  Any objection?

25       MR. COMMISSIONG:  No, Your Honor.

Hytmiah - Direct - McDonald                    130

1          MR. VILLANUEVA:  No objection.

2          THE COURT:  Exhibit 101 is received in evidence

3    and published to the jury.

4          (Government's Exhibit Number 101 received in

5    evidence.)

6          (Exhibit published to the jury.)

7    Q    Do you have Government Exhibit 102 in front of you?

8    A    Yes.

9    Q    Do you recognize it?

10   A    Yes.

11   Q    What do you recognize it to be?

12   A    A picture of me.

13   Q    Is that a fair and accurate picture of how you looked

14   in 2017?

15   A    Yes.

16         MR. MCDONALD:  The Government offers

17   Government Exhibit 102.

18         THE COURT:  Any objection?

19         MR. COMMISSIONG:  No objection.

20         MR. VILLANUEVA:  No, Your Honor.

21         THE COURT:  All right.  Government Exhibit 102 is

22   received in evidence.

23         (Government's Exhibit Number 102 received in

24   evidence.)

25         MR. MCDONALD:  For the record, I'll take the three

Hytmiah - Direct - McDonald                131

1  photographs back from you, Mr. Hytmiah, and I'm going to

2  place them here on this board.

3  Q    Mr. Hytmiah, can I have you stand up again and come

4  around to this board?

5  A    (Complies.)

6  Q    Thank you.

7         You testified earlier that the people we see on

8  this board played some role in the robbery; is that

9  accurate?

10 A    Yes.

11 Q    And that would be, for the record, GP, Lazo, Sha Bang,

12 Struck, and Barrack, correct?

13 A    Yes.

14 Q    Were there people for this robbery that Sha Bang had

15 put together or assembled for you?

16 A    Yes.

17 Q    And who were those people?

18 A    LaBanga.

19 Q    Who did LaBanga bring with him when you met him on the

20 day of the robbery?

21 A    He brought GP, Lazo, and Heddis.

22 Q    And you participated in this as well, right?

23 A    Yes.

24 Q    All right.  Does this board right now accurately

25 reflect the participants in the robbery that you testified

Hytmiah - Direct - McDonald                    132

1  about so far?

2  A    Yes.

3          MR. MCDONALD:  And that includes photographs of

4  Government Exhibits 100, 101, 102, 104, 105, 106, 103, and

5  108 for the record.

6          You can have a seat, sir.

7          THE COURT:  Is that a question?

8          MR. MCDONALD:  That was -- that was me stating for

9  the record what's on the board; and if there's any objection

10 to what's on the board, I'll --

11         THE COURT:  All right.

12         MR. MCDONALD:  -- reference that.

13         THE COURT:  Well, I didn't hear an objection on

14 that.  I just wanted to know if there was a question in

15 that.

16         MR. MCDONALD:  I just wanted to make a record of

17 what's on the board since that won't show up in the

18 transcript.

19         THE COURT:  All right.  Thank you.

20 BY MR. MCDONALD:

21 Q    The robbery that you were describing that you

22 participated in with the defendants, that was of a stash

23 house, correct?

24 A    Yes.

25 Q    And you described earlier that the location was

Hytmiah - Direct - McDonald                    133

1    approximately between 191 and 194 Street on Jamaica Avenue,

2    correct?

3    A    Yes.

4    Q    Could you describe what the physical location looked

5    like; the actual place of the robbery, what the building

6    looked like?

7    A    It was a home -- like a church --

8    Q    Could I show --

9    A    -- that had --

10   Q    I'm sorry.  I didn't mean to cut you off.

11   A    It was a church with a residence up on top of the

12   church.

13   Q    And what was on the top of the church?

14   A    A stash house.

15            MR. MCDONALD:  Can I show the witness Government

16   Exhibit 221, please.

17   Q    Do you see Government Exhibit 201 in front of you?

18   A    Yes.

19   Q    Do you recognize it?

20   A    Yes.

21   Q    What do you recognize it to be?

22   A    The stash house.

23   Q    Is it a photograph?

24   A    Yes.

25   Q    And it's a photograph of the stash house, if I'm

Hytmiah - Direct - McDonald                    134

1  understanding you correctly?

2  A    Yes.

3           MR. MCDONALD:  Can I show the witness

4  Government Exhibit 202, please.

5  Q    Do you recognize Government Exhibit 202?

6  A    Yes.

7  Q    Can you describe what it is?

8  A    It's the front of the stash house.

9  Q    It's a photograph of the stash house?

10 A    Yeah.

11 Q    It's a different photograph than 201?

12 A    It's the same picture.  It just shows more of the

13 house.

14          MR. MCDONALD:  And can I show the witness

15 Government Exhibit 203, please.

16 Q    Do you recognize Government's Exhibit 203?

17 A    Yes.

18 Q    What is it?

19 A    The front door of the house.

20 Q    It's a photograph of the front door of the stash house;

21 is that correct?

22 A    Yes.

23 Q    Do all of these photographs fairly and accurately

24 represent or depict the stash house, as you remember it in

25 2017, the building where the stash house was?

Hytmiah - Direct - McDonald                    135

1  A    Yes.

2        MR. MCDONALD:  I offer Government Exhibits 201,

3  202, and 203.

4        MR. COMMISSIONG:  No objection.

5        MR. VILLANUEVA:  No objection.

6        THE COURT:  All right.  Exhibits 201, 202, and 203

7  are received in evidence.

8        (Government's Exhibit Numbers 201, 202, and 203

9  received in evidence.)

10       MR. MCDONALD:  Could we publish Government

11 Exhibit 201, please.

12       (Exhibit published to the jury.)

13 Q   Mr. Hytmiah, I believe if you touch the screen in front

14 of you, it will make a mark.  You described this as a

15 photograph of the stash house.

16       Could you identify which building in this

17 photograph you're talking about?

18       THE COURT:  Just circle it with your finger.  See

19 if it works.

20       THE WITNESS:  (Complies.)

21       THE COURT:  Okay.  Thank you.

22 Q   And for the record, you have circled the building in

23 the middle with two -- of the photograph with two windows

24 and a small upper window as well; is that correct, sir?

25 A    Yes.

Hytmiah - Direct - McDonald                    136

1          THE COURT:  To be more precise, the witness
2     circled the second floor.
3          MR. MCDONALD:  And that was my next question, Your
4     Honor, yes.
5     Q    And you've circled the second floor of that building,
6     correct, sir?
7     A    Yes.
8     Q    The church you have been describing, do you see that
9     church in this photograph?
10    A    Yes.
11    Q    And could you just point out what you mean when you've
12    been talking about a church?
13    A    The symbol that's in front of the house there.
14    Q    The sign?
15    A    Yes.
16         MR. MCDONALD:  Could we go Government Exhibit 202,
17    please, and take down the marks on the screen, please.
18         Mr. Reccoppa, could we clear the screen?  It's in
19    the top right corner, I think.
20         (Pause in proceedings.)
21         MR. MCDONALD:  Thank you.
22         THE COURT:  It's done.
23    Q    Now, just looking at Government Exhibit 202, do you the
24    second floor that you had circled in the prior photograph
25    here, correct, sir?

Hytmiah - Direct - McDonald                    137

1    A    Yes.

2    Q    Okay.  Would you agree with me that we're looking at

3    the front of the building here?

4    A    Yes.

5    Q    Was the location that you're describing as the stash

6    house, was it in the front of the building or another part

7    of the building?

8    A    It was all -- inside the building on the top.

9    Q    On the top?

10   A    Yeah.

11   Q    And do you know which part of the building?  Was it the

12   part of the building we're looking at or another part of the

13   building?

14   A    Well, I can't tell from outside looking in, but, like,

15   it's on the top of the church, the windows there.

16   Q    Could you describe what the area around this building

17   is like?

18   A    What do you mean by that?

19   Q    Well, what -- what the -- well, I'll start with this:

20   This is on Jamaica Avenue, correct?

21   A    Yes.

22   Q    And is this a view from Jamaica Avenue, as you remember

23   it?

24   A    Yes.

25   Q    Okay.  What are the other types of buildings in the

Hytmiah - Direct - McDonald                    138

1    area, if you remember?

2    A    Other houses.

3    Q    Did you -- are you familiar with this area, this

4    neighborhood where this building is?

5    A    Yes.

6    Q    Okay.  Where are the other houses in this area relative

7    to where this location is?

8    A    To the left, to the right, and inside the block at the

9    right.

10   Q    Would they be behind this building?

11   A    Yes.

12   Q    What time of day did the robbery take place?

13   A    At nighttime.

14        MR. MCDONALD:  You can take down this photograph.

15        Thank you.

16   Q    Now, at the time of the robbery, did you have LaBanga

17   or the defendant Latiff Thompson's phone number?

18   A    Yes.

19   Q    Were you in contact with him using phones?

20   A    Yes.

21   Q    Do you remember his phone -- do you remember your phone

22   number at the time?

23   A    Oh, right now, no; but back then, yes.

24   Q    If I showed you your phone subscriber information from

25   the time, would that assist you in remembering your phone

Hytmiah - Direct - McDonald                    139

1    number?

2    A    Yes.

3          MR. MCDONALD:  Can I show the witness phone ring,

4    the first page of Government Exhibit 401?

5    Q    Without saying anything, just looking at this, do you

6    see information here that helps you recall your phone number

7    at that time?

8    A    Yes.

9    Q    Okay.  What was your phone number at the time?

10   A    (347) 592-0372.

11   Q    (347) 592-0372, correct?

12   A    Yes.

13         MR. MCDONALD:  Okay.  You can take that down,

14   please.

15         THE COURT:  What exhibit was that?

16         MR. MCDONALD:  401, Your Honor.

17         THE COURT:  Thank you.

18         Go ahead.

19   Q    At the time, you testified earlier, that you were

20   arrested by NYPD and then went out to Port Washington, you

21   had a phone taken from you; is that correct?

22   A    Yes.

23   Q    In your phone, did you have some of the phone numbers

24   of some of the people that you had participated in this

25   robbery with?

Hytmiah - Direct - McDonald                    140

1    A    Yes.

2    Q    Do you remember those phone numbers right now?

3    A    No.

4    Q    Do you remember if you had Barrack's number in your

5    phone?

6    A    Yes.

7    Q    Do you remember if you had LaBanga's number in your

8    phone?

9    A    Yes.

10   Q    Do you remember if you had Sha Bang's number?

11   A    Yes.

12        MR. MCDONALD:  May I approach, Your Honor?

13        THE COURT:  Yes.

14   Q    If I showed you your phone, would looking at the

15   contacts in your telephone help you recall those phone

16   numbers?

17   A    I only know by the name.

18   Q    In the contact list; is that correct?

19   A    Yes.

20   Q    Can I ask you to look at the contact list and see if

21   that refreshes your memory of the phone numbers of any of

22   the people you've mentioned?

23   A    (Complies.)

24   Q    Why don't we start with Barrack?  Without reading

25   anything, do you recall Barrack's phone number?

Hytmiah - Direct - McDonald                    141

1   A    Yes.

2   Q    Could you provide that?

3   A    You want me to say the number?

4   Q    Well, is the number that was in your -- "do you

5   remember" is the question?

6   A    I remember the contact when I wrote the name, Barrack.

7   Q    Okay.  Do you remember -- does looking at the contact

8   remind you or refresh you of what the number was?

9   A    No.

10  Q    Okay.

11  A    I don't remember nobody's number besides mine.

12  Q    Is that your telephone?

13  A    Yeah.

14  Q    Okay.  Did you use that phone to communicate --

15  A    Yes.

16  Q    -- with other people?

17       Did you ever have any difficulty communicating

18  with Barrack using the phone number that you had saved in

19  your telephone?

20  A    Excuse me?

21  Q    Did you ever have any difficulty communicating with

22  Barrack using the phone number that you had saved in your

23  telephone?

24  A    No.

25  Q    Can I ask you to read the number that you had saved for

Hytmiah - Direct - McDonald                    142

1   Barrack?

2   A    (347) 987-2351.

3   Q    Do you have a contact for LaBanga in your phone?

4   A    Yes.

5   Q    Does looking at the contact there refresh your memory

6   as to what his phone number was?

7   A    No.

8   Q    Did you communicate using that phone with LaBanga?

9   A    Yes.

10  Q    Did you ever have any difficulty communicating with

11  LaBanga at the phone number that you had recorded in your

12  phone?

13  A    No.

14  Q    Can I ask you, then, to read the phone number that you

15  had for LaBanga at the time?

16  A    (718) 200-3767.

17  Q    (718) 200-3767?

18  A    Yeah.

19  Q    Did you have a contact for Sha Bang?

20  A    Yes.

21  Q    Does looking at the contact for Sha Bang remind you of

22  his phone number?

23  A    No.

24  Q    Same question:  Did you use your phone at the time to

25  communicate with Sha Bang?

Hytmiah - Direct - McDonald                143

1   A    Yes.

2   Q    Did you ever have any, to your memory, difficulty

3   contacting Sha Bang using the number that you had recorded

4   in your phone at the time?

5   A    No.

6   Q    Can I ask you to look at the contact you had for

7   Sha Bang and provide the number?

8   A    (917) 634-0165.

9   Q    Now, the phone number for Sha Bang, was it saved under

10  the name "Sha Bang"?

11  A    No.

12  Q    What was that number saved under?

13  A    Blueface -- Blueface Gang.

14          MR. MCDONALD:  May I approach, Your Honor?

15          THE COURT:  (No response.)

16          MR. MCDONALD:  Your Honor, may I approach?

17          THE COURT:  Yes.

18          MR. MCDONALD:  I'm retrieving your phone from you.

19  Q    You said Blueface "bang"?

20  A    Blueface Gang.

21  Q    And what does that mean; what does Blueface Gang mean?

22  A    Because we used to call ourselves Blueface.

23  Q    And what is "Blueface"?

24  A    That's basically having a -- you got a hundred-dollar

25  bill, the new hundreds -- before the new hundreds, when the

Hytmiah - Direct - McDonald                    144

1   new hundreds came out.

2   Q    So could you explain that, what that means?

3   A    Basically we just calling ourself Blueface.

4   Q    And what does the "Blueface" refer to?

5   A    To the hundred dollars -- the hundred-dollar bill.

6   Q    From -- from the print on the hundred-dollar bill, it

7   was the --

8   A    The color.

9   Q    -- blue part of the bill?

10  A    The color.

11  Q    The color.

12       Who was --

13       THE COURT:  Wait.  I'm sorry.  The hundred-dollar

14  bill had something blue on it?

15       THE WITNESS:  Yes.  The new hundreds is blue.

16       THE COURT:  What is blue?

17       THE WITNESS:  The whole -- the paper around the

18  bill, the paper is blue.

19       THE COURT:  All right.  Go ahead.

20  Q    And I'm just going to keep reminding you to speak up

21  because it is hard to hear you this far away.

22       Who was in Blueface?  What is Blue Face?

23  A    It was -- it's basically just call ourself Blue Face.

24  It was me, Dez, and Sha Bang.

25  Q    And who is Dez?

Hytmiah - Direct - McDonald                145

1    A    It's one of my other co-defendants.

2    Q    Do you know his real name?

3    A    Yes.

4    Q    What is it?

5    A    Desmond Murchison.

6    Q    Now, the robbery at the location that we saw earlier in

7    Government Exhibits 200, 201, 202 at the church, was it your

8    idea to plan this robbery?

9    A    It was my idea to get my peoples and with Sha Bang to

10   get his peoples.

11   Q    How did you first learn about a possible robbery at

12   that location?

13   A    Sha Bang pick'en me on to it.

14   Q    Could you explain that just a little louder?  Again,

15   try to -- try to -- I know it's hard.  Try to angle your

16   head down a little bit so you're speaking into the

17   microphone.

18   A    Basically Sha Bang put me on to the lick.  A "lick"

19   means a robbery.  And I told him I could have somebody.  Can

20   he get other people?  And then that's how we all got

21   acquainted, the robbery.

22   Q    How far before the robbery did Sha Bang put you on

23   to it?  How far in advance, timewise?

24   A    Everything was basically in one day.

25   Q    And do you remember how it was you spoke with Sha Bang,

Hytmiah - Direct - McDonald                    146

1  following in person, when you learned about the potential

2  robbery?

3  A    I spoke to him on the phone.

4  Q    Do you remember what, if anything, he told you?

5  A    Yes.  He basically told me that there was a stash house

6  on top of the church, and there was 400,000 in there and a

7  lot of marijuana.

8  Q    We talked about the stash house, we talked about the

9  church.  You said 400,000.  What is 400,000?  What do you

10 mean by that?

11 A    Money.  Cash.

12 Q    Would that be $400,000?

13 A    Yes.

14 Q    And you said marijuana?

15 A    Yes.

16 Q    What do you recall, if anything, that he said about the

17 marijuana?

18 A    Basically he just said there would be -- there would be

19 a lot of pounds of marijuana inside the stash house.

20 Q    Did you discuss with him any other details about how

21 this robbery would occur when you first spoke with him?

22 A    No.  He just basically told me that someone put him on

23 to a lick, and he asked me, do I have somebody who could do

24 it, and I said yeah.

25 Q    What does putting on mean?  What -- when he says,

Hytmiah - Direct - McDonald                147

1    Somebody put him on to it, what does that mean?

2    A    Somebody gave him intel for the robbery.

3    Q    And do you know who that person was?

4    A    Yes.

5    Q    Who was that?

6    A    YB.

7    Q    And who is "YB"?

8    A    A mutual friend.

9    Q    You said "YB"?

10   A    Yeah.

11   Q    Who is that person?

12   A    A mutual friend.

13   Q    A mutual friend of you and Sha Bang's?

14   A    Yes.

15   Q    And did you speak with YB about this?

16   A    I don't remember.

17   Q    But you spoke with Sha Bang, and you knew he had spoken

18   with YB; is that correct?

19   A    Yes.

20   Q    I think you testified before that Sha Bang had some

21   people and you had some people; is that correct?

22   A    Yes.

23   Q    During your call with Sha Bang, did you discuss who his

24   people were or who your people were?

25   A    He basically just told me to call LaBanga, and so I

Hytmiah - Direct - McDonald                148

1   didn't know who LaBanga was bringing and Sha Bang didn't

2   know who I had.

3   Q    He provided you the name LaBanga?

4   A    Yes.

5   Q    And you knew who that was at that time?

6   A    Yes.

7   Q    And so after your call, what did you do next, as you

8   remember it?

9   A    Well, if I'm not mistaken, I -- I believe I called

10  LaBanga.

11  Q    And LaBanga being the defendant here, correct?

12  A    Yes.

13  Q    And do you remember your discussion with him?

14  A    I basically told him there was a lick involved, which a

15  lick means robbery.

16  Q    Do you remember how you spoke with him; in person,

17  telephone?

18  A    I spoke to him on the phone and then in person.

19  Q    All right.  And did you do in person first of telephone

20  first?

21  A    Telephone.

22  Q    And when you spoke with him, what do you -- just walk

23  us through what you remember about your conversation.

24  A    I basically told him that -- we was about to rob a

25  stash house, that it had 400,000 in it and a lot of

Hytmiah - Direct - McDonald                    149

1  marijuana, and it was -- and it was -- it was inside a

2  church.

3  Q    What, if anything, do you remember the defendant Latiff

4  Thompson saying?

5  A    It wasn't much.  He just said, all right.

6  Q    All right.  Do you remember any questions that were

7  asked, any additional discussion about the location at that

8  point?

9  A    I basically told him everything, and he just came with

10 his peoples.

11 Q    Okay.  You talked about a lick, which is a robbery, you

12 said?

13 A    Yes.

14 Q    Are you familiar with the term a "stain"?

15 A    Yes.

16 Q    What's a stain?

17 A    It's the same thing as the robbery.  It's just a

18 different name for a robbery.

19 Q    Do you know what the term "plate" is?

20 A    Yes.

21 Q    What's a plate?

22 A    A plate is a pound of marijuana.

23 Q    When you were discussing this robbery, did you use the

24 term "plates" or "pounds"?

25 A    I probably just said both.

                    Hytmiah - Direct - McDonald                150

1   Q    Do you know what a dub is?

2   A    A dub?

3   Q    Yeah, the term a "dub."  What's a dub?

4   A    A dub could be -- it depends on how you're using the

5   phrase.  If I say, you know, Pass me a dub, it means passing

6   $20.  Or if I say give me a picture of a dub, that means

7   like you're just debted, like I'm not dealing which you no

8   more.

9   Q    You said -- I want to focus on the second definition

10  you gave.  Can you explain what that version -- usage of

11  "dub" is -- when you said debted, could you just walk

12  through what -- what do those terms mean?

13  A    It's basically like you did something with me and I

14  didn't like the outcome of it, so I told you you was debted;

15  or if you gave me something and I ain't give it back to you,

16  and I said you was debted see, then I'm not giving something

17  back to you.

18  Q    So what is "debted"?

19  A    Basically I see you just not -- you don't get nothing.

20  You're debted.

21  Q    To get nothing out of something is --

22  A    Yeah.

23  Q    Are you familiar with the term "brazy"?

24  A    Brazy?

25  Q    Brazy.

Hytmiah - Direct - McDonald                    151

1   A    Yes.

2   Q    What was that?

3   A    It's just changing the C for B.  If it's "crazy," and

4   you probably just said the word "brazy."  Basically just

5   changing the letter C into a B.

6   Q    And why would you change the letter C into a B to say

7   brazy instead of crazy?

8   A    It's just a figure of -- of speech that people used to

9   use in a kind of slur.

10  Q    What was your role in this robbery that you're

11  testifying about with respect to the defendants?

12         What did you -- what did you do after getting a

13  call with Sha Bang and speaking with LaBanga?

14  A    Excuse me?

15  Q    What did you do after speaking with Sha Bang and

16  LaBanga; what was your role?  What did you do?

17  A    My role was basically -- I just did my homework on the

18  stash house, and then I waited for them to come back to meet

19  me.

20  Q    You used the term "homework."

21  A    Yeah.

22  Q    What does homework mean?

23  A    Homework means basically like I went to go look at the

24  house and see was there any cameras.  Like how is the -- how

25  is, like, the population out there, what kind of activity is

Hytmiah - Direct - McDonald                    152

1  going around.  I was basically looking at the camera, seeing

2  what kind of police is around and what the house looked

3  like.

4  Q    And if you could adjust your microphone again.  Sorry,

5  it's fallen to the side there.  I know it's difficult.

6           And you conducted homework for this robbery?

7  A    Yes.

8  Q    And I asked you earlier about the location, so, like,

9  what was around.  This was part of what your homework would

10 be?

11 A    Yes.

12 Q    Did you see any risk of police in the area?

13 A    Yes.

14 Q    And what was that risk?

15 A    There was a blue and white car that was going up and

16 down the block in the beginning, and there is a precinct

17 over there, the 103rd Precinct.

18 Q    And what about the buildings around the church, was

19 there anything notable about those buildings as it related

20 to your planning for the robbery, any concerns you had about

21 the buildings?

22 A    My only concern about the buildings was basically that

23 it was -- it was secluded, so there was not enough room for

24 people to enter from the back.  We had to go all the way

25 around.

Hytmiah - Direct - McDonald                    153

1   Q    Could you explain what you mean by that?

2   A    Like, basically the backyard was attached to another

3   building, so there was no way for me to enter the backyard.

4   You have to come out and go around and go into a co-op to

5   enter the home, inside the house.

6   Q    I think you testified earlier the robbery occurred at

7   night; is that correct?

8   A    Yes.

9   Q    Do you remember what time at night it occurred?

10  A    No.

11  Q    Are we talking sort of evening, before midnight, after

12  midnight; could you place us there?

13  A    Probably midnight.

14  Q    I want to talk about the team that you put together

15  that you described.  Who was part of the group that you were

16  going to put together for the robbery?

17  A    On my behalf?

18  Q    Uh-huh.

19  A    Just Barrack and Struck.

20  Q    Now, Sha Bang had told you about this potential

21  robbery.  Would you considered him part of your group?

22  A    No.

23  Q    Why not?

24  A    Because he wasn't there.

25  Q    What does that mean -- but he told you about it.  What

Hytmiah - Direct - McDonald                    154

1  does it mean that he wasn't there?  Why is that significant

2  to you?

3  A    He's like if anything goes wrong, he's a ghost, like

4  nothing could happen to him.

5  Q    What do you mean by ghost?

6  A    Like he's not there.

7  Q    And what's the benefit to him about being there?

8  A    Come again?

9  Q    Well, why is it -- when you call him a ghost, what is a

10  ghost?

11  A    It basically means that he's not on the scene and he --

12  he put no input about how the robbery is going to occur or

13  what's going to happen or -- he's just safe, not to worry

14  about disappearing.

15  Q    Does that change whether he's going to get money or

16  drugs out of this robbery?

17  A    Yeah.

18  Q    How so?

19  A    Because his life is not in danger or he's not putting

20  in no effort towards the robbery.  He just told me

21  something, and I took it upon myself to do the robbery.

22  Q    Would you consider yourself sort of the leader of this

23  robbery?

24  A    I would say the brains.  I wouldn't say the leader.

25  Q    The brains?

Hytmiah - Direct - McDonald                    155

1   A    Yeah.

2   Q    Could you describe what role each of the different

3   people played in the robbery?

4   A    Everybody that's included?

5   Q    Uh-huh.

6   A    I played the driver.  Struck played the mic.  The mic

7   is the video, something about the frequency of the police.

8   Barrack played to go inside the house.  Lazo played as going

9   inside the house.  LaBanga played as going inside the house.

10  GP played as going inside the house, and Heddis was the

11  driver.

12  Q    There were two drivers?

13  A    Yes.

14  Q    Meaning there were two cars?

15  A    Yes.

16  Q    What cars were involved?

17  A    My car and his car.

18  Q    And what was your car?

19  A    A Maxima.

20  Q    And that was the -- the blue Maxima we discussed

21  earlier?

22  A    Yes.

23  Q    And do you recall what Heddis's car was?

24  A    No.  I'm pretty sure it was a new model.  I'm not sure

25  the exact type of car it was, but I think it was either

Hytmiah - Direct - McDonald                    156

1   white or gray.

2   Q    White or gray?

3   A    Yes.

4   Q    You said it was a new model?

5   A    Yes.

6   Q    What do you mean by "new model"?

7   A    By the type of the lights.  I figured he was in a

8   rental.  I'm not sure -- it was a new model of that car is

9   the year of the car.

10  Q    I said:  "What do you mean by 'new model'?"  What led

11  you to believe he was in a new model car?  What did you see

12  about the car that led you to say now that it was a new

13  model?

14  A    Because it looked like a rental.  Rentals don't sell.

15  Rentals don't have old cars in them.  It's always

16  up-to-date, even before the end of the year, year out.

17  Q    How was the appearance of Heddis's car different than

18  the appearance of your car?

19  A    Oh, because his car doesn't look like something that

20  you're about to do it.  And my car was basically just -- it

21  was one of my -- it was one of my messed-up cars.

22  Q    I'd just ask you to slow down a little bit.  Again,

23  keep trying to speak into the microphone so we can hear you

24  back here.

25            When you had your phone conversation with -- your

Hytmiah - Direct - McDonald                    157

1  initial phone conversation you testified about with Latiff

2  Thompson, do you remember where you were?  Your first phone

3  conversation.

4  A    I believe I was in my car on the Northside.

5  Q    After you spoke with Latiff Thompson, is that when you

6  conducted your homework?

7  A    Yes.

8  Q    Okay.  Did you speak with Latiff Thompson again at any

9  point?

10 A    Yes.

11 Q    Okay.  And walk us through what your next conversation

12 as you remember it was.

13 A    I told him to meet me at my aunt's house.

14 Q    And what was the location of your aunt's house?

15 A    184-23 Galway.

16 Q    Had Latiff Thompson ever been to this location before,

17 to your memory?

18 A    No.

19 Q    Had you ever provided him this location before?

20 A    No.

21 Q    I believe you testified earlier you don't know the

22 exact date of when the robbery occurred, correct?

23 A    Yes.

24 Q    Would it be fair to say that the date of the robbery

25 would be the date you provided Latiff Thompson your aunt's

Hytmiah - Direct - McDonald                158

1   address?

2   A    Yes.

3   Q    Do you remember any additional conversations before

4   meeting up with anyone about this robbery?

5   A    No.

6   Q    Did there come a time on the -- prior to the robbery

7   that you met with either of the defendants?

8   A    Excuse me?

9   Q    Was there a time that you met with either of the

10  defendants prior to the robbery?

11  A    No.

12  Q    Well, did you meet them at some point before the

13  robbery occurred?

14  A    Oh, excuse me.  Yes.

15  Q    And where did you meet with them?

16  A    At my aunt's house.

17  Q    And this would have been after you provided

18  Latiff Thompson your aunt's address?

19  A    Yes.

20  Q    Tell the Members of the Jury what you remember about

21  meeting for the first time with the defendants at your

22  aunt's house.

23  A    Well, basically I Was doing my homework, and he called

24  me and told me he was there at my aunt's house, which I was

25  with LaBanga.  So I met them at my aunt's house.  We went

Hytmiah - Direct - McDonald                    159

1    into my aunt's basement.  They came inside -- the people who

2    came inside the house with LaBanga, Lazo, Heddis, and GP.

3    They walked inside the basement.  I didn't know -- I knew

4    everybody besides Heddis, so there really wasn't -- wasn't

5    much conversation.

6            I basically was speaking to LaBanga about the

7    robbery.  And I told him it was a stash house on top of a

8    church, and there was a lot of money in there, which was

9    400,000, and there was going to be a whole bunch of

10   marijuana and --

11   Q    I'm going pause you right there.

12           So I'm going to start with what you said about at

13   some point LaBanga arrived at your aunt's house; is that

14   correct?

15   A    Yes.

16   Q    And how did the defendant Latiff Thompson arrive?

17   A    In the car.

18   Q    Okay.  Was anyone else in the car?

19   A    Yes.

20   Q    Who?

21   A    Heddis, LaBanga, Lazo, and GP.

22   Q    When they first arrived at your aunt's house, do you

23   remember where they were seated in the car?

24   A    No.  All I know is just Heddis was the driver.

25   Q    When the car arrived, did you see the car arrive?

Hytmiah - Direct - McDonald                    165

1   A    Yes.

2   Q    In your basement, was the radio that you had testified

3   about still there?

4   A    Yes.

5   Q    Was there a plan for who would operate the radio?

6   A    Yes.

7   Q    And who was -- what was that plan?

8   A    Basically I just told the person.  I just called and

9   told them to put the radio on, that I'm right here, here's

10  the address.

11  Q    All right.  But who was going to be listening to the

12  radio?

13  A    Struck.

14  Q    So was Struck there?

15  A    Yes.

16  Q    And what, if anything, did you tell Struck about using

17  the radio?

18  A    I basically told him, just cut the radio on to 103rd,

19  107 Precinct, and I gave him the address and I told him to

20  just listen up.

21         THE COURT:  I'm sorry, 103rd and 107th, were they

22  on the same band of the radio?

23         THE WITNESS:  Yes.

24         THE COURT:  Were together?

25         THE WITNESS:  On the same frequency.

Hytmiah - Direct - McDonald                    166

1    THE COURT:  So you could listen on that band to

2    activity for those two precincts; is that right?

3            THE WITNESS:  Yes.

4            THE COURT:  Okay.

5            Go ahead.

6    BY MR. MCDONALD:

7    Q    How were you going to communicate with Struck about

8    what was on the radio?

9    A    I'm on the phone.

10   Q    And you would speak with him, and he would tell you,

11   it's my understanding -- excuse me, is your understanding,

12   whatever he was hearing on the radio?

13   A    Yes.

14   Q    Why not bring the radio with you?

15   A    Well, I -- there's no need to.  Why would I need to

16   bring the radio with me?

17   Q    Were there any risks in bringing a radio like that with

18   you?

19   A    Yes.

20   Q    What are those?

21   A    Because I got in trouble for having the radio on me.

22   It's called a fraudulent entry.

23   Q    Slow down over the -- could you say that last part

24   again?  I didn't understand it.

25   A    I used to be driving around with the radio on me, but I

Hytmiah - Direct - McDonald                    167

1  got pulled over for it, and I got charged for the radio.  So

2  I don't need -- I don't have the radio on me no more.

3  Q    And why, to your understanding, is it illegal to have a

4  radio like this?

5  A    Because I'm listening to things I'm not supposed to be

6  listening to.

7  Q    And that would be the police radio calls; is that

8  right?

9  A    Yes.

10  Q    Now, you described both Lazo and GP having guns; is

11  that correct?

12  A    Yes.

13  Q    Do you remember what those guns looked like?

14  A    Yes.

15  Q    Could you describe what type of guns those were, if you

16  know?

17  A    They basically was black.

18  Q    Were they handguns, revolvers; do you know the

19  difference?

20  A    They were black automatics.

21  Q    When you say "automatic," are we talking about, like,

22  an automatic pistol?

23  A    Automatic -- yeah, automatic handgun, pistol, yes.

24  Q    All right.  Did they look like real guns to you?

25  A    Yes.

Hytmiah - Direct - McDonald                    168

1    Q    What -- what makes you say that?

2    A    Because I know what a real gun and a fake gun look

3    like.

4              (Continuing on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   169

1  Q    So did you believe that both GP and Lazo had real guns?

2  A    Yes.

3  Q    In your other robberies, did you use real guns?

4  A    Yes.

5  Q    Did you ever use fake guns?

6  A    No.

7  Q    Why not?

8  A    Why would I use fake guns for?

9  Q    What would be the risk of using a fake gun to rob a

10 stash house?

11 A    Because I'm going in a house that has real guns and I

12 have a fake gun.  Doesn't add up.

13 Q    Do you remember any of the clothing that the defendant,

14 Latiff Thompson was wearing?

15 A    No.

16 Q    Do you remember any of the clothing that the defendant

17 you know as Heddis was wearing?

18 A    No.

19 Q    What about the clothing that GP was wearing?

20 A    Yes.

21 Q    What do you remember about that?

22 A    I just know he had a hoodie.  It was hoodie material.

23 Q    Do you remember anything about the color?

24 A    No.

25 Q    What about Lazo?  The clothing he was wearing?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   170

1   A    Hoodies.

2   Q    Was anyone wearing any distinctive clothing?  Anything

3   that stood out?

4   A    Yes.  Barrack on my behalf, yes.  Somebody that was on

5   my side, yes.

6   Q    What was he wearing?

7   A    I just know that he had jeans on.

8   Q    Why is that distinctive?

9   A    Because he stand out.  Everybody that has like dark

10  clothes on and he had light blue jeans on.

11  Q    You remember other people having dark clothes on and he

12  had light blue jeans on?

13  A    Yes.

14  Q    Do you remember what you were wearing?

15  A    I believe I had a sweat suit on.

16  Q    Would that be what you would normally wear when

17  carrying out a robbery or burglary?

18  A    Yes.

19  Q    Did the group that arrived with the defendants bring

20  anything besides guns with them?

21  A    Yes.

22  Q    What else did they bring?

23  A    LaBanga had a gym bag with him.

24  Q    When you say a gym bag, can you describe what you're

25  referring to?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   171

1   A    A gym bag that athletes with have in their locker room

2   to carry clothing and sneakers.

3   Q    Do you remember what color the gym bag was?

4   A    Yes.

5   Q    Can you describe what it looked like?

6   A    If I'm not mistaken, it was all black.  I think with a

7   Nike check on it.

8   Q    What was the purpose of the gym bag as you understood

9   it?

10  A    To collect the marijuana.

11  Q    You talked about this, at this point, not yet -- this

12  robbery not yet happened involving $400,000 potentially; is

13  that right?

14  A    Yes.

15  Q    It sounds like you testified you committed a number of

16  burglaries and robberies, correct?

17  A    Excuse me?

18  Q    You've testified you committed a number of burglary and

19  robberies, correct?

20  A    Yes.

21  Q    Where does $400,000 fall in terms of a robbery or

22  burglary for you in terms of size?

23  A    The highest.

24  Q    When you say the highest, what do you mean?

25  A    I mean as far as the highest that I ever went for.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  172

1  Q    Other than this robbery, what was the biggest robbery

2  you remember attempting to go for?

3  A    $160,000.

4  Q    Anything else that you remember significant about

5  meeting in the basement before the robbery?

6  A    No.

7  Q    I think you testified earlier that there were other

8  people who were living in your aunt's house; is that

9  correct?

10 A    Yes.

11 Q    Were some of those people around?

12 A    They was inside the house, but I don't remember exactly

13 where they was at.

14 Q    Were they participating in the planning of this?

15 A    No.

16 Q    When were you doing the planning, and it sounds like

17 you were discussing this with the defendant Latiff Thompson,

18 was there a discussion about who would do what or who would

19 go where for the robbery?

20 A    No.

21 Q    When would that be decided?

22 A    I guess it just played out however it played out.  That

23 wasn't my job.

24 Q    Why wasn't that your job?

25 A    Because I don't know them for me to say I want you to

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   173

1   go -- I don't know what they're capable of doing for me to

2   say I want you to do this and you do that.

3   Q    So what was your expectation about how they would

4   determine who was going to do what role?

5   A    For my understanding, from me doing this a lot, I knew

6   that I was going to be the driver and the person that was

7   with me, Barrack, that he was going inside.  And by me just

8   assuming that Heddis was driving, that he was going to be

9   the driver on their behalf and the other three was going to

10  go inside.

11  Q    Was there a discussion at all about how much each

12  person would get if the robbery was successful?

13  A    I don't remember.

14  Q    Was that something you normally would discuss ahead of

15  time or no?

16  A    No.

17  Q    Why not?

18  A    Because you don't know what's really in there that

19  you're going to get.  I don't like to count my eggs before

20  they're hatched.

21  Q    Before Latiff Thompson and Heddis arrived with GP and

22  Lazo at your house, do you know where they had come from?

23  A    No, but I was assuming they came from the bricks.

24       MR. COMMISSIONG:  Objection as to assuming, your

25  Honor.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  174

1        THE COURT:  Jury will disregard the answer.

2   Q    So you do not know where they were coming from; is that

3   correct?

4   A    No.

5   Q    About how far is your aunt's house from the location,

6   approximately?  Like time or distance; if you know, from the

7   church?  How far is your aunt's house from the church?

8   A    Probably about like five minutes, if that.

9   Q    So relatively close; would you agree with me on that?

10  A    Yes.

11  Q    At some point did you leave the basement of your aunt's

12  house?

13  A    Yes.

14  Q    Did anyone else leave with you?

15  A    Yes.

16  Q    Who left with you?

17  A    Me, Barrack, Heddis, LaBanga, GP, Lazo.

18  Q    And after you left the basement, where did you go to?

19  A    To the stash house.

20  Q    Did you drive there?

21  A    Yes.

22  Q    Could you describe how that occurred?

23  A    I got in my car.  Me, and Barrack.  And Heddis,

24  LaBanga, GP and Lazo got in their car.

25  Q    And do you remember who was driving their car?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   175

1   A    Yes.

2   Q    Who was that?

3   A    Heddis.

4   Q    And you were the driver of your car?

5   A    Yes.

6   Q    The blue Maxima?

7   A    Yes.

8   Q    Could you walk the jury through leaving your aunts

9   house and arriving in the area of the stash house?

10  A    I basically got in my car, they got in their car.  They

11  followed behind me to the location.  Until we made it to the

12  stash house.

13       THE COURT:  Can we establish a time both for the

14  visit to the aunt's house and the departure of the stash

15  house so that we have a timeline here?

16       MR. MCDONALD:  I will ask --

17       THE COURT:  Are you going to get to that?

18       MR. MCDONALD:  I will get to that.  Although --

19       THE COURT:  I'm just asking that, for the jury to

20  have a sense of this witnesses' progress.

21  Q    Do you know what time you left your aunt's house?

22  A    I don't know the exact time, but I knew that we was --

23  we had the conversation about the robbery probably for like

24  five minutes and then we went straight to it.

25  Q    And do you know -- you said you testified -- you said

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  176

1  it's about a 5 minute drive to the robbery location; is that

2  right?

3  A    Yes.

4  Q    And do you know how long you were in the location of

5  the robbery?

6  A    When it was going on?

7  Q    (No verbal response given.)  If you know, if you

8  remember?

9  A    I don't remember, but it was about some time.  Probably

10 like 30 minutes.

11 Q    So when you say about some time, why was it taking

12 time?

13 A    Because they had to figure out how they was going to

14 get inside the house.

15 Q    Now, you don't know what time specifically or exactly

16 what time of day this occurred?

17 A    It was at nighttime.

18 Q    It was nighttime and I think you said midnight or

19 earlier.  And by that, are you saying specifically at

20 midnight or you mean in the nighttime?  Like, during the

21 night?

22 A    When I say midnight, I mean after 12.

23 Q    After 12, okay.

24       And I think you testified before you don't know

25 the exact date, correct?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  177

1    A    Yes.

2    Q    But you know it was the date that you had told LaBanga

3    the address of your aunt's house?

4    A    Yes.

5    Q    Did you have -- in your car you were with Barrack,

6    correct?

7    A    Yes.

8    Q    And you were driving?

9    A    Yes.

10   Q    Did you have any weapons in your car?

11   A    No.

12   Q    Did Barrack have a weapon on him?

13   A    No.

14   Q    And in the other car being driven by Heddis, there were

15   four people total, correct?

16   A    Yes.

17   Q    And your understanding was that both GP and Lazo had

18   guns with them when they were in that car, correct?

19   A    Yes.

20   Q    Where was the bag, the gym bag, that you described?

21   Where did that go?  Who took that to the location?

22   A    LaBanga.

23   Q    So what did you have on?  Like, what physical thing did

24   you have on you when you went to the location?

25   A    Excuse me?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  178

1  Q    What property, what things did you have with you when

2  you went to this location?

3  A    Me?

4  Q    Yes.

5  A    My car.

6  Q    Did you have your phone?

7  A    Yes.

8  Q    Did you have anything else?  A screwdriver, any of

9  those things we talked about?

10  A    I think we did have a screwdriver.

11  Q    You testified you arrived in the area of the stash

12  house; is that right?

13  A    Yes.

14  Q    Do you remember where, approximately, you went to or

15  what street or location you went to when you arrived?

16  A    Yes.

17  Q    Where was that?

18  A    I believe I was on 193rd and Jamaica.

19  Q    Were you on Jamaica Avenue or were you on 193rd Street?

20  A    I was on Jamaica Avenue and then I turned into one of

21  the side streets.

22  Q    And the second car, the car being driven by Heddis, do

23  you know where that car went?

24  A    Yes.

25  Q    Where did it go?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   179

1   A    Behind the house on the right side.

2   Q    You testified you're familiar with the area.  How do

3   you get behind the house from where you were?  How do you

4   drive a car to that location?

5   A    You have to drive down Jamaica and make a left.  At the

6   light -- I don't know the street that was.  And you come

7   across up 90th, make another left, and you come back around,

8   you're on that side of the house now.

9   Q    The area behind the house, I think you testified

10  earlier there are other houses in that area?

11  A    Yes.

12  Q    After you parked on 193rd and Jamaica, did you stay in

13  the car?

14  A    Yes.

15  Q    Did anyone get out of your car?

16  A    Yes.

17  Q    Who got out?

18  A    Barrack.

19  Q    Did you see where he went?

20  A    Yes.

21  Q    Where did he go?

22  A    He walked across the street towards the house.

23  Q    And just walk us through what you saw Barrack doing?

24  A    He basically walked across the street towards the

25  house, and then he made his way in the back.  But he walked

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  180

1    to the corner, made his way in the back of the house.

2    Q    And were you speaking on the phone with anyone at this

3    time?

4    A    Yes.

5    Q    Who were you speaking on the phone with?

6    A    I was on the phone with -- if I'm not mistaken, I was

7    on the phone with Struck and I was on the phone with

8    Barrack.

9    Q    And so what were you speaking with Barrack about?

10   A    Basically about what was going on.

11   Q    What, if anything, do you recall learning from Barrack

12   about what was going on?

13   A    He basically was telling me that it's a balcony in the

14   back and they're trying to figure out how they're about to

15   get in the house from the back.

16   Q    Could you see the second car, Heddis' car, when you

17   were having this conversation with Barrack?

18   A    Not until when I had to circle.  Circle the area.

19   Q    So at some point you left the location you were in?

20   A    Yes.

21   Q    Can you walk through what you saw when you left the

22   location and where you went?

23   A    Basically when I left the location and I made my way

24   back on Jamaica Avenue and I went inside that little co-op

25   area, and I went up on the right hand side and I looked to

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  181

1  my left, that's when I seen GP and Lazo and Barrack figuring

2  out how they about to get on top of the balcony, and at the

3  same time looking at them, I see Heddis in his car right

4  there.

5  Q    So you were on Jamaica Avenue and you, at some point,

6  turned left; is that right?

7  A    Yes.

8  Q    And when you turned left, what did you see?

9  A    I entered like a community.

10  Q    And so from where you were -- you were in the driver's

11  seat in your car, right?

12  A    Yes.

13  Q    Are we talking to the left side of your car or the

14  right side of your car?

15  A    The left side.

16  Q    When you looked to the left side of your car, what did

17  you see?

18  A    I seen Barrack, Lazo, and GP figuring out how they was

19  going to get on top of the balcony to get into the house.

20  And I seen Heddis car on the other side, parked right there,

21  waiting.

22  Q    Was anyone in Heddis' car?

23  A    I believe it was just him.

24  Q    Did you get out of your car at that point?

25  A    No.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  182

1   Q    What did you do?

2   A    I sat there and waited until when I seen them entering,

3   like getting the window open, and I drove up.  I came back

4   down and I made my way back to where I was parked at.

5   Q    When you say you made your way back to where you were

6   parked, that was back on Jamaica and 193; is that correct?

7   A    Yes.

8   Q    When you are describing seeing Lazo and GP and Barrack

9   go up to a second floor, is that what you're describing?

10  A    Yes.

11  Q    Could you describe how they were doing that?  How were

12  they getting up to the second floor?

13  A    I think they was boosting him.  If I'm not mistaken,

14  there was like a boost.  I wasn't there too long.  I

15  actually seen the elevation on the top, climbing over.  And

16  then once I seen them adjusting the window, I just made my

17  way back to the front.

18  Q    What did they climb up onto; if you remember?

19  A    The balcony.  I don't remember what they was standing

20  on to get to the balcony, but I know they was helping each

21  other to get on the balcony.  Once I seen that the second

22  person, which I don't know who was the second person was, on

23  there adjusting the window, I just drove back around to the

24  front of the scene.

25  Q    Now, when this was happening, did you see the

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   183

1   defendant, Latiff Thompson?

2   A    Yes.

3   Q    And where was he?

4   A    He was standing in front of the house.

5   Q    By standing in front of the house, are we talking about

6   on Jamaica Avenue?

7   A    Yes.

8   Q    After you left and drove back around, if I'm getting

9   this correctly, you drove back to Jamaica Avenue; is that

10  correct?

11  A    Yes.

12  Q    Is that when you saw Latiff Thompson?

13  A    Yes.

14  Q    What was he doing at that point?

15  A    He was acting like he was at the bus stop.  But I don't

16  remember how I ended up being on the phone with him, but I

17  was on the phone with him, too.

18  Q    Do you remember what you were discussing on the phone

19  with him?

20  A    He was basically telling me he was going to sit there

21  and wait until they opened the door.  He was going to wait

22  like he was at the bus stop.

23  Q    Do you know why he didn't go around the side or the

24  back to try to climb up?

25  A    No, I don't.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  184

1 Q    Did Latiff Thompson have anything with him when he was

2 waiting?

3 A    Yes.

4 Q    What did he have?

5 A    The gym bag.

6 Q    Where was the gym bag?  Where was it located?

7 A    Across his hip and his shoulder.

8 Q    You said he was waiting at the bus stop.  What did it

9 look like he was doing?

10 A    Looked like he was waiting in the bus stop.  He was

11 blending in.

12 Q    Was there anyone else around that you saw?  Anyone walk

13 by or anyone in the area pass by?

14 A    I don't remember.

15 Q    When you returned back to 193 and Jamaica, you remember

16 speaking with Latiff Thompson; is that correct?

17 A    Yes.

18 Q    Were you still speaking with Struck as well?

19 A    Yes.

20 Q    At any point, was there any police response or any

21 indication that police were coming to the location?

22 A    No.

23 Q    What do you remember happening next from where you were

24 on 193 and Jamaica?

25 A    I basically sat there, cut my lights off, adjusted the

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  185

1  mirrors and the rear view mirrors, so I could see without me

2  turning my head.  I could sit back in my car and see

3  everything from where I was parked at.

4  Q    So which -- if you could explain that.

5            Which direction were you parked then if you were

6  using your rear view mirrors?

7  A    Basically the trunk was facing Jamaica.

8  Q    The trunk of your car was facing Jamaica Avenue?

9  A    Yes.

10            THE COURT:  But you were on the side street?

11            THE DEFENDANT:  No -- yes.  Basically yes.

12            THE COURT:  And let me just understand.  Jamaica

13  Avenue runs east/west.  Was this church on the south side or

14  the north side of Jamaica Avenue?  On the side that goes

15  towards Kennedy Airport or the side that goes towards

16  Westchester?  Let me put it other way.  The side that goes

17  towards Nassau County or the side that goes towards Downtown

18  Jamaica?

19            THE DEFENDANT:  It was on the side going towards

20  Downtown Jamaica.

21            THE COURT:  Okay.  So that's the north side of

22  Jamaica Avenue.  If you got on the bus where he was

23  standing, he would be going towards Jamaica --

24            THE DEFENDANT:  Yes.

25            THE COURT:  -- Downtown Jamaica?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   186

1    THE DEFENDANT:  Yes.  Basically, where he was

2    standing at if he got on the bus, the bus take him to the

3    Coliseum.

4    Q    The street --

5         MR. MCDONALD:  Let me see if I can clarify.

6    Q    When you turned -- when you're on Jamaica and you

7    turned left, what would the next major street if you

8    continued on that street that you turned off on?

9    A    Say that again.

10   Q    When you were on Jamaica you turned left; is that

11   right?

12   A    Yes.

13   Q    And you saw the church to the left side, correct?

14   A    Yes.

15   Q    If you didn't look to the left and you continued

16   straight, what is the next major street you would have come

17   to?

18   A    If I didn't turn left and I kept going straight, it's

19   just a long trip down Jamaica.  It runs down Francis Lewis.

20   Q    After you turned off Jamaica onto the side street,

21   what's the next street?

22   A    It's 90th and then it's Hillside.

23   Q    It's Hillside?

24   A    Yes.

25   Q    It's Hillside Avenue?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  187

1    A    Yes.

2    Q    Would you agree with me that the church was between

3    Jamaica and Hillside; correct?

4    A    It was between 90th and Jamaica.

5    Q    So understood -- okay.

6         MR. MCDONALD:  Your Honor, I think we'll have

7    additional evidence --

8         THE COURT:  I'm just trying to establish with all

9    of the turns exactly where the church was located with

10   respect to the testimony about climbing up to the second

11   floor, and going around the block, and so forth.  To help

12   the jury understand.

13        MR. MCDONALD:  Yes.

14        THE COURT:  And the Court, I would add.

15   Q    When you went back and you were parked, which direction

16   was your car facing?  Towards the church or away from the

17   church?

18   A    Away from the church.  The trunk was facing the church

19   and the hood was facing away from the church.

20        MR. MCDONALD:  If I can bring up Government

21   Exhibit 204 please for the witness.

22   Q    Do you see Government Exhibit 204?

23   A    Yes.

24   Q    What is this?

25   A    I see Jamaica and I see the church.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  188

1  Q    Is this a fair and accurate picture or photo of how

2  this area looked in 2017?

3  A    Yes.

4            MR. MCDONALD:  I offer government Exhibit 204.

5            MR. VILLANUEVA:  No objection.

6            MR. COMMISSIONG:  No objection.

7            THE COURT:  Government Exhibit 204 is received in

8  evidence and published to the jury.

9            (Government's Exhibit 204 received in evidence.)

10  Q    Do you see in this photograph about where you were

11  located when you came back after circling and parking?

12  A    Yes.

13  Q    Can you mark on the photograph approximately where you

14  were?

15  A    Basically like right over here, but I'm into the block

16  across the street (indicating).

17  Q    Now, what runs across -- the street that's going from

18  the left side of the photo to the right side of the photo,

19  that's Jamaica Avenue; is that right?

20  A    Yes.

21  Q    You had positioned your car, from my understanding, so

22  your trunk, the back of your car was facing directly towards

23  the church; is that right?

24  A    Yes.

25  Q    Was anyone else in the car with you?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  189

1   A   No.

2   Q   Who were you on the phone with at this time?

3   A   I was on the phone with Struck, Barrack, and LaBanga.

4   Q   Did you, at some point, learn that the group that had

5   been going onto the second floor got into the apartment?

6   A   Yes.

7   Q   How did you learn that?

8   A   Because Barrack told me he was in.

9   Q   And walk us through what you remember learning from

10  Barrack on the telephone.

11  A   Well, before he really got in the house he was telling

12  me he see the guy.  He was sleeping on the couch with the

13  game on.  And they entered inside the house.

14  Q   When you say he saw a guy, he was asleep on the couch?

15  A   Yes.

16  Q   What happened next?

17  A   They basically ran down on him, they grabbed him up.

18  Q   How do you know that?

19  A   I hear the scuffling and I hear them talking to him in

20  the house.

21  Q   When you say you heard the scuffle, what did you hear?

22  A   I heard movement.

23  Q   What did you hear?  Like, what did it sound like?

24  A   Like movement.  Just movements.

25  Q   Did Barrack tell you anything about what was happening?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  190

1   A    Later on, yes.

2   Q    When you say later on, when?

3   A    When they got back in the car.

4   Q    We'll come to that in a minute.  What else did you hear

5   happening on the phone with Barrack?

6   A    He was beating the guy up.

7   Q    What does that mean?

8   A    He was beating him up, assaulting him.  Beating him up.

9   Q    You can hear that on the phone?

10  A    Yes.

11  Q    And did you know Barrack to beat people up?

12  A    No.

13  Q    At some point did he tell you if the person in the

14  house had been tied up or restrained in any way?

15  A    Yes.

16  Q    What did he say?

17  A    Excuse me?

18  Q    What did he tell you?

19  A    When he was in the house?

20  Q    It was after he told you that the person had been

21  restrained?

22  A    Yeah.  He told me that when he got back in the car.

23  Q    Did you learn anything else from Barrack when you were

24  on the phone with him when he's inside the house?

25  A    Basically he was just retaining the person that was

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  191

1  inside the house.  And once they got him retained, they

2  started searching for stuff, but I told him to open the door

3  for LaBanga.

4  Q    And did someone open the door for LaBanga?

5  A    Yes.

6  Q    Do you remember what that was?

7  A    Yes.

8  Q    Who was that?

9  A    Barrack.

10  Q    What did you see happen?

11  A    They opened the door and LaBanga walked inside.

12  Q    When you say opened the door, do you see on this

13  photograph that is Government Exhibit 204 what door that

14  was?

15  A    Yes.

16       MR. MCDONALD:  Maybe it's easier if we go to

17  Government Exhibit 203.

18  Q    Is this the door you're referring to?

19  A    Yes.

20  Q    When this door opened, what did the defendant, Latiff

21  Thompson, do?

22  A    He made his way inside.

23  Q    Did Barrack stay inside?

24  A    Yes.

25  Q    Did anyone else come out at this point?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   192

1   A    No.

2   Q    Did you speak with anyone else after this happened?

3   A    Excuse me?

4   Q    Did you speak with anyone else on the telephone after

5   this happened?  After Latiff Thompson went inside?

6   A    Yes.

7   Q    Who did you speak with?

8   A    I was speaking to LaBanga.

9   Q    That's the defendant?

10  A    Yes.

11  Q    What were you speaking with him about?

12  A    About the marijuana that they found inside the house

13  inside the cabinet.

14  Q    So just walk the jury through whatever it is you

15  remember about your conversation.

16  A    I watched LaBanga walk up, walk up to the steps inside

17  the house.  Seconds later, he tells me it's a cabinet with

18  marijuana inside of it.  I told him to just start throwing

19  the marijuana inside the bag and then he told me there's a

20  safe in there.

21  Q    Did you say anything to him?  What did you say to him?

22  A    I was telling him take the marijuana and put it inside

23  the bag.  And also I told him look in the refrigerator and

24  see if you see $400,000 inside the refrigerator.  The money

25  is supposed to be inside the refrigerator.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  193

1  Q    You asked him to look in the refrigerator why?

2  A    That's where the money is supposed to be at.

3  Q    When you say the money was supposed to be at, how did

4  you learn?

5  A    From Sha-Bang.

6  Q    So Sha-Bang said there would be $400,000 inside the

7  refrigerator?

8  A    Yes.

9  Q    Did you learn what was in the refrigerator?

10  A    I don't remember.

11  Q    Was there any discussion about the safe?

12  A    Yes.

13  Q    What was that discussion?

14  A    They basically was telling me that the safe was

15  adjusted to a certain way to the floor.  And I told them rig

16  it out and bring it straight to me.

17  Q    Did you have any other conversations with Latiff

18  Thompson or any other things you remember from your

19  conversation with Latiff Thompson when he was inside the

20  house?

21  A    No.  I'm the one that was basically telling them to

22  bring me the safe and let me see the safe.

23  Q    Did you see anyone leave this building at any point?

24  A    Yes.

25  Q    What did you see?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  194

1  A    LaBanga and Barrack brought the safe to my car.

2  Q    Describe for the jury what you saw and how they got to

3  your car.

4  A    Basically the front door opened up and they both was

5  carrying the safe.  Side by side.  And they made their way

6  across the street.  And they threw the safe in the back seat

7  of my car.

8  Q    When they got to your car, did you notice anything

9  about their appearance that was different than what you saw

10 them earlier?

11 A    No.  Not yet.

12 Q    When you say not yet, what are you referring to?

13 A    I didn't notice there was blood all over Barrack's

14 clothing until he sat in the car.

15 Q    Where in your car did the safe go?

16 A    In the back seat.

17 Q    After the safe was in your car, did the defendant go

18 back to the house?

19 A    Who?

20 Q    Latiff Thompson, excuse me.

21 A    He went back to his car.  I was asking him where is GP

22 and Lazo and he was saying he don't know.

23 Q    Did you see anyone else come out of the front door of

24 the house?

25 A    No.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  195

1  Q    What did Barrack do after he brought the safe to your

2  car with Latiff Thompson?

3  A    He basically told me that he think they jumped off the

4  balcony.

5  Q    What did you understand him to mean when he said he

6  thought they jumped off the balcony?

7  A    Because they didn't come through the front door.  He

8  said they was just grabbing the marijuana and was jumping

9  off the balcony.

10 Q    When he was saying they, would was he referring to?

11 A    Lazo and GP.

12 Q    Did anyone bring any marijuana to your car?

13 A    No.

14 Q    Did you know where Lazo and GP were at that point?

15 A    No.

16 Q    Did Barrack go back inside the location after he

17 brought the safe to your car?

18 A    No.

19 Q    You described that Latiff Thompson went back to his

20 car; is that correct?

21 A    Yes.

22 Q    Were you still speaking on the phone with anyone?

23 A    Yes.  I'm on FaceTime with him.

24 Q    You got on the phone with Latiff Thompson?

25 A    Yes.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  196

1  Q   Why did you do that?

2  A   Because I wanted to see was he lying to me or where

3  everybody else was at.

4  Q   Why did you think he was lying to you?

5  A   Because I don't understand how you say you don't know

6  where everyone is at.  Like people just disappeared.

7  Q   What was your concern of people disappearing?  What was

8  the problem?

9  A   That it was something funny going on.

10  Q   Did you stay at this location?

11  A   No.  As soon as the safe got in my car, I drove

12  straight off.

13  Q   Was anyone with you?

14  A   Yes.

15  Q   Who?

16  A   Me and Barrack.

17  Q   Did you discuss with Barrack what had happened inside

18  the stash house?

19  A   Yes.

20  Q   Walk us through that discussion.

21  A   I asked him what happened.  He basically told me that

22  the guy was sleeping, he had the RV, those things that you

23  play the game with.  He was sleeping with it on his head.

24  They tied him up, they asked him where the money was.  He

25  was screaming out I just re'd up, I don't have no more

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH 197

1 money. All of the money went to the drugs.

2 Q When you say he had the RV, you're talking about the

3 big virtual reality- type of glasses --

4 A Yes.

5 Q -- on his head?

6 A Yes.

7 Q Barrack said he was sleep?

8 A Yes.

9 Q And that he had been tied up?

10 A Yes.

11 Q You said the word re'd up. What does that mean?

12 A Excuse me.

13 Q What does re'd up mean?

14 A Basically means that the money he made, he put it back

15 into it to get more marijuana.

16 Q When you say the money that he made, who are you

17 referring to the he there?

18 A The person inside the stash house.

19 Q And you understood this person to be a drug dealer; is

20 that correct?

21 A Yes.

22 Q And what does re'd up mean? Putting more money into

23 it. What does it mean?

24 A Basically bought more marijuana.

25 Q What would that mean in terms of how much money you

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  198

1   would have found in the stash house?

2   A    What do you mean by that?

3   Q    Well, how did he -- he would have spent the money to

4   buy more marijuana?  Is that what you understand that to

5   mean?

6   A    Yes.

7   Q    What else did Barrack tell you; if anything?

8   A    That's -- to my knowledge, that's about it.

9   Q    What did you notice, if anything, about his appearance

10  that was different?

11  A    That he had a lot of blood on his clothes.

12  Q    When you say he had a lot of blood on his clothes, can

13  you describe what parts of his clothing had blood; if you

14  remember it.

15  A    His jeans, his shirt.  Everything had a whole bunch of

16  blood on it.

17  Q    Did he appear to be injured?

18  A    Excuse me?

19  Q    Did he appear to be injured?

20  A    No.

21  Q    Was he bleeding; as far as you could tell?

22  A    No.

23  Q    Did he say whose blood this was?

24  A    No.

25  Q    Did you have an understanding of whose blood this was?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  199

```
 1   A    Yes.

 2   Q    Whose was it?

 3   A    The person that was in the house.

 4        MR. MCDONALD:  Your Honor, can we take -- is it

 5   time for a break?

 6        THE COURT:  Let's go a little further.

 7   Q    Where did you go to after driving away from the stash

 8   house?

 9   A    I drove back to my aunt's house.

10   Q    You were on face time with Latiff Thompson; is that

11   correct?

12   A    Yes.

13   Q    What were you discussing with him?

14   A    I asked him where is GP and Lazo at.  He says he don't

15   know.  And then he showed me the -- he showed me -- he's on

16   FaceTime and he showed me the back seat of the car.  And it

17   was him and Heddis in the car.

18   Q    And did you know where they were going?

19   A    Basically said he was going to go look for them.

20   Q    And so he was showing you the back seat of the car did

21   not have any people in it; is that right?

22   A    Yes.

23   Q    What were you thinking at this point?

24   A    He was playing games.

25   Q    What do you mean by playing games?
```

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   200

1    A    Like they had to figure out what they was going to do

2    once they got the stuff out of the house.

3    Q    Did you see any drugs in this car on FaceTime?

4    A    No.

5    Q    When you went back to your aunt's house, can you

6    describe what you were doing?  What happened?

7    A    I went back to my aunt's house, I went inside the

8    basement.  Me and Barrack put the safe inside the basement.

9    I started opening the safe and I got inside the safe.

10   Q    When you opened the safe, what was inside the safe?

11   A    It was cash and it was a gun.

12   Q    How did you open the safe?

13   A    Either with a crowbar or a flathead screwdriver.

14   Q    How much money was in the safe; as you remember it?

15   A    I believe it was in the 20s but it's nowhere near the

16   $400,000.

17   Q    When you say the 20s, what does the 20s mean?

18   A    20 something thousand.

19   Q    20 something thousand?

20   A    Yes.

21   Q    So it's significantly less than $400,000?

22   A    Yes.

23   Q    You said there was a gun in the safe?

24   A    Yes.

25   Q    Can you describe the gun?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  201

1   A    I just know it was an all-black gun.

2   Q    Now, at this point, did you know where the marijuana

3   that you had discussed with Latiff Thompson was?

4   A    Not yet.

5   Q    Did you speak with anyone about what had happened?

6   A    I was still -- as I'm opening the safe, I'm still on

7   the phone with LaBanga and I was letting him see me open the

8   safe.  So when I opened the safe and I let him see what was

9   in the safe, then I told him to call Sha-Bang.  He said he

10  was about to see what was going on.  I called Sha-Bang,

11  Sha-Bang told me he was going to call LaBanga.  And once I

12  called back, out of nowhere they with Lazo and GP.  They

13  said they found him at his baby mother's house.

14  Q    Let's walk through that.

15       When you opened the safe and showed that there was

16  not $400,000 dollars in the safe, do you remember how you

17  felt or what you demeanor was like?

18  A    Yes.  I was aggravated.

19  Q    Why was that?

20  A    Because what I came for, it wasn't there.  And they got

21  all of the marijuana so basically they came off better than

22  I came off.

23  Q    You said you were going to call Sha-Bang at some point.

24  Did you speak with Sha-Bang?

25  A    Yes.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  202

1  Q   Why did you call him?

2  A   Because I was asking him what kind of people I'm

3  dealing with right now.

4  Q   When you say -- could you explain what you mean by

5  that?  What kind of people he's got you dealing with?  What

6  was your concern?

7  A   Basically like you call me about something and you got

8  people that take care of something.  And when they went to

9  go do the robbery, now people is doing funny stuff,

10  disappearing, all kinds of stuff.  So I'm asking him what's

11  going on and he said he didn't know.

12  Q   You described at some point you learned where GP and

13  Lazo were; is that correct?

14  A   Yes.

15  Q   Where were they as you learned it?

16  A   As Lazo house.  Lazo's baby mother house.

17  Q   At Lazo's baby mother's house?

18  A   Yes.

19  Q   How did you learn that information?

20  A   LaBanga told me.

21  Q   And when you learned that information, what did you do?

22  A   I jumped in my car and I went straight over.

23  Q   When you jumped in your car, did anyone go with you?

24  A   Yes.

25  Q   Who?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH   203

1   A    Struck.

2   Q    Did you bring anything with you?

3   A    Yes.

4   Q    What did you bring?

5   A    A gun.

6   Q    A gun?

7   A    Yes.

8   Q    Where did you get a gun?

9   A    From out of the safe.

10  Q    Why did you bring a gun with you?

11  A    I was livid at the time, so I just brought it with me.

12  I was aggravated.

13  Q    Did you say livid?

14  A    Yes.

15  Q    And what about Barrack?  Did he go with you?

16  A    No.

17  Q    Why not?

18  A    Because he was soaken -- his clothes was soaked with

19  blood.  So I told him he's not getting back in my car.

20  Q    Now struck had been operating the radio you said?

21  A    Yes.

22  Q    Did he have a gun or anything with him?

23  A    No.

24  Q    Do you remember where you went to to get to Lazo's baby

25  mother's house?

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  204

1   A    Yes.

2   Q    Where was that?

3   A    If I believe, I went to Sutphin and 116th.

4   Q    That's in Queens?

5   A    Yes.

6   Q    About how long did it take you to get there; if you can

7   estimate?

8   A    I was speeding, so I don't remember.

9   Q    Why were you speeding?

10  A    I was aggravated and I didn't care about nothing.  I

11  was just speeding.

12  Q    Were you speaking with anyone on the phone?

13  A    No.

14  Q    Did you arrive at Sutphin and 116th?

15  A    Yes.

16  Q    What happened when you got there?

17  A    I called LaBanga and he told me where they was at.  And

18  I -- just me and Struck got out of the car and I went

19  straight, opened the door, and went straight downstairs.

20  Q    How did you know -- you're describing going to a -- it

21  sounds like a house; is that right?

22  A    Yes.

23  Q    How did you know which house to go to?

24  A    Struck told me.

25  Q    How did Struck know, if you know --

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  205

1  A    Struck knows Lazo baby mother.

2  Q    So when you arrived at the house, did you go inside?

3  A    Yes.

4  Q    Just walk us through what -- the jury through what

5  happened when you went inside the house.

6  A    I went inside the house and from the view that I seen,

7  I seen all the marijuana out, spreaded out.  I seen Heddis,

8  I seen LaBanga, I seen Lazo and I seen GP.  And then I heard

9  a girls voice coming from upstairs and they basically was

10  telling me let's split it up right here.  And I'm like I'm

11  not splitting nothing up right here.  Put it back in the bag

12  and follow me.

13  Q    So when you went inside the house, what part of the

14  house were you in?

15  A    I believe the basement.

16  Q    You described seeing marijuana spread out; is that

17  correct?

18  A    Yes.

19  Q    What was it spread out on?

20  A    I'm not sure was it the bed or the counters, but it was

21  spread out.  Marijuana was spread out.  I seen bullets in a

22  Ziplock bag and I seen a gun.

23  Q    Let's start with the marijuana.  What did it look like?

24  The marijuana being spread out?

25  A    It was in like a compressed weed.  Compressed weed

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  206

1  means it's was like sealed in the package, so you won't

2  smell nothing.

3  Q   And were there -- how many of these packages would you

4  estimate there were?

5  A   When I counted it, it was 40 something.

6  Q   And did these packages all look the same or different?

7  A   As far as sizes, the same.  But it was different type

8  of quantity.

9  Q   You called it compressed weed.  What's your

10 understanding about why it's compressed?

11 A   So it can fit inside the package and it's like a

12 smell-proof so you won't smell outside of the package.

13 Q   And when you saw the marijuana laid out, what did you

14 do?

15 A   I started stuffing the marijuana inside the garbage

16 bag.

17 Q   When you went in the house, did you still have the gun

18 with you?

19 A   Yes.

20 Q   Did you have it out or hidden somewhere?

21 A   I don't remember.  But I had the gun on me.

22 Q   Was there any discussion with either the defendants

23 when you went inside the house?

24 A   Yeah.  I believe I had a little fake conversation with

25 Lazo.  He asking me why did I open the safe without them.

DIRECT EXAMINATION. MR. MCDONALD. SHAMIEK HYTMIAH  207

1  Q    The defendant, Latiff Thompson, asked you why you

2  opened the safe?

3  A    No.  Lazo.

4  Q    Oh, excuse me.  Lazo?

5  A    Yes.

6  Q    My apologies.

7       And would you describe this as like an argument?

8  A    He's said what he said.  I don't remember what I said.

9  But I just know I grabbed all of the stuff up and threw it

10  in the bag.  And I told him he has to follow me out.

11       (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hytmiah - Direct/Mr. McDonald                              208

1   EXAMINATION BY

2   MR. MCDONALD:

3   (Continuing.)

4   Q    And you had the gun out?

5   A    I don't remember.

6   Q    Did you point the gun at anyone?

7   A    No.  Not to my knowledge.

8   Q    When you began picking up the packages of marijuana,

9   where did you get the trash bag, the plastic -- the trash bag

10  that you're putting them in?

11  A    I believe I brought the bags from my house, the kitchen

12  bags, the 30-gallon ones.  The all-black garbage bags and I

13  started shoving them up in there.

14  Q    Did you ask anyone where they had gone where GP and

15  Lazzo had gone after the robbery?

16  A    Yes.

17  Q    What did they say?

18  A    Trying to insult my intelligence telling me they took

19  the bus back.

20  Q    And do you remember who said that?

21  A    Lazzo.

22  Q    And why was that an insult to your intelligence?

23  A    Because was committing a robbery.  The getaway car is

24  right here and there was no calls came through, nobody's

25  going to run, no rush.  What are you scared of?  Going all

Hytmiah - Direct/Mr. McDonald                     209

1   the way back to South Side.

2   Q    Did you collect the marijuana that you saw in the

3   basement of Lazzo's baby mother's house?

4   A    Yes.

5   Q    Did you discuss with either of the defendants where you

6   were going to?

7   A    I'm not sure.  When I said to people going back to my

8   house.

9   Q    Was there a discussion about sharing or splitting up

10  proceeds and who was going to get what?

11  A    As far as my knowledge, when I went downstairs in the

12  basement they were trying to -- I don't know which one said

13  it, but they was saying it stood up right here.  I said, I'm

14  not standing anything up here, follow me back.

15  Q    After you collected the marijuana, did you collect

16  anything else from the basement of that house?

17  A    No.

18  Q    What did you do after you collected all the marijuana in

19  the bag?

20  A    I jumped in my car and drove off.

21  Q    Okay.  And did anyone go with you?

22  A    Yes.

23  Q    Who?

24  A    Me and Struck.

25  Q    Did anyone follow you?

Hytmiah - Direct/Mr. McDonald                210

1   A    Yes.

2   Q    Who followed you?

3   A    Heddis, Barock, Lazzo, LaBanga, and GP.

4   Q    When you say "followed you," could you describe how they

5   followed you?

6   A    Basically, the way I pulled up I did a broken U-turn and

7   I turned back towards Longstreet.  Longstreet is like where

8   Sutphin and 116 is at.  And the way they car was, it was

9   facing towards Sutphin is when I jumped in my car and started

10  driving farther ripping off they all jumped in they car and

11  instead of them doing dog a broken U-turn they just reversed

12  their way back out trying to catch up with me.

13  Q    So you were driving in front of them then at this point;

14  is that correct?

15  A    Yes.

16  Q    Okay.  What car were they in, if you remember?

17  A    The same car as the robbery.  They pulled up in.

18  Q    That's the one you had described?

19  A    Yes.

20  Q    When you drove away, were you going -- were you speeding

21  again?

22  A    Yes.

23  Q    Where were you driving to?

24  A    I was going back to my aunt's house.

25  Q    And it was just you and Struck in the car?

Hytmiah - Direct/Mr. McDonald                211

1   A    Yes.

2   Q    Were they following you?  Was the second car following

3   you?

4   A    For a split second, yes.

5   Q    How far did that car follow you for?

6   A    The most I could say is up until I made a left on

7   Longstreet, Longstreet and 116.

8   Q    So what road were you driving on before you made the

9   left?

10  A    I believe that's 116.

11  Q    You were driving on 116 before you turned?

12  A    Yes.

13  Q    Did you see anything unusual or noteworthy when you were

14  driving?

15  A    Yes.

16  Q    What did you see?

17  A    I fine the Ford Focus.

18  Q    What's the significance of seeing a Ford Focus?

19  A    It's an unmarked detective car that's parked up in

20  there.

21  Q    And how did you know it was an unmarked detective car?

22  A    Because that's my neighborhood and I know those kind of

23  cars.  And I seen the car when I was going there previously

24  when I was leaving from there.

25  Q    When you an unmarking detective car, just for the

Hytmiah - Direct/Mr. McDonald                    212

1  record, you mean an unmarked police car?

2  A    Yes.

3  Q    Was there anyone inside that police car?

4  A    I'm not sure.

5  Q    Did you pass that police car?

6  A    Yes.

7  Q    Okay.  Did you arrive back in your aunt's house?

8  A    Yes.

9  Q    Did the car with the other, four, Heddis LaBanga, GP,

10 and Lazzo arrived?

11 A    No.

12 Q    After you arrived at your aunt's house, what did you do?

13 A    I called Sha Bang, asked him did you hear from LaBanga.

14 He told me no.  I was blowing LaBanga phone up, he wasn't

15 answering and I shot him a text.

16 Q    Why were you -- you said you were blowing up LaBanga's

17 phone, why were you doing that?

18 A    Because it shouldn't take that long to get to the

19 destination.  Because they jump in the car to catch up with

20 me, so I figured it shouldn't take that long to get to my

21 aunt's house.

22 Q    Were you speaking with Latiff Thompson at this point?

23 A    No, I didn't get no answer.

24 Q    So did you speak with anyone else?  I think you said you

25 spoke to Sha Bang?

Hytmiah - Direct/Mr. McDonald                213

1  A    I spoke to Sha Bang, yes.

2  Q    What did you do with all of the marijuana you picked up

3  at Lazzo's baby's mother's house?

4  A    I kept it.

5  Q    Did you count it at any point?

6  A    Yes.

7  Q    Okay.  How much do you recall counting in terms of

8  packages?

9  A    Like 40 something.

10 Q    And how much would each package have weighed?  How much?

11 A    It was a pound.

12 Q    Where did you -- when you get back to your aunt's house

13 that is Galway?

14 A    Yes.

15 Q    Where were you in the house when this was happening?

16 A    In the basement.

17 Q    When you spoke with Sha Bang, what did you discuss with

18 him?

19 A    I'm told him there was some funny business going on

20 because I don't see how, first thing, they disappeared from

21 the robbery second; the second thing they didn't come back to

22 get their cut.

23 Q    Now, at this point, you have taken 40, what you remember

24 40 or more pounds of marijuana, and you remember this other

25 group following you but they've not shown up.  What did you

Hytmiah - Direct/Mr. McDonald                    214

1   believe was happening?

2   A    I was so mad at the time that I forgot that I seen the

3   police car that was working on corner.  So I was thinking

4   they was playing games.  I thought they had the 400,000.

5   Q    Explain that what playing games meant.  What were you

6   thinking had happened?

7   A    I figured it was going with the flow and they would

8   follow me and play it off.  And then I seen them no more so I

9   didn't know what I was thinking.  My mind was playing tricks

10  on me.

11  Q    Did you, at any point, learn what had happened to the

12  second car?

13  A    Yes.  Sha Bang told me the next day they was locked up.

14  Q    And what does that mean, "locked up"?

15  A    The police got them.

16  Q    And did you learn about this from a phone call with

17  Sha Bang or meeting him?

18  A    From a phone call.  That's when I realized that I had

19  text LaBanga but he didn't text me back.

20  Q    Now, I want to talk about what you did with the

21  marijuana.

22         Did you give Barock, who had been with you, did you

23  give him any of the money or marijuana that had been taken

24  from the stash house?

25  A    Yes.

Hytmiah - Direct/Mr. McDonald                    215

1  Q    And what did you give him?

2  A    If I'm not mistaken, I gave him an -- I gave him a pound

3  and $500.

4  Q    And did you give anyone else any of the marijuana or the

5  money?

6  A    I can't recall.

7  Q    Did you split it up with anyone else?

8  A    No, I kept everything.

9  Q    Okay.  What about the gun that you had taken out of the

10 safe, what happened with that?

11 A    What happened?  I brought it back to the house.  I just

12 left it there.  I don't know if Barock took it, he probably

13 took it with him.

14         MR. MCDONALD:  Your Honor, is this a good point for

15 a break.

16         THE COURT:  Yes, I think so.  We'll take a

17 ten-minute break.

18         All rise for the jury.

19         (Jury exits courtroom at 3:41 p.m.)

20         (Witness leaves the witness stand.)

21         THE COURT:  About how much more do you have?

22         MR. MCDONALD:  10 to 15 minutes.

23         THE COURT:  Another what?

24         MR. MCDONALD:  10 or 15 minutes.

25         THE COURT:  Then we'll start cross.

```
                Hytmiah - Direct/Mr. McDonald              216
```

1          MR. VILLANUEVA:  I'll try to finish but I'm not

2    sure I will.

3          THE COURT:  If you don't, we have tomorrow.

4          MR. VILLANUEVA:  I'll be here.

5          THE COURT:  All right.  Thank you, everyone.

6          (A recess in the proceedings was taken.)

7          (Defendant enters the courtroom at 3:57 p.m.)

8          (Witness takes the witness stand.)

9          THE COURT:  You want the witness to wear the clear

10   covering and not the face mask?  Let's see if that works.

11   Just keep your voice up as much as possible.

12          Let's call in the jury.  Thank you.

13          (Jury enters courtroom at 4:00 p.m.)

14          THE COURT:  Please be seated, everyone.  And we'll

15   continue with the direct examination of the witness.  I

16   remind the witness that he's still under oath.

17          If any of the jurors in the back can't hear

18   something in particular, raise your hand and we'll get it

19   repeated.  In the meantime, we'll try to up the volume for

20   tomorrow morning.

21          Okay.  You may continue the examination.

22          MR. MCDONALD:  Thank you, your Honor.

23   EXAMINATION BY

24   MR. MCDONALD:

25   (Continuing.)

Hytmiah - Direct/Mr. McDonald                217

```
 1  Q    Mr. Hytmiah, we talked just before the break you were

 2  giving Barock marijuana and money; is that correct?

 3  A    Yes.

 4  Q    Did you give any of the other participants on that board

 5  and I guess I should add --

 6            MR. MCDONALD:  May I approach, your Honor.

 7            THE COURT:  Yes, you may.

 8  Q    You know one of the defendants is Heddis, right; is that

 9  correct?  H-e-d-d-i-s or H-e-a-d-i-s?

10  A    Yes.

11  Q    Okay.  You know with the defendant Latiff Thompson is

12  LaBanga?

13  A    Yes.

14  Q    Is this approximately correct?

15  A    Yes.

16  Q    And you were known as Woody and Sha Balla, is this

17  correct?

18  A    Yes.

19  Q    Now, of the other people that you've testified about who

20  participated in this stash house robbery, who else did you

21  give either the money or some of the marijuana to?

22  A    Nobody else.

23  Q    Did anyone ever try to reach out to you to get either

24  marijuana or money from the robbery?

25  A    Yes.
```

GA111

Hytmiah - Direct/Mr. McDonald                    218

1  Q    Who do you recall reached out to you?

2  A    GP reached out to me and LaBanga reached out to me.

3  Q    Let's start with GP.  How did GP reach out to you?

4  A    Yeah, yeah, yeah, he called my phone.

5  Q    And what do you recall him saying or asking?

6  A    He was telling me he just got out of jail and he's going

7  to get some of his cut.

8  Q    And what did you tell him, if anything?

9  A    I was telling him it was quiet.

10 Q    What does that mean?  And try to speak up.

11 A    I told him it was dead, it was quiet.  I told him it was

12 quiet, I wasn't giving him nothing.

13 Q    Why did you tell him that?

14 A    Because one of our mutual friends see him on Facebook

15 that he was posting pounds of marijuana.

16 Q    And who told you that he was posting pounds of marijuana

17 on Facebook?

18 A    One my friends.

19 Q    Who is that?

20 A    Kimmy.

21 Q    Who is Kimmy?

22 A    Somebody from the neighborhood.

23 Q    And when Kimmy told you this, what did you do?  Did you

24 check this information in any way?

25 A    I believe she sent me the picture.  She told me this in

Hytmiah - Direct/Mr. McDonald                    219

1   person, but then she also sent me the picture if I'm not

2   mistaken.

3   Q    What picture did you see?

4   A    I basically seen, like, I seen a picture of the plates

5   of marijuana and a whole bunch of packages stacked up on top

6   of the marijuana and the gym bag in the left corner with the

7   picture.

8   Q    What gym bag did you see?

9   A    The same gym bag from the robbery.

10   Q    The black one you described?

11   A    Yes.

12   Q    And the plates, those are the pounds of marijuana; is

13   that correct?

14   A    Yes.

15   Q    Did those look like the marijuana you had taken from

16   Lazzo's baby mother's house?

17   A    Yes.

18   Q    And I don't think I asked you this.  Do you know what

19   Lazzo's baby mother's name is?

20   A    I think it's Shakita, something like that.  It starts

21   with an S.

22   Q    And that house, have you seen a picture of that house

23   before?

24   A    Excuse me.

25   Q    Have you seen a photo of that house that you went to

Hytmiah - Direct/Mr. McDonald                 220

1  Lazzo's baby mother's house?

2  A    Yes.

3  Q    Can I bring up Government Exhibit 217, please, for the

4  witness.

5          Do you see Government Exhibit 217 in front of you?

6  A    Yes.

7  Q    What is it?

8  A    That's the house where I picked up the marijuana from.

9  Q    Is this a fair and accurate picture of the house as it

10 appeared when you went there to collect the marijuana?

11 A    Yes.

12         MR. MCDONALD:  I offer Government Exhibit 217.

13         MR. VILLANUEVA:  No objection.

14         MR. COMMISSIONG:  No objection.

15         MR. MCDONALD:  May I publish it.

16         THE COURT:  Any objection.

17         MR. VILLANUEVA:  No objection.

18         MR. COMMISSIONG:  No objection.

19         THE COURT:  Exhibit 217 is received in evidence and

20 published to the jury.

21         (Government's Exhibit 217 was received in evidence

22 as of this date.)

23         (The above-referred to exhibit was published to the

24 jury.)

25

Hytmiah - Direct/Mr. McDonald                    221

```
 1              THE COURT:  Okay.
 2    EXAMINATION BY
 3    MR. MCDONALD:
 4    (Continuing.)
 5    Q    This is the house you went to that you had been
 6    testifying about where you collected marijuana from?
 7    A    Yes.
 8              MR. MCDONALD:  We can take the photo down now.
 9    Thank you.
10    Q    We talked about GP.  Who else reached out to you?
11    A    LaBanga.
12    Q    How did -- when you say, "LaBanga," you mean the
13    defendant Latiff Thompson; correct?
14    A    Yes.
15    Q    How did he reach out to you?
16    A    His brother called me on the phone on a three-way.
17    Q    His brother?
18    A    Yes.
19    Q    Who is his brother?
20    A    Littles.
21    Q    How do you know Littles?
22    A    I know him from the neighborhood.
23    Q    And do you know Littles' government name or real name?
24    A    No.
25    Q    But you know him to be the defendant Latiff Thompson's
```

Hytmiah - Direct/Mr. McDonald                    222

1   brother?

2   A    Yes.

3   Q    And when Littles called you, walk us through what

4   happened?

5   A    He basically called me on the phone with LaBanga and I

6   spoke to LaBanga on the phone.

7   Q    And when you spoke to LaBanga on the phone, where was

8   he?

9   A    He was in jail.

10  Q    And what was that conversation?  Can you walk us through

11  what happened during that conversation?

12  A    He basically just asking me for thousand dollars so he

13  could bail out.

14  Q    How did you -- do you remember what he said?

15  A    I don't remember.

16  Q    Did you give him a thousand dollars?

17  A    No.

18  Q    Did you give him anything?

19  A    No.

20  Q    Was there more than one conversation with either the

21  defendant Latiff Thompson or Littles about this?

22  A    I think I spoke to him at least once or twice and I

23  didn't speak to him no more.

24  Q    Did you speak with Littles about this?

25  A    Yes.

Hytmiah - Direct/Mr. McDonald                    223

1  Q    Did you give Littles any of the marijuana or the money?

2  A    No, but he was asking me for a pound of weed so he could

3  sell it to get his brother out.

4           MR. MCDONALD:  May I bring up Government

5  Exhibit 109 for the witness, please.

6  Q    Can you see Government Exhibit 109 in front of you?

7  A    Yes.

8  Q    Do you recognize it?

9  A    Yes.

10 Q    What do you recognize it to be?

11 A    That's Littles.

12 Q    It's a photograph of Littles?

13 A    Yes.

14 Q    Is it a fair and accurate representation of Littles as

15 he appeared in 2017?

16 A    Yes.

17          MR. MCDONALD:  I offer Government Exhibit 109.

18          MR. VILLANUEVA:  No objection.

19          MR. COMMISSIONG:  No objection.

20          THE COURT:  All right.  Exhibit 109 is received in

21 evidence and published to the jury.

22          (Government's Exhibit 109 was received in evidence

23 as of this date.)

24          (The above-referred to exhibit was published to the

25 jury.)

```
               Hytmiah - Direct/Mr. McDonald                 224
```

1  EXAMINATION BY

2  MR. MCDONALD:

3  (Continuing.)

4  Q    What did you do with the marijuana that you had

5  collected from Lazzo's baby mother's house?

6  A    I gave some away and I sold some.

7  Q    And you got money in return for selling it; is that

8  right?

9  A    Yes.

10  Q    Do you know what type of marijuana it was?

11  A    Yes.

12  Q    What was it?

13  A    It was set Sour Diesel and Kush.

14  Q    What is Sour Diesel?

15  A    It's a strain of the weed.

16  Q    A strain of the weed?

17  A    Yes.

18  Q    And how did you know it was Sour Diesel?

19  A    Because I used to smoke weed before.

20  Q    And you had used Sour Diesel before?

21  A    Yes.

22  Q    You mentioned Kush?

23  A    Yes.

24  Q    What is Kush?

25  A    It's another strain of weed?

GA118

Hytmiah - Direct/Mr. McDonald                     225

1  Q    Is it also known as Platinum Kush?

2  A    Yes.

3  Q    How did you know that the marijuana, some of the

4  marijuana was Platinum Kush?

5  A    Because it was different colors on it.  One was a darker

6  color from another one.

7  Q    At the time, do you remember how much you could sell a

8  pound of Sour Diesel for?

9  A    If I'm not mistaken, it was either from 30 something to

10  $5,000.

11  Q    What about a pound of Platinum Kush?

12  A    Same thing.

13  Q    You mentioned describing seeing the Facebook photo, or

14  the photo you had been shown of the gym bag and the

15  marijuana, Back Woods.

16         Did I get that correctly?

17  A    Yes.

18  Q    What are Back Woods?

19  A    It's basically something that you smoke weed out of.

20  Q    And so, it's like a cigar for rolling?

21  A    Yes.

22  Q    And this was part of the photograph of the marijuana; is

23  that correct?

24  A    Yes.

25  Q    When you saw the photograph with the marijuana and the

Hytmiah - Direct/Mr. McDonald                226

1   Back Woods and the gym bag, what did you believe had happened

2   with GP?

3   A    That they stashed some weed on me when I was coming to

4   the house to pick it up.

5   Q    When you say come to the house, what house?

6   A    The house that's on 116 and Sutphin.

7   Q    When you were at that house, did you see anything that

8   led you to believe that they had already been able to stash

9   weed before you had arrived?

10  A    Yes.  Because when I walking out, I snatched a QP off

11  the floor by the steps.

12  Q    I didn't understand that.

13  A    When I was walking out, I snatched a QP of weed that was

14  on the steps by the door.

15  Q    What's a QP of weed?

16  A    It's a quarter plate of the marijuana that was right

17  there.

18  Q    And it was by the door?

19  A    Yes.

20  Q    And so, why did seeing that make you think that they had

21  already stashed some of the marijuana?

22  A    Because first, when I pulled up, they was taking long to

23  tell me to go inside.  And second, when I came in, they tried

24  to, like, try to disperse everything around.  And there was

25  no reason for a QP at the door.  It means, like, somebody was

Hytmiah - Direct/Mr. McDonald                    227

1   bringing it upstairs or it dropped out, or it was just

2   sitting there.

3   Q    I asked you about a lot of terminology.

4           Do you know the word Jackie?

5   A    Yes.

6   Q    What's a Jackie?

7   A    It's a gun.

8   Q    Are there other words for gun that you used?

9   A    Yes.

10  Q    Could you give some?

11  A    A hammer.  Dog.  Biscuit.  Triple Five.  Burner.

12  Q    Do you know the term four-fifth or four-fifths?

13  A    Yes.

14  Q    What's that?

15  A    It's a gun, it's a four-fifth.

16  Q    After you had spoken with GP and the defendant about

17  trying to collect some of the drugs or money, did you have

18  any other conversations about splitting proceeds or splitting

19  what was taken from the robbery?

20  A    Say that again.

21  Q    Did you speak to anyone else about splitting drugs or

22  splitting money that was taken during this robbery?

23  A    No.

24  Q    Did you give ShaBang anything from the robbery?

25  A    No.

```
                     Hytmiah - Direct/Mr. McDonald              228
```

1  Q    Why not?

2  A    Because I figured he was down with it.

3  Q    He was -- what does that mean?

4  A    I figured he was part of the scenario.  I figured he

5  knew what was going on, he was in cahoots with what was going

6  on.

7  Q    Does that mean that you believed he was getting

8  something from his group?

9  A    Yes.

10 Q    That would be the group including GP, Lazzo, and the

11 defendants?

12 A    Yes.

13 Q    So when you saw the photo on Facebook, you knew that

14 they had taken something that you had not been able to

15 collect from that house; is that right?

16 A    Yes, I counted it.

17 Q    How much did you count?

18 A    14 plates.

19 Q    Is that 14 pounds?

20 A    Yes.

21 Q    When you say, "Counted," you counted the plates in the

22 photo?

23 A    Yes.

24 Q    And do you know which of the marijuanas they had, the

25 Sour Diesel or the Platinum Curb?

Hytmiah - Direct/Mr. McDonald                    229

1    A    No, that was all mixed up.

2    Q    We talked about the marijuana and the money.  Do you

3    know how many guns were taken from the robbery?

4    A    All I knew was I recovered one run after it was inside

5    the safe.  And when I went inside Lazzo house, if I'm not

6    mistaken, I seen a gun over there.  But I definitely seen a

7    Ziploc bag full of bullets.  So they took it and found the

8    gun in the house.  I don't remember whether it was one or

9    two.

10   Q    And the Ziploc, you mentioned this earlier, the Ziploc

11   of bullets, did you have any discussion about where the

12   Ziploc of bullets had come from?

13   A    They told me it came from the house.

14   Q    And by "The House," the stash house we've been talking

15   about; correct?

16   A    Yes.

17        MR. MCDONALD:  I would like to play a portion of

18   Government Exhibit 500 for the purpose of the witness

19   identifying the voice.  And, for the record, we'll be playing

20   from 18 seconds to approximately 52 seconds.  I've checked

21   with defense counsel, there's no objection to this being

22   played for purposes of voice identification.

23        MR. VILLANUEVA:  That's true.

24        MR. COMMISSIONG:  That's correct, your Honor.

25        THE COURT:  Okay.

Hytmiah - Direct/Mr. McDonald                230

1      MR. MCDONALD:  So we can go ahead and play.

2      THE COURT:  Okay.  Let's do it.

3      (A brief pause in the proceedings was held.)

4      MR. MCDONALD:  I suspect that there will be

5  cross-examination of the witness.  And then, if it's okay, I

6  can do this during redirect if that will be acceptable.

7      THE COURT:  Any problem with that?

8      MR. VILLANUEVA:  No, Judge, that's fine.

9      THE COURT:  Let's move on then.

10     MR. MCDONALD:  Okay.

11 EXAMINATION BY

12 MR. MCDONALD:

13 (Continuing.)

14 Q    Before today, when was the last time you saw the

15 defendant Latiff Thompson?

16 A    The day of the robbery.

17 Q    When was the last time you saw the defendant you know as

18 has Heddis?

19 A    The day of the robbery.

20 Q    One final term to ask you about.  What Pacquiao is?

21 A    Yes.

22 Q    What's that mean?

23 A    It's a term that's, like something hit hard.

24 Q    What's that mean?

25 A    I guess if you smoking it, it says Pacquiao because it

Hytmiah - Direct/Mr. McDonald                    231

1  means it hits hard.

2  Q    Is that a reference to drugs?

3  A    Yes.

4  Q    What about pudding major?

5  A    Pudding major?

6  Q    What does that mean?

7  A    It's probably saying somebody pick up the most money.

8  Q    Were these terms that you've used?

9  A    I probably said one of those terms before.

10           MR. MCDONALD:  One moment, your Honor.

11 Q    The reference to Pacquiao.  That's a reference to

12 marijuana specifically; is that correct?

13 A    Yes.

14 Q    Last thing I want to ask you about is when you were

15 describing the robbery location, you described that the entry

16 had happened on the back of the building; is that correct?

17 A    Yes.

18 Q    Why, from your memory, why not just go through the front

19 door that Latiff Thompson had gone through?

20 A    Because it was on the main strip of Jamaica Avenue and

21 they couldn't get us out by the doors and there was cameras.

22 Q    Where were the cameras?

23 A    If I'm not mistaken, it was inside the doorway.

24 Q    Was there a camera inside the doorway?

25 A    Yes.

Hytmiah - Cross/Mr. Villanueva                    232

1  Q    And why, why would those things make it more preferable
2  to go through the rear of the building?
3  A    Because nobody could see them going in from the back.
4          MR. MCDONALD:  I have no further questions, your
5  Honor.
6          THE COURT:  Very well.  Cross-examination,
7  Mr. Villanueva.
8          MR. VILLANUEVA:  Yes.
9  CROSS-EXAMINATION
10 BY MR. VILLANUEVA:
11 Q    Mr. Hytmiah, can you hear me?
12 A    Yes.
13 Q    Can you hear me clearly?
14 A    Yes.
15 Q    I'd like to begin with your cooperation agreement.
16          THE COURT:  Can you introduce yourself to the
17 witness?
18          MR. VILLANUEVA:  Absolutely, your Honor.
19          THE COURT:  Thank you.
20 Q    Mr. Hytmiah, my name is Gary Villanueva.  I'm one of the
21 lawyers for Mr. Latiff Thompson, okay?
22 A    Yes.
23 Q    Mr. Hytmiah, how tall are you?
24 A    6-3.
25 Q    How much do you weigh?

Hytmiah - Cross - Villanueva                    257

1    A    No.

2    Q    Do you kick up or share benefits or profits from your

3    home invasions and burglaries with other higher-ups in the

4    Mac Ballers?

5    A    No.

6    Q    Do you do robberies and burglaries and home invasions

7    with Mac Ballers?

8    A    If they was there at the time, yes.

9    Q    Okay.  You were arrested initially in December of '17

10   with two other people, correct?

11   A    Yes.

12   Q    And one of them was a guy named Murchison; is that

13   correct?

14   A    Yes.

15   Q    He's a Mac Baller, right?

16   A    Yes.

17   Q    You were also arrested with a guy named Cheese

18   Constantine, correct?

19   A    Yes.

20   Q    He's a Mac Baller, correct?

21   A    Yes.

22   Q    And the guy that you've been talking about today,

23   Sha Bang, or is it -- Sha Bang, do I got it right?

24   A    You said it right the first time.

25   Q    Okay.  He's a Mac Baller, too, correct?

GA127

Hytmiah - Cross - Villanueva                 258

```
 1   A    Yes.
 2   Q    So when possible, you prefer to work with Mac Ballers,
 3   correct?
 4   A    No.
 5   Q    No, you don't?
 6   A    I prefer to work with, you know, whoever knows what
 7   they doing.
 8   Q    But over time, because of your relationship with
 9   Mac Ballers, you've worked primarily with Mac Ballers; isn't
10   that correct?
11   A    No.
12   Q    Do you know Littles?
13   A    Yes.
14   Q    And who is Littles?
15   A    That's one of my co-defendants.
16   Q    Okay.  And he's the younger brother of Latiff Thompson,
17   correct -- and when I say "he's the younger brother," he's,
18   what, almost ten years younger than you, correct?
19   A    I don't know his age, so I couldn't tell you the --
20   very little.
21   Q    But he's significantly younger than you --
22   A    Yes.
23   Q    -- is that correct?
24        Correct?
25   A    Yes.
```

Hytmiah - Cross - Villanueva                    259

1   Q    And you knew him before you knew Latiff Thompson,

2   correct?

3   A    Yes.

4   Q    And you know Littles because Littles is a member of the

5   Mac Baller, correct?

6   A    Yes.

7   Q    And he's a gang member with you, correct?

8   A    Yes.

9   Q    And he's participated with you on the seven or so

10  robberies or home invasions that you talked about earlier,

11  correct?

12  A    Yes.

13  Q    And he's involved with you because he's a Mac Baller

14  and you trust him as a result of his status as a Mac Baller,

15  correct?

16  A    No.

17  Q    It's because he knows what he's doing?

18  A    Once again, I didn't call him on this -- I didn't

19  initially call him to commit this robbery or home invasion.

20  It's mutual friends.  I called somebody, and they call who

21  they gonna' call?  So that's not up to me knowing whether he

22  was Mac Baller or not, because it didn't matter to me at

23  all.

24  Q    Okay.

25  A    What matters to me is getting the job done, and that's

GA129

275

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF        : 18-CR-33(NGG)
AMERICA,                  :
                            :
                            : United States Courthouse
                            : Brooklyn, New York
    -against-         :
                            :
                            : Friday, March 18, 2022
                            : 10:30 A.M.
MATTHEW ELIAS, ALSO   :
KNOWN AS "HEDDIS", AND  :
LATIFF THOMPSON, ALSO  :
KNOWN AS "LA BANGA",   :

       Defendants.
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE JUDGE GARAUFIS
SENIOR JUDGE

A P P E A R A N C E S:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                     Eastern District of New York
                     271 Cadman Plaza East
                     Brooklyn, New York 11201
                     BY: JAMES MCDONALD, ESQ.
                         DANA RENHQUIST, ESQ.
                         Assistant United States Attorneys

For the Defendant:    ADAM & COMMISSIONG
                     Attorneys for the Defendant
                     MATTHEW ELIAS
                     65 BROADWAY, SUITE 715
                     NEW YORK, NEW YORK 10006
                     BY:  KARLOFF COMMISSIONG, ESQ.

DIRECT. REHNQUIST. RODRIGUEZ                424

1  Road.

2  Q    And which street is 155 Street?

3        THE COURT:  You can actually touch the screen and

4  show it.

5        THE WITNESS:  Okay.  I'll draw a line to indicate.

6  A    So this is 155 Street (indicating).

7  Q    And which road is 116th Road?

8  A    That is 116th Road (indicating).

9  Q    So for the record, 116th Road is -- 155 Street is

10 running parallel to the screen?

11 A    Yes.

12 Q    And where in proximity to this intersection was your

13 vehicle stationed that night?

14       THE COURT:  Just draw a circle.

15       (Witness complies.)

16       MS. REHNQUIST:  Let the record reflect that the

17 witness has identified the location where the car is parked

18 on the bottom right-hand side of the screen.

19       THE COURT:  Very well.

20 Q    While you're stationed at 2:40 in the morning, what, if

21 anything, did you observe at the time?

22 A    I -- we were facing the westbound direction looking

23 down at that road -- looking down at 116 Road, and I

24 observed a silver Altima drive past my vehicle heading

25 westbound, and basically rolled through that intersection at

GA131

DIRECT. REHNQUIST. RODRIGUEZ                425

1   155 Street and continued and just basically pulled over two

2   or three houses past that intersection.

3   Q    Is this the intersection in Government Exhibit 219 that

4   you're discussing?

5   A    Yes, it is.

6   Q    And you observed the Altima drive through the stop sign

7   that you can see in the middle right-hand side of the

8   screen?

9   A    Yes, I did.

10  Q    Could you mark on the screen where you saw that silver

11  Altima pull over on the opposite side of this intersection?

12        (Witness complies.)

13        MS. REHNQUIST:  Let the record reflect that the

14  witness has identified the opposite side of the intersection

15  on the right-hand side of the street.

16        THE COURT:  Very well.

17  Q    Where in relation to where the car eventually stopped

18  was the last known address you had for Lawrence Woods?

19  A    It was around that area.  I have the actual last known

20  address in my notes if you need it.  But it was basically

21  about three houses in from the intersection on the westbound

22  direction.

23  Q    So within the same vicinity?

24  A    Yes.

25  Q    You mentioned a Altima.

DIRECT. REHNQUIST. RODRIGUEZ                426

1        Did you see any other vehicles that night at

2   approximately 2:40 in the morning?

3   A    So I can see -- I can see another vehicle that arrived

4   at the location.  I can see, basically, the taillights and

5   then the headlights, and then I got a closer look at that

6   vehicle once both vehicles left that location and started

7   traveling back in my direction.

8   Q    Okay.  And did you eventually learn the make or model

9   of that second vehicle?

10  A    It was an older model, a Nissan Maxima.

11  Q    Eventually, you said you saw the Altima pull through

12  the intersection and then station itself a bit furtherer

13  down 116th Road?

14  A    Yes.  It just rolled past that intersection and it

15  just, sort of, double parked, you know, right along that

16  dot, you know, that I placed there.

17  Q    Did you see the Maxima also go to that location?

18  A    Yes, it did.

19  Q    And when you say rolled through, what do you mean?

20  A    The vehicle just completely disregarded that stop sign,

21  that 155 Street, running north and south is a two-way

22  street, just as 116 Road is a two-way street, and it is not

23  a four-way stop.

24  Q    After both vehicles pulled over a few houses in on

25  116th Road, what, if anything, did you observe next?

DIRECT. REHNQUIST. RODRIGUEZ                    427

1  A    So at a distance, I can see what appeared to be the

2  silhouettes of people just basically entering the sidewalk

3  and just hanging out, you know, in the vicinity of the

4  sidewalk, adjacent to where the vehicles are were double

5  parked.

6  Q    At this time, could you identify any of those

7  individuals?

8  A    No.

9  Q    Aside from the individuals from those two cars, was

10 anyone else outside at this time?

11 A    No.  It was very late.  It was, you know, well after

12 2:00 o'clock in the morning.  There wasn't any pedestrian

13 traffic or vehicular traffic, you know, going on that night.

14 Q    Is it fair to say your attention was drawn to the

15 activity that you were observing on 116th Road?

16 A    Yes.  Yes.  I focused on just basically looking at the,

17 you know, the -- the persons that appeared to be down the

18 road, and it just drew my attention because the silver

19 Altima hit on my plate reader, and at that point, once the

20 image comes up on the screen, we double check the plate

21 number and the plate of that vehicle went back to a

22 rental -- to another rental vehicle.

23 Q    Okay.  After you observed the individuals get out of

24 the two cars that were double parked on 116th Road, what

25 happened next?

DIRECT. REHNQUIST. RODRIGUEZ                428

1   A    They were there for, you know, for a little while, and

2   we continued to just do surveillance at the location.  After

3   about 15 minutes or so, I basically observed the silhouettes

4   of the persons that were on the sidewalk, just basically

5   disappear onto the street, and I observed the two vehicles

6   traveling eastbound towards my direction across that

7   intersection.

8   Q    Were the vehicles traveling on 116th Road?

9   A    Yes.  Both vehicles were traveling on 116 Road.

10  Q    Back towards the direction where your vehicle was

11  parked?

12  A    That is correct.

13  Q    Did you make any observations about the vehicles at

14  that time?

15  A    Yes.  So I -- it appeared to me that they were

16  following closely with each other, and again, the silver

17  Altima and the Nissan Maxima just basically rolled past that

18  intersection and continued eastbound behind me.

19  Q    Were the vehicles driving quickly?

20  A    They were in a hurry.

21  Q    Now, you mentioned earlier that the car you were

22  conducting surveillance in that night was equipped with a

23  license plate reader?

24  A    That is correct.

25  Q    In addition, one of the other vehicles that was out

DIRECT. REHNQUIST. RODRIGUEZ                429

1  with you on surveillance that night was also equipped with a

2  license plate reader?

3  A     That is correct, yes.

4          MS. REHNQUIST:  Can we pull up for the witness,

5  Government Exhibit 701.  And this document is seven pages.

6          Could we just scroll through so the witness can

7  see each of the pages.

8          Your Honor, would it also be possible to clear the

9  screen.  I believe there's a marking on it leftover.

10         THE COURT:  Oh, yes.

11 Q     Lieutenant Rodriguez, without telling us what they are,

12 do you recognize these documents?

13 A     I do.

14 Q     And what are they?

15 A     They're basically the printed documents of how it

16 appears when you conduct a query for a plate reader search.

17 Q     Are these documents that are pulled from the New York

18 Police Department license plate reader system?

19 A     Yes, they are.

20 Q     Are these documents that were taken by your marked

21 vehicle on September 17, 2017 -- unmarked, sorry?

22 A     Yes.

23 Q     And also, is one of them taken from one of the other

24 cars that you were out conducting the surveillance with that

25 night?

DIRECT. REHNQUIST. RODRIGUEZ                    430

1   A    Yes.  That is correct.

2          MS. REHNQUIST:  Your Honor, the Government offers

3   Government Exhibit 701.

4          MR. COMMISSIONG:  No objection.

5          MS. VILLALONA:  No objection.

6          THE COURT:  All right.  Exhibit 701 is received in

7   evidence and published to the jury.

8          (Government Exhibit 701, was received in

9   evidence.)

10         (Exhibit published.)

11  Q    First looking at Page 1, could you explain to the jury

12  what this record shows?

13  A    So at the top of the document, the document indicates

14  the source of that picture.  It indicates that it's sourced

15  from an LPR or license plate reader.  It also indicates the

16  asset or basically listing the vehicle number.  That vehicle

17  number is listed as Patrol Borough Queens South Auto Larceny

18  Unit, unit 0402.

19  Q    And is that the vehicle that was equipped with the

20  license plate reader that took these images?

21  A    Yes.  That is correct.

22  Q    Was that your vehicle or your partner's vehicle?

23  A    That was the secondary vehicle equipped with the LPR

24  system.

25  Q    And what time was this photograph taken?

DIRECT. REHNQUIST. RODRIGUEZ                    431

1    A    It was taken at approximately 0240 hours.

2    Q    And is that 2:40 in the morning?

3    A    2:40 in the morning.

4    Q    On what date?

5    A    September 7th, 2017.

6    Q    Could you circle on the screen where it says the date

7    and time of photograph was taken.

8             (Witness complies.)

9             MS. REHNQUIST:  And let the record reflect that

10   the witness is circling the top left hand -- top right-hand

11   side of the document.

12            THE COURT:  Very well.

13   Q    Just below that, is there a photograph of the license

14   plate?

15   A    Yes.  The document captures what the camera perceives

16   to be as the plate, it appears to be in a dark background,

17   and then it also captures a still image of the vehicle

18   license driving past the unit.

19   Q    What is the license plate of this vehicle that was

20   captured at 2:40 in the morning on September 7, 2017?

21   A    It's a New York plate, Henry Robert Zebra 6188.

22   Q    And do you recognize the model of the vehicle?

23   A    Yes.  That's the older model Nissan Maxima that was on

24   scene that night.

25   Q    And is that Maxima that you observed rolled through the

DIRECT. REHNQUIST. RODRIGUEZ                    432

1   stop sign around 2:40 in the morning?

2   A    That's the Nissan Maxima that I saw roll through the

3   stop sign as he was leaving that night after stopping

4   briefly.

5   Q    Okay.  Focusing on the bottom part of the document, do

6   you see the, sort of, red bubble marker?

7   A    Yes.

8   Q    What is that marker?

9   A    The red mark indicates the -- it's the GIS locator for

10  the unit conducting the plate read.  Basically, indicating

11  that vehicle 402 was parked in the vicinity of this

12  intersection at the time.

13  Q    What intersection is that?

14  A    That is the intersection of 116 Avenue and 155 Street.

15  Q    And in order for this photograph to have been taken,

16  does that mean that this Maxima with license plate HRZ6188

17  would have driven past the license plate reader at

18  approximately 2:40 in the morning on September 7, 2017?

19  A    That is correct.

20        MS. REHNQUIST:  Could we turn to Page two of the

21  document?

22  Q    Again, focusing on the top half of the document, could

23  you please describe the date and time this photograph was

24  taken?

25  A    It was taken September 7, 2017, at approximately

DIRECT. REHNQUIST. RODRIGUEZ                    433

1    0240 a.m.

2    Q    And what is the license plate number that was captured

3    in this photograph?

4    A    It's license plate Henry Charlie Charlie 1340.

5           MS. REHNQUIST:  And if we could go back to the

6    full page of the document.

7    Q    On the bottom part, can you please explain what

8    information is captured below the photograph of the license

9    plate and the vehicle?

10   A    The information at the bottom lists the -- some of the

11   particulars of the vehicle.  It's a gray Nissan four-door

12   sedan and it has -- it's listed the registered owner as EIN

13   Holdings which is basically a rental company.

14   Q    Do you know which rental company?

15   A    Actually, EIN is an acronym for Enterprise Alamo and

16   I'm drawing a blank on the N.  I'm sorry.  Enterprise Alamo

17   National.

18   Q    Turning to Page 2 of this document -- I'm sorry, Page

19   3, but the second page of this LPR hit and looking at the

20   map.

21           Where was this vehicle when this license plate

22   reader hit was captured?

23   A    My vehicle was in the vicinity of 116 Road and 155

24   Street, as indicated by the GIS locator.

25   Q    So is the license plate hit that's captured in this

DIRECT. REHNQUIST. RODRIGUEZ                    434

1   document the Nissan Altima that drove by you at

2   approximately 2:40 in the morning on September 7, 2017?

3   A    That is correct.

4   Q    Now, could you -- now, in relation to this map, the red

5   marker indicates where the license plate image was captured?

6   A    Yes.

7   Q    Could you mark where you observed the vehicles pull

8   over after they drove by you the first time.

9            (Witness complies.)

10           MS. REHNQUIST:  Let the record reflect that the

11   witness has indicated across the intersection of 155 Street

12   and 116th Road.

13   Q    And as it pertains to the Nissan Altima that we were

14   just discussing, which direction were they coming from when

15   you first observed them roll through the stop sign?

16   A    So when I first -- what I first observed was at

17   approximately 0240 hours, the Nissan Altima was traveling in

18   this direction as I was parked -- as we were parked in the

19   vicinity of where the GIS locator was located, and it

20   proceeded past that intersection, rolling through that stop

21   sign.

22           THE COURT:  So that was from east to west?

23           THE WITNESS:  Yes, Your Honor, east to west.

24   Q    Okay.

25           MS. REHNQUIST:  Now, if we could clear the screen.

DIRECT. REHNQUIST. RODRIGUEZ                    435

1    Q    There are two other license plate reader hits I want to
2    go through with you.
3            THE COURT:  Okay.
4    Q    Looking at Page 4, what was the date and time of this
5    license plate reader hit?
6    A    This LPR scan is recorded at 0258 hours, approximately,
7    September 7, 2017.
8    Q    And what's the license plate reader that was captured
9    in this?
10   A    Henry Robert Zebra 6188.
11   Q    And is -- do you know which vehicle this license plate
12   hit is for?
13   A    This is the older model Nissan Maxima.
14   Q    And does this license plate reader hit capture when the
15   Nissan Maxima was now driving past you for the second time,
16   westbound to eastbound on 116th Road?
17   A    Yes.  This captures the Nissan Maxima traveling
18   eastbound on 116 Road.
19           MS. REHNQUIST:  And can we turn to the next page.
20   Q    What is the date and time of this license plate reader
21   hit?
22   A    September 7, 2017, 0259 hours, recorded for unit 8087.
23   Q    What license plate is captured here?
24   A    Henry Charlie Charlie 1340.
25   Q    Now zooming back to the map.

DIRECT. REHNQUIST. RODRIGUEZ                436

1          This Henry Charlie Charlie 1340 was recorded

2    driving past you at 2:50:03 a.m.; is that right?

3    A    That is correct.

4    Q    And in the preview document, we looked at the license

5    plate reader hit for license plate HRZ 6188 and that was at

6    2:58:59 a.m.?

7    A    That is correct.

8    Q    Does this mean that the vehicle with HCC 1340 license

9    plate, the Nissan Altima, drove by you four seconds after

10   the older Nissan Maxima?

11   A    The Altima was -- yes.  The Maxima and the Altima are

12   now traveling eastbound on 116 Road.  The older model Nissan

13   Maxima rolls past my car first, with the Altima following.

14   Q    Four seconds later?

15   A    Four seconds later, yeah.  Very close proximity.

16   Q    Focusing on the map here, you mentioned that the cars

17   are now driving from westbound to eastbound?

18   A    That is correct.

19   Q    When you observed these vehicles come through the stop

20   sign for the second time, what, if anything, did you do?

21   A    As they were travelings eastbound on 116 Road in this

22   direction, I radioed over to my other two units, the

23   description of the vehicles using our TAC radio, and I

24   provided them more specifically with the information on the

25   rental, the silver Nissan Altima.

DIRECT. REHNQUIST. RODRIGUEZ                    437

1  Q    You informed your partners who were in other vehicles

2  in the area, the license plate information for the Nissan

3  Altima?

4  A    I gave them -- I recall giving them the description of

5  the vehicle, silver Nissan Altima, and I basically indicated

6  to them to initiate a car stop on the silver Nissan Altima.

7  Q    After you sent the information over the radio, what did

8  you do?

9  A    I pulled out of the parking space, I made a right-hand

10 turn on 155 Street now traveling northbound, and then I made

11 another right hand turn on 116 Avenue traveling eastbound.

12 Q    Traveling eastbound?

13 A    Traveling eastbound, yes.

14 Q    Did you eventually come to the intersection of 116th

15 Avenue and Barron Street?

16 A    I did.

17 Q    Upon arriving at the intersection of 116th Avenue and

18 Barron Street, what, if anything, did you observe?

19 A    I observed the Nissan Altima which I indicated to my

20 other units, basically pulled over by my other two units.

21 Q    And this is the Nissan Altima with license plate HCC

22 1340?

23 A    That is correct.

24 Q    Now, the traffic stop that took place on 116th and

25 Barron Street, is this right by Baisley Park?

DIRECT. REHNQUIST. RODRIGUEZ                 438

1   A     Yes.   So Barron Street is a short block that runs, sort

2   of, north and south between Foch Boulevard and 116 Avenue,

3   and there's a park area basically right here (indicating).

4             (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RODRIGUEZ - DIRECT - RENHQUIST                    439

1    CONTINUED DIRECT EXAMINATION

2     BY MS. REHNQUIST:

3    Q    So Baisley Park is located just to the east of Barron

4    Street?

5    A    Well, it's -- it's south -- south and east, because

6    Baisley Park is, you know, is made up of different pieces

7    that make up that park but...

8         MS. RENHQUIST:  And could you -- could we clear

9    the screen, please?

10   Q    Now you mentioned that there was a car stopped

11   conducted.  As a result of that stop, you said that four

12   individuals were arrested?

13   A    That is correct.

14   Q    And who are those individuals?

15   A    I'm sorry?

16   Q    Who are those individuals?

17   A    Oh, Mr. Matthew Elias, Mr. Latiff Thompson, Lawrence

18   Woods and Mr. Tyquan Henderson.

19   Q    After the arrests were made, was a cell phone recovered

20   from Tyquan Henderson?

21   A    Yes.

22         MS. RENHQUIST:  Showing you what has been marked

23   as Government Exhibit 301.

24         May I approach, Your Honor?

25         THE COURT:  Yes, you may.

RODRIGUEZ - DIRECT - RENHQUIST                    440

1          (Counsel approaches the witness.)

2    Q    Lieutenant Rodriguez, do you recognize what I've handed

3    you?

4    A    Yes.

5    Q    And what is it?

6    A    This is the cell phone that -- that was recovered that

7    night that Mr. Tyquan Henderson was in possession of.

8    Q    And how do you know that?

9    A    I was there and I was present for the arrest processing

10   when the property was taken into custody, and I signed off

11   on the -- on the invoice.

12   Q    And attached to this phone is NYPD invoice number

13   4000515055?

14   A    515049.

15   Q    049.

16          Your Honor, the government offers Government

17   Exhibit 301.

18          MS. VILLALONA:  No objection.

19          MR. COMMISSIONG:  No objection.

20          THE COURT:  All right, Government Exhibit 301 is

21   received in evidence.

22          (Government's Exhibit 301 received in evidence.)

23   Q    Lieutenant Rodriguez, where was Tyquan Henderson

24   located in the car that was stopped?

25   A    He was in the back seat sitting behind Mr. Latiff

RODRIGUEZ - DIRECT - RENHQUIST                441

1  Thompson.

2  Q    And where was Mr. Latiff Thompson sitting?

3  A    He was in the front passenger seat.

4  Q    Who was the driver of the vehicle?

5  A    Mr. Matthew Elias.

6  Q    And where was Mr. Woods sitting?

7  A    Mr. Lawrence Woods was sitting behind Mr. Matthew

8  Elias.

9  Q    And just to confirm, the vehicle stop happened on

10  Barron Street in between 116th Road and 116th Avenue?

11  A    That is correct.

12  Q    Was a cell phone also recovered from Mr. Latiff

13  Thompson that day?

14  A    Yes, that is correct.

15         MS. RENHQUIST:  Your Honor, may I approach?

16         THE COURT:  Yes, you may.

17         (Counsel approaches the witness.)

18  Q    Lieutenant Rodriguez, do you recognize this?

19  A    I do.

20  Q    What is it?

21  A    This is an Apple iPhone with A pink back case that was

22  recovered from Mr. Latiff Thompson the night -- the night of

23  his arrest.

24  Q    And how do you know that?

25  A    I was present during the arrest processing and for the

RODRIGUEZ - DIRECT - RENHQUIST                    442

1   invoicing of the property.

2   Q    What is the invoice number associated with the cell

3   phone?

4   A    It's 4000515071.

5           MS. RENHQUIST:  Your Honor, the government offers

6   Government Exhibit 300.

7           MS. VILLALONA:  No objection.

8           MR. COMMISSIONG:  No objection.

9           THE COURT:  All right, Government Exhibit 300 is

10  received in evidence.

11          (Government Exhibit 300, was received in evidence.

12  Q    And finally I want to show you what's been marked for

13  identification as Government Exhibit 304.

14            Your Honor, may I approach?

15          THE COURT:  Yes, you may.

16          (Counsel approaches the witness.)

17          MS. RENHQUIST:  Sorry, 302.

18  Q    Lieutenant Rodriguez, do you recognize this?

19  A    Yes, I do.

20  Q    What is it?

21  A    This is the sweatshirt that Mr. Tyquan Henderson was

22  wearing that night.

23  Q    How do you know?

24  A    I was present on the scene, and I was present for the

25  arrest processing during which this item was -- was

RODRIGUEZ - DIRECT - RENHQUIST                443

1   collected and vouchered.

2   Q    And is there an invoice associated with this item?

3   A    Yes, there is.

4   Q    What is the invoice number?

5   A    It's 4000515182.

6            MS. RENHQUIST:  Your Honor, the government offers

7   Government Exhibit 302.

8            MS. VILLALONA:  No objection.

9            MR. COMMISSIONG:  No objection.

10           THE COURT:  All right, Government Exhibit 302 is

11  receive in evidence. (Government Exhibit 302, was received

12  in evidence.)

13  Q    Now, Lieutenant Rodriguez, we're going to omit the

14  package, but what is your understanding of what is inside

15  that package?

16  A    It's a sweatshirt that Mr. Tyquan Henderson was wearing

17  that night.

18           We basically recovered it and vouchered it as

19  investigatory because it had blood stains on it.

20  Q    Did you make observation of the state of the sweatshirt

21  that night when Tyquan Henderson arrived at the precinct?

22  A    Yes.

23  Q    And what were the observations that you made?

24  A    He had some blood stains, it appeared to be on the

25  sleeve of the sweatshirt.

RODRIGUEZ - DIRECT - RENHQUIST                444

1  Q    And just to clarify, after the car stop and the

2  individuals were arrested, were they brought back to the

3  113th Precinct for processing?

4  A    Yes, they were.

5  Q    In your 16 years with the NYPD, have you had the

6  opportunity to view evidence that has blood on it?

7  A    Yes, I have.

8  Q    Does it include clothing?

9  A    Yes, I have.

10 Q    In your experience, does the color of blood change over

11 time?

12 A    Yes, it does.

13 Q    And how does it color change?

14 A    It will turn dark.

15      MS. RENHQUIST:  Your Honor, at this time we'd like

16 to open the evidence.  And I would ask if Agent Stevens can

17 approach to open the evidence with the gloves.

18      THE COURT:  Yes.  Yes.

19          (Agent approaches the witness.)

20      (Pause in the proceedings.)

21 Q    Lieutenant Rodriguez, focusing on the arms of the

22 sweatshirt, can you please explain what you observed?

23 A    Yes, so the sweatshirt has a visible blood stain right

24 around this area here (indicating).  It appears to be a

25 little darker in color.

RODRIGUEZ - DIRECT - RENHQUIST                445

1      THE COURT:  That's the right sleeve?

2      THE WITNESS:  This is the right sleeve, yes, Your

3  Honor.

4  Q    And if you look at the rest of the sweatshirt on the

5  cuff and the elbow areas, do you notice anything else?

6  A    Yes.  It also -- it also has some blood stains right

7  along this area here (indicating), which would be the right

8  sleeve towards the wrist area.

9  Q    And you mentioned that this sweatshirt was recovered on

10 September 7th, 2017?

11 A    That's correct.

12 Q    Approximately four-and-a-half years ago?

13 A    Yes.

14 Q    And could you -- in over time, could you explain the

15 blood stains will change color?

16 A    They will.  They will go from a bright color to a -- a

17 darker color.

18 Q    The night of September 7th, 2017, when you observed

19 this stain, in your opinion, did they resemble what you

20 recognized to be blood?

21 A    That is correct.

22      MS. RENHQUIST:  Your Honor, I'm not sure if --

23 what the Court wants to do as far as the jurors want to look

24 at the stains up close, or do you want them to do that in

25 the jury room?

GA152

480

1   Q     Turning to page 220.  Line entry 1798.  The name in
2   this contact?
3   A     Yes.  The name is Heddis.  H-E-A-D-I-S.  And the
4   telephone number is 1-347-479-3385.
5   Q     Turning to page 295.  Line entry 2144.  Can you please
6   read that name?
7   A     Yes.  The name is Keda, K-E-D-A.  The telephone number
8   is 1-929-402-6802.
9   Q     Page 337.  Entry 2271.  The contact name?
10  A     Yes.  The contact name is Lazo B.  L-A-Z-Z-O, B.
11  Q     The phone number?
12  A     Telephone number is 1-347-632-7597.
13  Q     Page 348.  Entry 2314.  What's the contact name here?
14  A     Yes.  The contact name is Litties.  L-I-T-T-I-E-S.
15  Q     I believe it says Littles?
16  A     I'm sorry, I'm sorry.  Yes.
17  Q     It's small.
18  A     Yes, it's Littles.  L-I-T-T-L-E-S.
19  Q     And the phone number associated with the littles
20  contact?
21  A     Is 1-347-269-9079.
22  Q     To page 495.  Entry 2966.  The contact name here?
23  A     Yes the contact name is Sha-Bang.  S-H-A B-A-N-G.
24  Q     And the phone number?
25  A     Telephone number is 1-917-634-0165.

GA153

489

1  communicated in this chat?

2  A    It's between the user La Oso Litty.  And Sex God

3  Bugatti.

4  Q    Next to the La Oso Litty username, does it say owner in

5  parenthesis?

6  A    That's correct, yes.

7  Q    What does that mean?

8  A    This means that the this is the owner of the device and

9  -- yes.  It means that is the owner of the device.

10  Q    So the La Oso Litty Facebook name was the Facebook

11  profile for the LaBanga phone?

12  A    That's correct, yes.

13  Q    And he's having a Facebook messenger communication with

14  the contact Six God Bugatti?

15  A    That's correct, yes.

16  Q    When is this Facebook messenger communication dated?

17  A    It's on September 6, 2017.

18  Q    And at 7:35 P.M.  on September 6, 2017, is there a

19  message from Six God Bugatti La Oso Litty?

20  A    Yes.

21  Q    At 7:35 p.m.  It's on page 39.  So at 7:39 P.M., could

22  you scroll down?  And looking at the blue chat from Six God

23  Bugatti sends a Facebook messages to the LaBanga phone and

24  he says Sha-Bang got to take us to get those jackies?

25  A    Yes.

GA154

490

1    Q    And then the LaBanga phone responds at 7:36 P.M.?

2    A    Correct, yes.

3    Q    And he says I know, been on him?

4    A    Yes.

5    Q    And does Six God respond?

6    A    Yes.

7    Q    At 7:36, Six God Bugatti responds saying he playing?

8    A    Correct.  Yes.

9    Q    And then the LaBanga phone responds a minute later

10   saying, he caught.  He's chillin with his family.  N word

11   got to do them?

12   A    Yes.

13   Q    Now, turning to Government Exhibit 301A.  Now, this is

14   the Cellebrite pull that you pulled from 1B42.  And if you

15   could look at the MSISDN's number.  What's the MSISDN number

16   for this phone?

17   A    It's not --

18   Q    I think it's on the second page.

19   A    Yes.  It should be on the bottom.

20   Q    Do you see the MSISDN number there?

21   A    Yes.

22   Q    What's the phone number for this phone which is

23   Government Exhibit 301?

24   A    Yes.  The telephone number is 1-407-985-0256.

25   Q    And when we looked at LaBanga phone, his contact list

491

1  previously, we saw this phone number?

2  A    Yes.

3  Q    And this phone number was associated with a contact

4  name of GP?

5  A    Yes.

6  Q    Now, I want to turn to page 4.  On page 4, what's

7  reflected on this page?

8  A    This is the Facebook messenger.

9  Q    And this is the Facebook messenger for the GP phone?

10  A    Correct yes.

11  Q    What's the Facebook messenger name here?

12  A    The Facebook messenger is Six God Bugatti.

13  Q    And Six God Bugatti is the owner for this phone?

14  A    That's correct, yes.

15  Q    So Six God Bugatti is the Facebook profile associated

16  with the GP phone?

17  A    That's correct, yes.

18  Q    This is then a Facebook conversation with the La Oso

19  Litty Facebook name?

20  A    Yes.

21  Q    And the La Oso Litty Facebook name we just reviewed as

22  the Facebook profile for the LaBanga phone?

23  A    Yes.

24  Q    So this is the Facebook conversation between the

25  LaBanga phone and the GP phone?

499

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,       : 18-CV-00033(NGG)
 4                                    :
                                      :
 5                                    :
            -against-                 : United States Courthouse
 6                                    : Brooklyn, New York
                                      :
 7                                    :
                                      : Monday, March 21, 2022
 8   MATTHEW ELIAS, ALSO KNOWN AS     : 1:00 p.m.
     "HEDDIS," AND LATIFF             :
 9   THOMPSON, ALSO KNOWN AS "LA      :
     BANGA,",                         :
10                                    :
            Defendants.               :
11
     - - - - - - - - - - - - - - - - - - X
12

13           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
14             UNITED STATES SENIOR DISTRICT JUDGE

15

16              A P P E A R A N C E S :

17   For the Government: BREON S. PEACE, ESQ.
                         United States Attorney
18                       Eastern District of New York
                         271 Cadman Plaza East
19                       Brooklyn, New York 11201
                     BY:  JAMES P. McDONALD, ESQ.
20                        DANA REHNQUIST, ESQ.
                          Assistant United States Attorney
21

22   For Defendant Elias:  ADAMS & COMMISSIONG, LLP
                           65 Broadway
23                         Suite 1603
                           New York, New York 10006
24                     BY:  KARLOFF CYLTON COMMISSIONG, ESQ.

25
```

SAM     OCR     RMR     CRR     RPR

Tran - direct - Rehnquist                                    505

1    Q    And next to that username it says owner?

2    A    That's correct, yes.

3    Q    Could you remind the jury what it means when it says

4    owner next to the Facebook username?

5    A    Yes.  When it says owner, it means this particular user

6    account is belong to associated with the device owner.

7    Q    Here the SixGod Bugatti username would be associated with

8    Tyquan Henderson?

9    A    That's correct.

10   Q    Going over these messages quickly.  On September 6, 2017,

11   at 7:35 p.m., SixGod Bugatti messages La Oso Litty:  Sha Bang

12   got to take us to get those jackies.

13              Is that right?

14   A    Yes.

15   Q    Then La Oso Litty, that's the Facebook user account for

16   the La Banga phone that we reviewed on Friday?

17   A    That's correct.

18   Q    La Oso Litty responds on September 6, 2017 at 7:36 p.m.:

19   I know been on him.

20   A    Yes.

21   Q    Is this the same Facebook communication that we reviewed

22   on the La Banga phone last week?

23   A    Yes.

24              MS. REHNQUIST:  Nothing further, your Honor.

25              THE COURT:  Cross-examination.

Attarian - direct - McDonald                                511

1  Q    Do you have Government's Exhibit 202 in front of you,
2  sir?
3  A    Yes.
4  Q    Is this the building that you are describing at 192-11
5  Jamaica Avenue?
6  A    Yes.
7  Q    How many floors does that building have?
8  A    Two-story building.
9  Q    Could you describe for the jury what is located on each
10 floor of this building?
11 A    First floor is commercial.  And there is two apartments
12 on the second floor, front and the back.
13 Q    Two apartments on the second floor?
14 A    Yes.
15 Q    Has that always been the case, that the first floor has
16 been commercial and the second floor has been two apartments?
17 A    Yes.
18 Q    From this photograph could you mark for the members of
19 the jury where the front apartment is on the second floor?
20          THE COURT:  You can circle it with your finger.
21          Let the record reflect show that the witness has
22 circled the two windows on the second floor of Exhibit 202.
23 Go ahead.
24 BY MR. McDONALD:
25 Q    In the commercial space could you describe generally what

RIVKA TEICH, RPR, RMR, CRR
Official Court Reporter

Hernandez - direct - McDonald                    618

1   of marijuana available.  So, if you're gonna sell it to

2   individual users, you're gonna sell it in these one gram

3   quantities, in these small zip-lock bag quantities.  And you

4   can breakdown, basically, a pound of marijuana into 453

5   individual dose bags for sale.

6   Q    Are you familiar with the term stash house?

7   A    Yes, sir.

8   Q    What's a stash house?

9   A    A stash house is a location where drugs or contraband

10  related to drugs are stored and safeguarded.

11  Q    Okay.  And what types of persons or organizations use

12  stashhouses?

13  A    All drug organizations who are involved in the sale,

14  production and sale, packaging of drugs.

15  Q    Are there characteristics common to stash houses from

16  your experience?

17  A    Yes, stash houses are typically located in a quiet -- in

18  a building or in a house that's quiet, that attracts --

19  doesn't attract attention from the neighbors, so it can be

20  safeguarded.  Sometimes it's near highways.

21       What you're looking for primarily is a place that

22  the drugs are safe to store without grabbing too much

23  attention from the neighbors.

24  Q    Is the location of a stash house sensitive information to

25  a drug trafficking organization?

646

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - -X
 3   UNITED STATES OF AMERICA,     : 18-CR-0033 (NGG)
                                    :
 4           Plaintiff,            :
                                    :
 5        -against-                :
                                    :
 6   MATTHEW ELIAS,                : United States Courthouse
          also known as "Heddis,"  : Brooklyn, New York
 7                                  :
     LATIFF THOMPSON,              :
 8        also know as "LaBanga,"  :
                                    : Tuesday, March 22, 2022
 9           Defendants.           : 9:30 p.m.
     - - - - - - - - - - - - - - - -X
10

11

12            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS (AND A JURY)
13             UNITED STATES DISTRICT SENIOR JUDGE

14

15

16                    A P P E A R A N C E S :

17   For the Government:       BREON S. PEACE, ESQ.
                               United States Attorney
18                             Eastern District of New York
                               271 Cadman Plaza East
19                             Brooklyn, New York 11201
                               BY:  JAMES P. MCDONALD, ESQ.
20                                  DANA REHNQUIST, ESQ.
                                    Assistant United States Attorneys
21
     For the Defendant        ADAMS & COMMISSIONG LLP
22   Matthew Elias, also      65 Broadway
     known as Heddis:         Ste 1603
23                             New York, New York 10006
                               BY:  KARLOFF CYLTON COMMISSIONG, ESQ.
24

25
```

Georg - Direct - Rehnquist                    663

1  to place their names on the board as --

2          THE COURT:  Yes.

3          MS. REHNQUIST:  -- Detective Georg testifies.

4          THE COURT:  Go ahead.

5          MS. REHNQUIST:  Thank you.

6          THE COURT:  Are these already in evidence?

7          MS. REHNQUIST:  (No audible response.)

8          THE COURT:  Are these -- oh, oh, you're just going

9  to put the --

10         MS. REHNQUIST:  Just the nameplates, Your Honor.

11         THE COURT:  Just the names.

12         Okay.  Go ahead.

13         MS. REHNQUIST:  Okay.  Could we start with

14 Government Exhibit 100?

15 Q    Who is that a photograph of?

16 A    Mr. Matthew Elias.

17 Q    Okay.

18         MS. REHNQUIST:  And I'm placing under

19 Government Exhibit 100 a photograph of Matthew Elias,

20 nameplate Matthew Elias.

21 Q    Turning to Government Exhibit 101, who is that a

22 photograph of?

23 A    It's Latiff Thompson.

24         MS. REHNQUIST:  And for the record, I'm placing a

25 nameplate of Latiff Thompson underneath

GA162

Georg - Direct - Rehnquist                664

1  Government Exhibit 101, a photograph of Latiff Thompson.

2  Q    Now turning to Government Exhibit 102?

3  A    Mr. Shamiek Hytmiah.

4         MS. REHNQUIST:  For the record, I'm placing a

5  nameplate of Shamiek Hytmiah underneath the photograph of

6  Shamiek Hytmiah.

7  Q    Government Exhibit 103?

8  A    This is Mr. Shamel Simpkins.

9         MS. REHNQUIST:  For the record, I'm placing a

10 nameplate of Shamel Simpkins underneath Government

11 Exhibit 103.

12 Q    Government Exhibit 104?

13 A    That's Mr. Brandon Darby.

14        MS. REHNQUIST:  I'm placing a nameplate of Brandon

15 Darby underneath Government Exhibit 104.

16 Q    Government Exhibit 105?

17 A    It's Mr. Tyquan Henderson.

18        MS. REHNQUIST:  I'm placing a nameplate of Tyquan

19 Henderson under Government Exhibit 105.

20 Q    And Government Exhibit 106?

21 A    That's Lawrence Woods.

22        MS. REHNQUIST:  I'm placing a nameplate of

23 Lawrence Woods underneath Government Exhibit 106.

24 Q    And, then, finally Government Exhibit 108?

25 A    Dion Atkinson.

David R. Roy, RPR, CSR, CCR
Official Court Reporter

1          MS. REHNQUIST:  I'm placing the nameplate of Dion

2   Atkinson underneath Government Exhibit 108.

3   Q    Detective Georg, you said you were investigating a

4   robbery that Latiff Thompson and Matthew Elias were involved

5   in?

6   A    Yes, that's correct.

7   Q    Where was the location of that robbery?

8   A    At 192-11 Jamaica Avenue.

9   Q    And how did you first learn of a robbery at that

10  location?

11  A    As a result of an interview with Mr. Shamiek Hytmiah.

12  Q    Had any robbery on September 7, 2017, at 192-11 Jamaica

13  Avenue ever been reported to law enforcement?

14  A    No.

15  Q    To this day, has a robbery on that date at that

16  location been reported to law enforcement?

17  A    No.

18  Q    After learning about the robbery at 192-11 Jamaica

19  Avenue, did you visit the location?

20  A    Yes.

21  Q    Did you go inside the location?

22  A    Yes.

23  Q    During your visit, did you take photographs of the

24  location?

25  A    Yes, that's correct.

Georg - Direct - Rehnquist                    677

1   well as any possible points of entry to the apartment.

2   Q    And could you please just describe the process that you

3   went through to identify the possible points of entry into

4   the building?

5   A    I started at the front of 192-11 Jamaica Avenue and

6   walked around the block, attempting to view the building

7   from as many angles as possible.

8   Q    And when you made that walk, did you also take a video

9   of yourself on that walk?

10  A    Yes.

11          MS. REHNQUIST:  If we could begin playing

12  Government Exhibit 213 from the beginning until about one

13  minute.

14          And just for the record, I would ask the witness

15  to please narrate what he was observing while taking that

16  walk around the block from Jamaica Avenue to 193rd Street.

17          (Video plays.)

18  A    So here, I'm beginning at the front of 192-11 Jamaica.

19          I'm now turning left, or eastward, on Jamaica

20  Avenue.

21          Here, you can see a bus stop in front of the

22  location.

23          I'm now continuing to walk eastward towards

24  193rd Street.

25          I'm now approaching the corner of 193rd Street and

Georg - Direct - Rehnquist                    678

1    Jamaica Avenue, you can observe the two pillars.

2            And now turning left, or northbound, on

3    193rd Street, walking north from 193rd Street towards the

4    direction of the residential houses and the walkways which

5    lead to the side of 192-11 Jamaica.

6            MS. REHNQUIST:  If we could pause the video here.

7            (Video stops.)

8    Q    You mentioned the walkways.  Is one of those walkways

9    reflected here on the screen (indicating) on the left-hand

10   side about halfway up the screen?

11   A    Yeah, that's correct.

12           MS. REHNQUIST:  If we could turn to Government

13   Exhibit 214.

14   Q    Now, again, Detective Georg, if you could just, please,

15   narrate to the jury what you're doing and observing in this

16   video?

17           (Video plays.)

18   A    Here, I'm walking up one of the walkways.

19   Q    Is that one of the walkways that we just observed in

20   the previous video?

21   A    Yes.

22           Now, approaching -- this yard here is overlooking

23   the side of 192-11 Jamaica Avenue.

24   Q    Is the side of 192-11 Jamaica Avenue the building

25   directly in front, past the fence?

GA166

Georg - Direct - Rehnquist                    679

1    A    Yes.

2    Q    Does the building have two levels?

3    A    Yes.

4    Q    And the bottom level is longer than the top level?

5    A    That's correct.

6    Q    Based on your observations at these times, what did you

7    observe about the first floor of 192-11 Jamaica Avenue?

8    A    The first floor extends further beyond the second

9    floor.  If you look in the front here, there's a large brick

10   wall.  At the top of this brick wall is a flat roof which

11   leads to the rear exterior wall of 192-11.

12   Q    And you mentioned that when you were there, you

13   observed that there are windows on the back end side of the

14   second floor?

15   A    Yes.

16             MS. REHNQUIST:  And if we could just finish

17   playing the video.

18             (Video plays.)

19             (Videos stops.)

20             MS. REHNQUIST:  I now want to turn to

21   Government Exhibit 206 --

22   Q    -- which is one of the photographs you took while

23   visiting the location.

24             Can you please explain to the jury where you were

25   located when you took this photograph?

Georg - Direct - Rehnquist                    680

1   A    This is a photo of that walkway from a bit further back

2   from -- from 193rd Street, taken across the street.

3   Q    So if you are on 193rd Street facing north, would this

4   be to your left-hand side?

5   A    Yes.  If you were facing north, it would be to your

6   left-hand side.

7          Here, I am -- yes, here (indicating), I'm facing

8   west towards the building.

9   Q    And in this photograph, you can see -- heading to the

10  roof of 192-11 Jamaica from your location on 193rd?

11  A    Yes.

12         MS. REHNQUIST:  And, then, if we could please pull

13  up Government Exhibit 208.

14  Q    Detective Georg, is this a zoomed-in photograph of

15  Government Exhibit 206?

16  A    Yes.

17  Q    And reflected in this photograph is also the back of

18  192-11 Jamaica?

19  A    Yes, that's correct.

20  Q    And to take this photograph, did you walk down the

21  walkway that you see in Government Exhibit 206?

22  A    Yes.

23         MS. REHNQUIST:  And, then, could we pull up

24  Government Exhibit 207.

25  Q    In Government Exhibit 207, could you please explain

Georg - Direct - Rehnquist                    681

1   where you were when you took this photograph?

2   A    This is further down the walkway, and I'm closer to

3   the -- to the yard overlooking the side of 192-11 Jamaica.

4   Q    And could you please explain the backyard setup here in

5   this photograph?

6   A    Again, as I stated earlier, in front, you'll see a sign

7   of 192-11 with a large brick wall, the first floor

8   extending, and that being the flat roof leading to the rear

9   exterior wall in the yard.

10        Here (indicating), you will note a low

11  chain-linked fence over here on the left side of the photo.

12  And to the rear, you'll see a pitched roof, a building with

13  a pitched roof; and there's another low fence in that area

14  as well.

15  Q    Could you please circle -- I think it's a little bit

16  hard to see.  Could you please circle on the screen where

17  the second fence is located?

18  A    This area here (indicating).

19        MS. REHNQUIST:  You can pull that down.

20  Q    I want to show you what has been marked for

21  identification as Government Exhibit 221.

22        What does this exhibit show?

23  A    This is an overhead map of Jamaica, Queens, and

24  surrounding areas.

25        MS. REHNQUIST:  Your Honor, the Government offers

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Georg - Direct - Rehnquist                    682

1   Government Exhibit 221.

2            MR. VILLANUEVA:  No objection.

3            MR. COMMISSIONG:  No objection.

4            THE COURT:  This is a map or an aerial photograph?

5            MS. REHNQUIST:  I believe it's an aerial map from

6   Google Maps, Your Honor.

7            THE COURT:  Oh, okay.

8            Government Exhibit 221 is placed in evidence.

9            (Government's Exhibit Number 221 received in

10  evidence.)

11           THE COURT:  Go ahead.

12  Q    You mentioned that this is an aerial view of Queens?

13  A    Yes.

14           MS. REHNQUIST:  If we could zoom in on the top

15  right corner.

16  Q    I know it's a little bit hard to read, but focusing on

17  the pin at the top of the screen, what location is marked

18  with that pin?

19  A    It appears 192-11 Jamaica Avenue.

20  Q    And the second pin, which is located southwest of

21  192-11 Jamaica Avenue, where is that pin located?

22  A    That is located at 184-23 Galway Avenue.

23  Q    Okay.  Do you recognize that address?

24  A    Yes.

25  Q    And what is it?

Georg - Direct - Rehnquist                    683

1  A    That is the residence of the aunt of Mr. Shamiek

2  Hytmiah, also referred to as "the Gal."

3  Q    And is this Galway address, 184-23, located off

4  Dunkirk Road?

5  A    Yes.

6  Q    Have you been to this location before?

7  A    Yes.

8  Q    Approximately how far of a drive in minutes is it from

9  184-23 Galway to 192-11 Jamaica?

10 A    Approximately between eight and ten minutes.

11         MS. REHNQUIST:  If we could zoom out?

12         Now, if we could -- you mentioned the middle of

13 the screen encompassing 184-23 Jamaica, and the two pins

14 located to the southwest.

15         Let me first turn to 184-23 Galway.

16 Q    We just talked about 184-23 Galway Avenue, Hytmiah's

17 aunt's residence.

18         MS. REHNQUIST:  Could we now focus on the two pins

19 on the bottom left-hand corner of the screen starting with

20 the pin furthest to the left?

21 Q    What address is reflected by that pin?

22 A    That address is 150-81 on 116th Road.

23 Q    Do you recognize that address?

24 A    Yes.  That's the residence of Ms. Nakeda Saini.

25 Q    Okay.  And what, if any, relation did that address have

1  to individuals involved in the robbery that took place on

2  September 7th, 2017?

3  A    That was the residence of the girlfriend of

4  Mr. Lawrence Woods.

5  Q    And located a block away, is there another pin?

6  A    Yes.

7  Q    And what does that pin reflect?

8  A    116th Avenue and Barron Street.

9  Q    And what is the significance of that location?

10 A    That is the location of a car stop which was conducted

11 involving Mr. Elias -- Mr. Thompson and Tyquan Henderson and

12 Mr. Woods.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT. REHNQUIST. GEORG                    685

1    DIRECT EXAMINATION

2    BY MS. REHNQUIST (CONTINUING):

3    Q    When was that car stop conducted?

4    A    Approximately 3:15 on September 7th, 2017.

5             THE COURT:  3:15?

6             THE WITNESS:  A.M.

7    Q    Were those individuals arrested after the car stop?

8    A    Yes, that's correct.

9    Q    Have you also been to this area?

10   A    Yes.

11   Q    Approximately how long does it take in minutes to drive

12   from 150-81 116th Road to 174-23 Galway Avenue?

13   A    Approximately ten minutes.

14            MS. REHNQUIST:  You can pull that down, please.

15   Q    Detective Georg, you just mentioned an arrest after a

16   car stop on September 7, 2017?

17   A    Yes.

18   Q    And that Mr. Latiff Thompson, Matthew Elias, Tyquan

19   Henderson and Lawrence Woods were arrested?

20   A    Yes.

21   Q    Who was the driver of the vehicle that was is it

22   stopped?

23   A    Matthew Elias.

24   Q    Do the arrest reports that you reviewed indicate that a

25   rental car had been used?

DIRECT. REHNQUIST. GEORG                686

1   A    Yes.

2   Q    Did you attempt to obtain rental car records to

3   determine whose rental car it was?

4   A    Yes.

5   Q    Which rental car agency did you contact?

6   A    Enterprise Rental Car.

7   Q    Did you receive records from Enterprise?

8   A    Yes.

9   Q    And included in those records, did you also receive a

10  certificate of authenticity related to those document?

11  A    Yes.

12       MS. REHNQUIST:  Showing, for the witness only,

13  what's been marked for identification as Government

14  Exhibit 700 and 700A.  Can we show him 700A?

15  Q    What are these documents, Detective Georg?

16  A    This is the rental agreement and the certificate of

17  authenticity for the rental car.

18  Q    And these are the records that you received from

19  Enterprise?

20  A    Yes.

21       MS. REHNQUIST:  Your Honor, the Government authors

22  Government Exhibit 700 and 700A.

23       MR. COMMISSIONG:  No objection.

24       MS. VILLALONA:  No objection.

25       THE COURT:  Okay.  Government Exhibit 700 and 701

DIRECT. REHNQUIST. GEORG                 687

1   received in evidence and published to the jury.

2          (Government's Exhibit 700 & 700A received in

3   evidence.)

4          (Exhibits published to the jury.)

5          MS. REHNQUIST:  Thank you, your Honor.  Can we

6   first turn to government Exhibit 700?

7   Q    Detective Georg, can you please explain to the jury

8   what this document is?

9   A    This is the rental contract for the rental car which

10  was stopped in the early morning hours of September 7,

11  20167.

12  Q    How do you know it's the same vehicle?

13  A    It's the same license plate number and make and model

14  listed on the agreement.

15  Q    If we could zoom in on the top left hand corner of the

16  agreement.

17          At the top, can you please read whose listed

18  as the renter of the vehicle?

19  A    The renter is listed as Matthew Elias.

20  Q    And looking down at the bottom of this zoomed-in

21  portion, can you please describe the vehicle that

22  Mr. Matthew Elias rented?

23  A    A Nissan Altima, color silver.

24  Q    And the license plate?

25  A    The license plate number is HCC1340.

DIRECT. REHNQUIST. GEORG                    688

1    Q    Based on your review of the arrest records, is this the

2    same license plate number for the car that was stopped on

3    September 7, 2017?

4    A    Yes.  That's correct.

5    Q    We can zoom out.  And now turning to the right hand

6    side of the screen on the top right hand corner.  Is this

7    rental agreement signed?

8    A    Yes.

9    Q    Are there initials there?

10   A    Yes.

11   Q    What are the initials?

12   A    M-E.

13   Q    Now turning to page three.  If we can zoom in on the

14   top portion of the screen.  Again, who is identified here as

15   the renter?

16   A    Matthew Elias.

17   Q    And what phone number was provided?

18   A    Under home phone it's listed (347) 479-3385.

19   Q    Is an employer also list here?

20   A    Yes.  The employer states Plumbing Incorporated of

21   America.

22   Q    Additionally, there's a home address provided?

23   A    Yes.

24   Q    What address is that?

25   A    The listed home address stated 125-60 Sutphin

DIRECT. REHNQUIST. GEORG                          689

1    Boulevard, Jamaica, New York.

2    Q    And is this the bricks or Baisley Park Gardens building

3    we discussed earlier?

4    A    Yes, that's correct.

5    Q    And finally, do you see an e-mail address listed?

6    A    Yes.

7    Q    What's that e-mail address?

8    A    That's states MattHElias@icloud.com.

9    Q    We can zoom out and focus on the bottom part of the

10   screen under rental ticket.

11            What was the date of pick up for this car?

12   A    The date of pick up is August 30, 2017.

13   Q    That was the date of return?

14   A    The is date of return is September 11, 2017.

15   Q    During your investigation, did you receive information

16   that Shamiek Hytmiah, Matthew Elias, and Latiff Thompson and

17   others went to a location at 116th Road after the robbery?

18   A    Yes.

19   Q    And did you take steps to determine whether any

20   vehicles belonging to those individuals went to 116th Road?

21   A    Yes.

22   Q    What steps did you take?

23   A    I conducted a search for license plate reader hits for

24   license plates associated with the rental vehicle, as well

25   as vehicles associated with Mr. Shamiek Hytmiah.

DIRECT. REHNQUIST. GEORG                690

1    Q    And the rental vehicle you're referring to, is that the
2    rental vehicle that Mr. Elias vented that we just reviewed
3    in Government Exhibit 700?
4    A    Yes, that's correct.
5    Q    And this is the vehicle with license plate HCC1340?
6    A    Yes.
7    Q    And you mentioned you also conducted a license plate
8    reader hit for Hytmiah?
9    A    Yes.
10   Q    And what type of car was Hytmiah driving that night?
11   A    He had a 2003 Nissan.
12   Q    Showing you what's in evidence as Government
13   Exhibit 701.
14            Do you recognize this exhibit to be the LPR or
15   license plate reader hits that you reviewed?
16   A    Yes.
17   Q    Now, based on these reports on the first page, the
18   HRZ6188 vehicle, whose vehicle is that?
19   A    Mr. Shamiek Hytmiah.
20   Q    And looking at this report at 2:40:03 in the morning,
21   you can zoom in on the map.  Where does the license plate
22   reader hit place Shamiek Hytmiah's vehicle at 2:40:03 in the
23   morning?
24   A    At the corner of 155th Street and 116th Avenue.
25   Q    And if we can zoom out and turn to page two.  This is

DIRECT. REHNQUIST. GEORG                    691

1    an LPR hit for the HCC1340 car?

2    A    Yes.

3    Q    And this is the Elias' vehicle?

4    A    Yes.  That's correct.

5    Q    What time is this license plate reader hit?

6    A    So this license plate reader is on September 7, 2017,

7    at 240 and 19 seconds a.m.

8    Q    And this is about 16 seconds after Hytmiah's vehicle

9    hit on 155th Street and 116th Avenue?

10   A    Yes, that's correct.

11   Q    We can turn the page to look at the map of where this

12   license plate reader hit placed Mr. Elias's vehicle 16

13   seconds later.  And can you please explain to the jury where

14   this license plate reader hit was taken?

15   A    This is located at 116th Road just east of 155th

16   Street.

17   Q    Now, these license plate reader hits were taken

18   16 seconds apart?

19   A    Yes, that's correct.

20   Q    Based on the LPR data, what, if anything, does it tell

21   you about how these vehicles were traveling?

22   A    That they were traveling in close proximity to one

23   another.

24   Q    Were they traveling on the same street?

25   A    No.

DIRECT. REHNQUIST. GEORG                    692

1  Q    Hytmiah's vehicle at 2:40:03 was traveling on 155th

2  Street?

3  A    Yes.

4  Q    And Elias 'vehicle at 2:40:19 was traveling on 116th

5  Road?

6  A    Yes, that's correct.

7  Q    Then looking at page four.  Again, this for the Hytmiah

8  vehicle?

9  A    Yes, that's correct.

10 Q    And where is Hytmiah's vehicle located at 2:58:59 a.m.?

11 A    At 116th Road just east of 155th Street.

12 Q    And then turning to the next page.  Four second later

13 at 2:59:03, where does Elias's vehicle hit?

14 A    On 116th Road just east of 155th Street.

15 Q    Based on the Elias vehicle hitting on the license plate

16 reader four seconds after Hytmiah's vehicle hits on the same

17 license plate reader on 116th Road, what, if anything, does

18 that indicate to you?

19 A    That one vehicle would be following the other.

20 Q    Keeping this map up for a second.

21          Earlier we talked about a residence that

22 Nakeda Saini lives in?

23 A    Yes.

24 Q    And that's associated with Lawrence Woods?

25 A    Yes.

1          Here is the hallway and on the right-hand

2     side -- on the right-hand side of the hallway there's a door

3     which leads to the front apartment, and directly in front in

4     the video here, is a door leading to the rear apartment.

5     Q    So when you enter, you have to climb one floor?

6     A    Yes.

7          MS. REHNQUIST:  If he could now turn to the time

8     period from 2:04 a.m. to 2:10 a.m.

9     Q    And Detective Georg, could you please explain to the

10    jury who Thompson and Elias are in communicate with during

11    this time period?

12    A    Tyquan Henderson, Lawrence Woods, Shamiek Hytmiah,

13    that's it.

14    Q    And could you just walk us through some of these calls?

15    A    Yes.  At 2:04 a.m., Latiff Thompson places a

16    three-second call to Tyquan Henderson.  At 2:05 a.m. Latiff

17    Thompson places a call to Lawrence Woods with no answer.  At

18    2:06 a.m., Latiff Thompson places a call to Shamiek Hytmiah

19    lasting three minutes 3 minutes and 23 seconds.  At

20    2:09 a.m., Latiff Thompson places a call to Shamiek Hytmiah

21    which is not answered.  A few seconds later at 2:09 a.m.,

22    Latiff Thompson places another call to Tyquan Henderson

23    which is not answered.  At 2:10 a.m., Shamiek Hytmiah has a

24    five minute and 54 second FaceTime with Latiff Thompson.

25    While that call is still active, a few seconds later at 210

Georg - Direct - Rehnquist                           728

1  and 20 seconds, Matthew Elias places a call to Tyquan

2  Henderson and this call lasts force 11 seconds.

3  Q    Now we just went over a lot of calls that took place

4  between 12:00 a.m. to approximately 2:10 a.m.

5             Based on your review of those calls, were you

6  able to determine for how long Latiff Thompson and Shamiek

7  Hytmiah were communicating during that time period?

8  A    Yes.  Approximately 72 minutes.

9         MS. REHNQUIST:  If we could turn to the next

10 slide.

11 Q    Based on your review of the cell site data, after

12 2:00 a.m., where do the Thompson and Hytmiah phones go?

13 A    In the vicinity of the Galway Avenue address.

14        MS. REHNQUIST:  If we could turn to the next

15 slide.

16 Q    While in that vicinity, who does Thompson communicate

17 with?

18 A    An individual in this contact list known as Biggie C,

19 as well as Lawrence Woods and Shamel Simpkins.

20 Q    What communications does Thompson have with Biggie C?

21 A    There are -- there is a FaceTime call lasting one

22 minute and six seconds and then four iMessages.

23 Q    And would you read those iMessages?

24 A    Yes.  At 2:23 a.m. -- excuse me at 2:23 a.m., Biggie C

25 messages Latiff Thompson, y'all Gucci.  Again at 2:23 a.m.

Georg - Direct - Rehnquist                          729

1  Biggie C messages Latiff Thompson, come see me when you

2  finish.  A few seconds later at 2:23 a.m., Biggie C messages

3  Latiff Thompson, I'm in the hood.  At 2:25 a.m., Biggie C

4  messages Latiff Thompson, you kicking like Jackie Chan.  And

5  then following that, there is a call from Lawrence Woods to

6  Latiff Thompson lasting one minute and 43 seconds, and then

7  at 2:35 a.m., there is a two minute and 26 second FaceTime

8  call from Shamel Simpkins to Latiff Thompson.

9           MS. REHNQUIST:  You can turn to the next slide.

10 Q    After the Thompson phone was located around the Galway

11 address, where, if anywhere, does the Thompson phone go from

12 there?

13 A    It then goes to the vicinity of 116th Road and 155th

14 Street.

15 Q    And what is in that location?

16 A    That is the residence of Nakeda Saini, the girlfriend

17 of Lawrence Woods.

18 Q    While the phone moves from the Galway address to the

19 area in which Nakeda Saini's address is located -- turning

20 to the next slide -- could you tell us who Thompson and

21 Elias are communicating with?

22 A    Latiff Thompson is communicating with Shamel Simpkins

23 and Lawrence Woods, and Matthew Elias is communicating with

24 Lawrence Woods.

25 Q    Can you please walk us through those phone calls with

Georg - Direct - Rehnquist                    730

1  Lawrence Woods?

2  A    Yes.  At 2:35 a.m., Shamel Simpkins has a two minute

3  and 26 second FaceTime with Latiff Thompson.  Following

4  that, between 2:38 and 2:41 a.m., Latiff Thompson has three

5  phone calls with Lawrence Woods, first lasting 39 seconds,

6  the second lasting three seconds, and the third lasting for

7  four seconds.  Between 2:41 and 2:44, Matthew Elias has two

8  phone calls with Lawrence Woods, the first lasting 18

9  seconds, and the second lasting for 40 seconds.

10 Q    Now, for each of those calls with Lawrence Woods, are

11 these Latiff Thompson and Matthew Elias calling Lawrence

12 Woods?

13 A    Yes.

14 Q    Now, when we started reviewing these phone records, you

15 mentioned that you started by looking at communications

16 between Latiff Thompson and Shamiek Simpkins?

17 A    Yes.

18 Q    Looking at slide 24, what does this slide reflect?

19 A    These are calls from between Shamiek Simpkins and

20 various other individuals.

21 Q    During what time period did these phone calls take

22 place?

23 A    Between the times of 2:29 a.m. and 4:07 a.m.

24 Q    Would you walk us there Shamel Simpkin's phone activity

25 interest 2:29, ending at 2:42?

Georg - Direct - Rehnquist                    731

1   A    Yes.  At 2:29, Shamiek Hytmiah calls Shamel Simpkins

2   lasting 16 seconds.  At 2:30 a.m., Shamiek Hytmiah calls

3   Shamel Simpkins lasting 17 seconds.  At 2:30 a.m., again, a

4   few seconds later, Shamiek Hytmiah has a one minute and 56

5   second call with Shamel Simpkins.  At 2:34 a.m., Shamel

6   Simpkins has a one-second call with Tyquan Henderson, and at

7   2:42, Tyquan Henderson has a two-second call with Shamel

8   Simpkins.

9   Q    And then focusing on the time period from 3:44 to 4:07,

10  who is Simpkins in touch with?

11  A    Simpkins calls Latiff Thompson, Tyquan Henderson,

12  Shamiek Hytmiah, and Dion Atkinson.

13  Q    Earlier, you also mentioned that Latiff Thompson and

14  Matthew Elias were arrested on September 7th?

15  A    Yes.

16  Q    What time did that arrest takes place?

17  A    Approximately 3:15 a.m.

18  Q    After you are arrested, do you have access to your cell

19  phone?

20  A    Typically, no.

21       MS. REHNQUIST:  We can turn to the next slide.

22  Q    Can you please explain to the jury what this slide

23  reflects?

24  A    These are calls and FaceTime messages sent to Latiff

25  Thompson's phone between the times of 3:00 a.m. and

Georg - Direct - Rehnquist                    732

1    3:34 a.m.

2    Q    And what do you see in these messages?

3    A    Would you like me to read to you the messages?

4    Q    Yes.

5    A    At 3:12 a.m., Shamel Simpkins messages Latiff Thompson

6    saying, N word is brazy, real shit.  At 3:15 a.m., Shamiek

7    Hytmiah places an unanswered FaceTime call to Latiff

8    Thompson.  At 3:18 a.m., Dion Atkinson places a call to

9    Latiff Thompson which is also unanswered.  At 3:29 a.m.,

10   Shamiek Hytmiah places another call to Latiff Thompson which

11   is not answered.  A few seconds later at 3:29 and 46

12   seconds, Shamiek Hytmiah sends an iMessage to Latiff

13   Thompson stating yar N word playing with me.  At 3:34 a.m.,

14   Shamiek Hytmiah places an iMessage to Latiff Thompson

15   stating, N word better have that gym bag with the rest of

16   that loud.  A few seconds later at 3:34 and 17 seconds, Dion

17   Atkinson calls Latiff Thompson which is not answered.

18            MS. REHNQUIST:  And could we continue to the next

19   slide.

20   Q    Can you please explain what's going on in this guide?

21   A    These are more calls and FaceTimes to Latiff Thompson's

22   phone between the times of 3:34 a.m. and 3:36 a.m.

23   Q    And could you walk us through those communications?

24   A    Yes.  At 3:34 a.m., Dion Atkinson sends a message to

25   Latiff Thompson stating, where you at bro.  At 3:35 a.m.,

Georg - Direct - Rehnquist                 733

1  Dion Atkinson attempts to place a call to Latiff Thompson

2  which is not answered.  A few minutes later at 3:39 a.m.,

3  Dion Atkinson sends a message to Latiff Thompson stating, yo

4  boy, you know this count still off.  At 3:40, Dion Atkinson

5  places another unanswered call to Latiff Thompson.  At

6  3:43 a.m., Shamel Simpkins places an unanswered FaceTime

7  call to Latiff Thompson.  At 3:44 a.m., Shamel Simpkins

8  places an unanswered telephone call to Latiff Thompson.  And

9  lastly, at 3:46 a.m., Shamel Simpkins sends an iMessage to

10 Latiff Thompson saying, that's out.  N word playing,

11 supposed to be on BF time.  N word tucking.  Sayless.

12 Q    In these last two sides, you just reviewed a series of

13 communications from individuals involved in the robbery to

14 Latiff Thompson; is that right?

15 A    Yes.

16 Q    What types of communications did you just review?

17 A    Text messages, iMessages, phone calls, and FaceTime.

18 Q    Did Latiff Thompson respond to any of those messages?

19 A    He did not.

20       MS. REHNQUIST:  If we can take the slide down.

21 Q    After Latiff Thompson, Matthew Elias, Tyquan Henderson,

22 and Lawrence Woods were arrested, were they eventually

23 detained with the New York Department of Correction?

24 A    Yes.

25 Q    Are detained individuals able to make telephone calls?

                    Georg - Direct - Rehnquist                    734

1   A    Yes.

2   Q    Are those calls monitored?

3   A    Yes.

4   Q    Are they recorded?

5   A    Yes.

6   Q    During the course of your four-year investigation, did

7   you have an opportunity to listen to some of those recorded

8   telephone calls?

9   A    Yes.

10  Q    Approximately how many of those recorded telephone

11  calls from the Department of Corrections did you listen to?

12  A    Approximately several hundred.

13  Q    And did you listen to calls for Matthew Elias?

14  A    Yes.

15  Q    Did you listen to calls for Latiff Thompson?

16  A    Yes.

17  Q    Did you listen to calls for Lawrence Woods?

18  A    Yes.

19  Q    Did you listen to calls for Tyquan Henderson?

20  A    Yes.

21  Q    Tyquan Henderson, did he eventually make bail?

22  A    Yes.

23  Q    And when did he make bail?

24  A    A few days after being arrested.

25  Q    And does that mean that he was released from the

Georg - Direct - Rehnquist                 740

1    A    Yes.

2    Q    And what is a Jackie?

3    A    A Jackie is a firearm.

4    Q    In addition to a Jackie, do you know other slang terms

5    for guns?

6    A    Yes.

7    Q    And what are some of those terms?

8    A    Grip, 4-5 or 4-5th.  There are many others.

9    Q    Also, I just want to point out one other point here.

10            There's someone referred to in this call as

11   Pinky?

12   A    Yes.

13   Q    And who is Pinky?

14   A    That's Mr. Shamiek Hytmiah.

15   Q    And when you mentioned the reference to Jackies, who is

16   it that's referring to Jackies?

17   A    Mr. Lawrence Woods.

18   Q    And what is he saying?

19            MR. COMMISSIONG:  Objection, Your Honor.

20            THE COURT:  Overruled.  You may answer.

21   A    I'll read from the transcript.

22            Just Jackies the only thing, the only thing

23   that I had is Jackies and they know that.

24   Q    In addition, some of those slang terms that we

25   discussed that you've learned over your 16 years, have you

Georg - Direct - Rehnquist                          741

1  learned what to dead someone means?

2  A    Yes.

3  Q    And what does that mean?

4  A    It's essentially to cut them off.

5  Q    And is anyone using the term dead or deading in your

6  review of this call?

7  A    Yes.  Mr. Lawrence Woods.

8  Q    And what does he say?

9  A    In earlier sentences it states, I mean, N word, it

10 seemed like deading me or something.

11 Q    And could you remind us, Shamel Simpkins, what is -- is

12 he referred to by other names?

13 A    Yes.  Sha Bang or Blueface Bang.

14 Q    And what is your understanding of what Sha Bang's role

15 was as it pertained to the robbery that took place on

16 September 7th?

17 A    He provided the tip for the robbery location, and it

18 also appears that he may have provided firearms for the

19 robbery, as well.

20 Q    Now, if we could turn to the transcript for Government

21 Exhibit 501 which is the next page in the binder transcript

22 501T.

23            Detective Georg, again, could you walk us

24 through the date, time, and participants in this phone call?

25 A    Yes.  The date is September 21st, 2017.  The time is

Georg - Direct - Rehnquist                    742

1  4:54 p.m.  Participants are Matthew Elias and unnamed female

2  caller.

3            MS. REHNQUIST:  Could we please play Government

4  Exhibit 501.

5            (Exhibit published.)

6            (Recording played.)

7  Q    And again, you mentioned you identified this call

8  because of the references to weapons?

9  A    Yes.

10 Q    What weapons are referenced in this call?

11 A    A gun.

12 Q    And you also mentioned that you chose calls based on

13 references to drugs?

14 A    Yes.

15 Q    And are there drugs mentioned in this call?

16 A    Yes.

17 Q    And in relation -- and who is mentioning the guns and

18 the drugs?

19 A    Mr. Elias.

20 Q    Now, continuing to review calls where you've heard them

21 discussing drugs, could we turn to Government Exhibit 502T

22 and could you please explain to the jury the date and time

23 of this call and who the participants are on the call.

24 A    Yes.  The date of this call was September 13th, 2017.

25 The time is 10:55 a.m.  The participants are Latiff Thompson

1  and James Roberson, also referred to as Littles.

2  Q    And who is Littles?

3  A    The brother of Mr. Latiff Thompson.

4  Q    All right.

5        MS. REHNQUIST:  Could we play 502.

6        (Exhibit published.)

7        (Recording played.)

8  Q    During this call, Thompson and Roberson are referring

9  to someone named GP.

10              Who is that?

11  A    That's Tyquan Henderson, also known as GP or Gun Play.

12  Q    And what did they learn about GP?

13  A    That GP received some marijuana.

14  Q    And they say that GP got his stuff from the freezer?

15  A    Yes.

16  Q    And is Thompson asking whether they gave GP his stuff?

17  A    Yes.

18  Q    And in relation, is he asking if they gave GP,

19  Thompson's stuff?

20  A    Yes.

21  Q    And you see, does Thompson mention Heddis?

22  A    Yes.

23  Q    And what is he referencing Heddis?

24  A    There's a point in time where Mr. Thompson is speaking

25  to a third person off the phone that you can't hear on the

Georg - Direct - Rehnquist                    744

1    recording, and he's explaining --

2              MR. COMMISSIONG:  Objection.

3              THE COURT:  You may answer.

4    A    When Mr. Thompson is stating that's what I'm trying to

5    tell Littles, just make sure GP don't got it, because I know

6    they wouldn't give him his shit and not give him our shit.

7    You see what I'm saying.  And then he states, nah, I'm

8    talking to Heddis.

9    Q    And then finally, Roberson mentions a post on The Book.

10   A    Yes.

11   Q    And that, with mad Backwoods.

12              Do you know what Backwoods are?

13   A    Yes.  It's a type of cigar that's commonly used for

14   smoking marijuana.

15              MS. REHNQUIST:  If we could turn to Government

16   Exhibit 503.

17   Q    Detective Georg, can you please explain to the jury the

18   date and time this communication took place and the

19   participants?

20   A    The date is September 16th of 2017.  The time is

21   10:56 a.m.  The participants are Latiff Thompson and Tyquan

22   Henderson, also known as GP.

23              (Continued on the following page.)

24

25

GA193

Georg - Direct - Rehnquist                    745

1           MS. REHNQUIST:  Can we please play Government

2    Exhibit 503?

3               (Audio plays.)

4               (Audio stops.)

5    DIRECT EXAMINATION

6    BY MS. REHNQUIST (CONTINUING):

7    Q    In this call, Thompson mentions someone named "Keda."

8    Do you know who that is?

9    A    That's a reference to Nakeda Saini.

10   Q    And who is that?

11   A    The girlfriend of Lawrence Woods.

12          MS. REHNQUIST:  I'm showing you what has been

13   marked for identification as Government Exhibit 107.

14          If we could pull that onto the screen.

15   Q    Detective Georg, do you recognize this photo?

16   A    Yes.  This a photo of Nakeda Saini.

17          THE COURT:  Of who?

18          MS. REHNQUIST:  Your Honor, the Government offers

19   Exhibit 107.

20          THE COURT:  Of whom is that a picture?

21          THE WITNESS:  Nakeda Saini.

22          THE COURT:  Any objection?

23          MR. VILLALONA:  No objection.

24          MR. COMMISSIONG:  None.

25          THE COURT:  All right.  Government Exhibit 107 is

Georg - Direct - Rehnquist                746

1    received in evidence.

2              (Government's Exhibit Number 107 received in

3    evidence.)

4              THE COURT:  And published to the jury.

5              (Exhibit published to the jury.)

6    BY MS. REHNQUIST:

7    Q    And you mentioned this is Nakeda Saini?

8    A    Yes.

9    Q    And does she have a nickname?

10   A    Yes.  Keda.

11   Q    All right.  Did you also *subpoena* phone records for

12   Nakeda Saini?

13   A    Yes.

14   Q    Based on your review of those records, were you able to

15   determine her phone number?

16   A    Yes.

17   Q    And is that phone number (929) 402-6802?

18   A    Yes.

19   Q    Now, turning back to the call, in addition to Keda,

20   they also mention someone named "Laz"?

21   A    Yes.

22   Q    Who is Laz?

23   A    That's "Lazo," or Lawrence Woods.

24   Q    And what is his relationship with Keda, if any?

25   A    Lawrence Woods is the -- it's a boyfriend/girlfriend

Georg - Direct - Rehnquist                    747

1  relationship between Lawrence Woods and Nakeda Saini.

2  Q    And how is Keda being referenced by Mr. Thompson in

3  this phone call?

4  A    (No audible response.)

5  Q    I believe it's at the bottom of Page 2 of Government

6  Exhibit 107?

7         THE COURT:  What number are we on?

8         MS. REHNQUIST:  503.

9  A    Okay.

10        So Mr. Thompson states that Keda sold one of the

11 plate and she only got 900 for it.

12 Q    And what's 900?

13 A    $900.

14 Q    What is a "plate"?

15 A    A plate is a pound of marijuana.

16 Q    And during the call, are there other references to

17 plates?

18 A    Yes.

19 Q    And how are they discussing "plates"?

20 A    Tyquan Henderson is expressing he's unhappy with the

21 sale of the plate for $900 and he's going to take all the

22 plates.

23 Q    And does Tyquan Henderson mention a bag?

24 A    Yes.

25 Q    Okay.

Georg - Direct - Rehnquist                              748

1          And how many does he have in this bag?

2     A    He states he only has six -- he only had six in his

3     bag, but he initially put seven in his bag.

4     Q    And then finally towards the end of the call, they're

5     discussing "moving plates"?

6     A    Yes.

7     Q    Okay.  And where -- where were they?  So they -- the

8     testimony says "They are not in the crib no more."  He was

9     trying to get Littles to move them into his crib.

10         MS. REHNQUIST:  Could you now turn to Government

11    Exhibit 504?

12    Q    Detective Georg, could you please explain to the jury

13    the date, and the time, and the participants of this phone

14    call?

15    A    The date of this call was September 17th, 2017.  The

16    time is 12:43 p.m.  the participants are Latiff Thompson and

17    James Roberson, also known as "Littles."

18         MS. REHNQUIST:  Can we play Government Exhibit

19    504?

20         (Audio plays.)

21         MS. REHNQUIST:  Your Honor, is the sound still on?

22    I wonder if we could put the audio on.

23         (Audio plays.)

24         (Audio stops.)

25         MS. REHNQUIST:  Now turning to Government

Georg - Cross - Villalona                              778

1   Q    Well, he was apprehended in Queens, correct?

2   A    Yes.

3   Q    Okay.  He wasn't apprehended in another state or

4   another country, correct?

5   A    I just don't know if the location he was apprehended

6   was his primary residence or whether it was somewhere else.

7   Q    And you reviewed, I believe you said, hundreds of

8   calls -- Rikers calls involving Mr. Thompson, correct?

9   A    Yes.

10  Q    And do you recall reviewing a call between Mr. Thompson

11  and Mr. Hytmiah?

12  A    I do not.

13  Q    You don't recall listening to a call between

14  Mr. Hytmiah or Mr. Thompson?

15  A    No, not that I recall that.

16  Q    Do you know that there was two calls between

17  Mr. Hytmiah and Mr. Thompson prior to December of 2017?

18  A    I know that in his post-arrest statement, he made a

19  statement saying that he had spoken to him from jail, but I

20  did not hear those calls.

21  Q    Did you look for those calls?

22  A    Yes.

23  Q    And is it your testimony you couldn't find those calls,

24  Detective Georg?

25  A    I did not -- I did not find those.

Elias - Cross - McDonald                    844

1   testified here today in this court.

2   Q    What else was in your car at the time it was stopped by

3   the police?

4   A    I don't have no clue.  Nothing was in my car.

5   Q    Would it help if I showed you the property invoices

6   that were created of the property that was in your vehicle

7   at the time?

8   A    Again, when I was in my vehicle, there was nothing in

9   my vehicle.  So anything that was in my vehicle that you are

10  referring to had to come only after I allowed passengers in

11  my vehicle.

12          MR. McDONALD:  I'm going to show the witness --

13          THE COURT:  Just a second.

14          MR. McDONALD:  Only.

15          THE COURT:  All right.

16  Q    Before I ask you a question about this, you had a --

17  parts of a security camera in your vehicle, didn't you?

18  A    No, sir.  Not that I know of.

19  Q    You had something known as a Arlo camera in your

20  vehicle; isn't that right?

21          MR. COMMISSIONG:  Objection.

22          Asked and answered.

23          THE COURT:  Overruled.  You may answer.

24  A    Excuse me, what did you say?

25  Q    You had something called an Arlo camera in your

Elias - Cross - McDonald                                 845

1  vehicle; is that right?

2  A    Again, sir, prior to them entering my vehicle, I had

3  nothing in my vehicle, so I don't know what was in my

4  vehicle after the passengers got in the car.

5  Q    Let me try to ask it this way, you did not have a

6  security camera in your vehicle --

7            MR. COMMISSIONG:  Objection, Your Honor.

8            THE COURT:  Overruled.  Let him answer.

9  A    Can you repeat that, sir?

10 Q    Did you have an Arlo security camera in your vehicle?

11 A    Again, I had no knowledge of anything being in my

12 vehicle prior to these passengers entering my vehicle, sir.

13 Q    Would it surprise you to learn that an Arlo cameras was

14 returned as property to -- can we go to the next page,

15 please -- was returned as property to you, or to your mother

16 on December 27th of 2017?

17 A    Again, as I said before, I don't know nothing about

18 anything being picked up, sir.  I was incarcerated at that

19 time.

20 Q    So if a security cameras was returned as your property

21 to your mother on that day, that would not be your security

22 camera; is that correct?

23 A    Again, had I known that my mother was going to pick up

24 property that was not mine, I would have told her to leave

25 it at the precinct.

873

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :  18-CR-0033(NGG)
                             :
                             :
                             :
                             :
                             :  United States Courthouse
      -against-              :  Brooklyn, New York
                             :
                             :
                             :
                             :  Wednesday, March 23, 2022
MATTHEW ELIAS and            :  10:00 a.m.
LATIFF THOMPSON,             :
                             :
      Defendants.            :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S :

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                      Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                      BY: DANA RHENQUIST, ESQ.
                          JAMES P. MCDONALD, ESQ.
                          Assistant United States Attorneys

For the Defendant:    GARY S. VILLANUEVA, ATTORNEY AT LAW
                      Attorney for the Defendant -
                      Matthew Elias
                          11 Park Place
                          Suite 1601
                          New York, New York 10007
                      BY: GARY S. VILLANUEVA, ESQ.

Elias - Cross - McDonald                    900

1  Q    Did she come to your car at that point?

2  A    How did she come if I brought her over there, sir?  I

3  don't understand what you're trying to say.

4  Q    So you picked her up somewhere?

5  A    I seen her on Parsons, I believe.

6  Q    You drove her from Parsons to this apartment complex?

7  A    To where she lived at.  At that apartment complex, sir.

8  Q    When you were in the car with her, what were you

9  discussing?

10 A    We was just talking normal, friends talk.  Again, we

11 was talking about life.  What she was doing, how was her

12 day, things like that.

13 Q    Now at some point Nakita came up in the conversation;

14 is that correct?

15 A    I never said that, sir.

16 Q    Was there any discussion of Nakita during this

17 conversation with this woman?

18 A    No, sir.  I never said that, sir.

19 Q    When you were with this woman, it was entirely in your

20 car, correct?  You never went inside the building?

21 A    I was in the car.

22 Q    She got out of your car at some point?

23 A    Later on sir, yes.

24 Q    Well, did she get out of the car the location you had

25 driven her to?

Thompson - Cross/Ms. Rehnquist                955

1   A     Yes.

2   Q     Items were taken from your person and vouchered by the

3   police?

4   A     Yes.

5   Q     This included a video game; is that right?

6   A     Yes.

7   Q     It included your cell phone?

8   A     Yes.

9   Q     And there were some other things that the police

10  vouchered from you that night, too, right?

11  A     Yes.

12  Q     So I want to show you one of those things that the

13  police vouchered from you that evening?

14        MS. REHNQUIST:  Your Honor, for identification

15  we're going to mark this as Government Exhibit 1001.

16        THE COURT:  Very well.

17        (Government's Exhibit 1001 was marked for

18  identification.)

19  Q     So, Mr. Thompson, one of the other things that the

20  police recovered from you that evening was this gun, wasn't

21  it?

22  A     No.

23  Q     This gun is a loaded gun.  Do you see the bullets?

24  A     Yes.

25  Q     Why don't we take a look at the voucher here.

Thompson - Cross/Ms. Rehnquist                  956

1          Does looking at this voucher remind you that this

2    gun was recovered from your person by the police on

3    September 7, 2017?

4    A    No, it wasn't recovered on my person.

5    Q    Does looking at this voucher remind you that this gun

6    was recovered from the vehicle that you were in on

7    September 7, 2017?

8    A    Yes.

9          MS. REHNQUIST:  Your Honor the Government moves

10   evidence Government Exhibit 1001.

11         MR. VILLANUEVA:  No objection.

12         MR. COMMISSIONG:  No objection.

13         THE COURT:  Government Exhibit 1001 is received in

14   evidence.

15         (Government's Exhibit 1001 was received in evidence

16   as of this date.)  1 thousand

17         MS. REHNQUIST:  Your Honor, may we have a brief

18   sidebar before I begin the next line of questioning?

19         THE COURT:  All right.

20         (Continued on the next page.)

21

22

23

24

25

Sidebar                                                        957

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  Tell me when you're ready.

5          MS. REHNQUIST:  Just given the Court's prior

6    rulings, I wanted to note for the record that at this time

7    the Government intends to introduce the bloody gloves that

8    were taken from Mr. Thompson that evening.

9          THE COURT:  Go ahead.

10          MR. VILLANUEVA:  Your Honor, I would ask the Court

11    for a curative instruction that it was not the gun that

12    they're talking about for this robbery.

13          MS. REHNQUIST:  I didn't hear you.

14          THE COURT:  The defense wants a curative

15    instruction that the gun that was just put into evidence is

16    not the gun that is talked about this robbery.

17          MS. REHNQUIST:  I don't believe there's any

18    evidence either way about where this gun came from because we

19    haven't introduced any evidence because of the Court's prior

20    rulings about the gun.

21          MR. MCDONALD:  Other than the gun came from the

22    car.

23          MS. REHNQUIST:  Other than the gun came from the

24    car.

25          THE COURT:  There's nothing in evidence or before

Sidebar                                                      958

1    the Court as to whether it was or was not.  I couldn't give a

2    curative instruction on something I don't know anything

3    about.

4              MR. VILLANUEVA:  The problem is, it invites the

5    jury to speculate that this gun is somehow involved in the

6    robbery where the Government has conceded all along that it's

7    not and that's the problem.

8              THE COURT:  Well, if you want something in the

9    final instructions, you'll have to ask for it.

10             MS. REHNQUIST:  Your Honor, it's also a fair

11   inference for the jury to make the gun was recovered.

12             THE COURT:  From the car.

13             MS. REHNQUIST:  From the car.  That was used in the

14   commission of offense.

15             THE COURT:  Well, if there's something that needs

16   to be done, it'll done in the jury instruction.  It won't be

17   done right now because I'm not going to start trying to

18   figure out, you know, how to do it at this late date.

19             (Sidebar discussion concludes.)

20             (Continued on the next page.)

21

22

23

24

25

Thompson - Cross/Ms. Rehnquist                959

1          (In open court.)

2   CROSS EXAMINATION

3   BY MS. REHNQUIST:

4   (Continuing.)

5   Q    In addition to the firearms that was just admitted as

6   Government Exhibit 1001, there were also other items that

7   were seized from you that night; is that right?

8   A    Yes.

9   Q    And one of those items is this pair of bloody gloves; is

10  that right?

11  A    No, that's not right.

12  Q    This pair of gloves that were taken from the rear right

13  pocket of defendant Latiff Thompson, date of birth July 19,

14  1988?

15          MR. VILLANUEVA:  Objection.

16          THE COURT:  Overruled.

17  A    I never seen those gloves in my life.

18  Q    Okay.  Does looking at this invoice remind you that

19  these bloody gloves were taken from your rear pocket on

20  September 7, 2017?

21  A    Yes, that's what it says.

22  Q    That is what it says?

23  A    Yes.

24          MR. VILLANUEVA:  Objection.

25          THE COURT:  Overruled.  Government Exhibit 1002 is

Thompson - Redirect - Villanueva                988

1          MS. REHNQUIST:  No, your Honor.  Thank you.

2          THE COURT:  Very well.  At this time -- let me

3    ask.  Do you have any further witnesses?

4          MR. VILLANUEVA:  No, your Honor.  We rest.

5          MR. COMMISSIONG:  On behalf of Mr. Elias, the

6    defense rests.

7          THE COURT:  All right.  Members of the jury, we're

8    going to take our lunch now and when you return, we're going

9    to have closing arguments from the Government and the

10   defense.  All rise for the jury.

11         (Jury exits the courtroom.)

12         THE COURT:  You may step down and return to the

13   counsel's table.  Please be seated everyone.

14         MR. MCDONALD:  You know, we may have one very

15   brief rebuttal witness that may take five minutes.

16         THE COURT:  You think you're going to have a

17   rebuttal?

18         MR. MCDONALD:  I do believe we will.

19         THE COURT:  So we'll have to wait on Rule 29

20   motions.

21         MR. COMMISSIONG:  Your Honor, can we have an idea

22   of who it is?

23         MR. MCDONALD:  It's Chris Velsor.  He's going to

24   introduce a photograph that he took yesterday of -- at

25   192-11 Jamaica Avenue and --

GA208

Thompson - Redirect - Villanueva                    989

1              MR. COMMISSIONG:  Why?

2              MR. MCDONALD:  He photographed the security camera

3    in the lobby, which we will be introducing.

4              MR. VILLANUEVA:  I'm sorry, Judge.  How is that

5    rebutting anything we put in evidence?

6              THE COURT:  What's the -- in what way is that a

7    rebuttal?

8              MR. MCDONALD:  The security camera that is in the

9    lobby is an Arlo security camera, which there was testimony

10   about a security camera from Matthew Elias.  And in this

11   photograph that they have just shown, you can see an Arlo

12   camera in the center console of the car.  And so there's one

13   of those cameras also in the lobby of that door.

14             MR. COMMISSIONG:  Your Honor, I believe there was

15   testimony, I think vigorous cross, on behalf of Mr.

16   Thompson's attorney regarding what was present when, I think

17   it was Detective Georg took photographs and a video.  And

18   what was there when he took the video and the photographs

19   and what was there two years before.  This is not

20   appropriate, your Honor --

21             THE COURT:  Well --

22             MR. COMMISSIONG:  We don't know when the security

23   camera was put into that hallway.

24             THE COURT:  You can all sit down.

25             MR. COMMISSIONG:  And your Honor, the owner of the

Thompson - Redirect - Villanueva          990

1    property testified that he didn't know when a security

2    camera was put in.  So what is this being put into rebut,

3    their own witnesses who couldn't tell you when the security

4    camera was there or if they ever saw it?

5             THE COURT:  What is the rebuttal?

6             MR. MCDONALD:  There was testimony from Shamiek

7    Hytmiah that there was a camera present in the entryway at

8    the time of the robbery.  So there was evidence that there

9    was a camera there.  The camera will be described as, I

10   think, very high up in the air and I think it's fair for the

11   jury to conclude from inferences and common sense it had not

12   been removed.  And it just happens to be that a camera

13   looking almost identical was found in Matthew Elias' car on

14   the night of September 7th of 2017.

15            MR. VILLANUEVA:  That's not --

16            THE COURT:  Excuse me.  Everyone gets their turn.

17   You'll get your turn.

18            MR. MCDONALD:  And Matthew Elias denied during his

19   cross examination that he an Arlo security camera, which is

20   visible in this photograph and on the vouchers, of course,

21   from the NYPD.

22            MR. COMMISSIONG:  Your Honor.  Your Honor.  `There

23   was no testimony that somebody removed a security camera

24   from that hallway.

25            THE COURT:  Does there have to be?

Thompson - Redirect - Villanueva            991

1     MR. COMMISSIONG:  There should be.

2     THE COURT:  Well, you think there should be but we

3 have a piece of evidence, a photograph, taken at the time in

4 2017 where there's one of these security cameras apparently

5 in the car.  Along with, you know, this computer game and

6 Mr. Thompson testified to his computer games and made a joke

7 about it with his counsel.  So you can't have it both ways.

8 You get everything or you do nothing.

9     MR. COMMISSIONG:  Your Honor, let me -- I want to

10 be clear about what the Government is saying.  Somebody went

11 somewhere and took the picture.  Could the Government

12 restate where this person took this picture of the video

13 camera?  Because I don't believe the video camera is in the

14 car.  My understanding is theres a video camera in the

15 hallway and that's where the person took the picture.  So if

16 they can just restate that.

17     MR. MCDONALD:  There's two cameras we're talking

18 about here.  There is, in evidence right now, a photograph,

19 a Government Exhibit 220C that has an Arlo security camera

20 in the center console of Matthew Elias' car on September 7,

21 2017.  Yesterday, we had an agent go take a photograph of

22 the make of the security and the look of the security camera

23 up close in the lobby of 192-11 Jamaica Avenue.  Which is

24 and will be described as somewhat high on the wall.  That

25 photograph appears to show the same camera that you see here

Thompson - Redirect - Villanueva                    992

1    in the center console of Matthew Elias car.

2            THE COURT:  Same type of camera?

3            MR. MCDONALD:  Same type of camera.  So I think

4    there are two inferences.  First, Shamiek Hytmiah testified

5    there was a camera present in this location where there was

6    still a camera present during his case.  Second, the fact

7    that the camera that just happens to be in the center

8    console matches the camera in the hallway and the testimony

9    from the owner of the company that it's not his camera

10   there, I think, leads to a fair inference that that camera

11   was installed by the owners of the drug stash house on the

12   second floor.  And, what we intend to argue, is that when

13   the robbery occurred, and they were in that buildings, one

14   of the things they took was an Arlo security camera, and

15   that's why an Arlo security camera was found in Matthew

16   Elias' taxicab.

17           MR. COMMISSIONG:  Number one, your Honor, this is

18   the first time we're ever hearing about this photograph from

19   yesterday that they want to introduce.  It's a photograph

20   from 2022.  March 2022 that they want to put up and compare

21   against a photograph from Mr. Elias' car in 2017.  That no

22   one said was missing.  Your Honor, if they want to call --

23   if they want to call the so-called owner of the stash house

24   to the stand to say, hey, you know, we installed a security

25   camera, why don't they do that?  This photograph that this

Thompson - Redirect - Villanueva          993

1  person took yesterday, five years after the incident, to

2  make this long-winding, confusing winding inference makes no

3  sense and is absolutely prejudicial to both defendants in

4  this case, your Honor.

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                         994

1          THE COURT:  Certainly prejudicial --

2          MR. COMMISSIONG:  And has no probative value.

3          THE COURT:  I didn't finish.  Do I get to finish

4     or are you going to continue interrupting me?

5          MR. COMMISSIONG:  My apologies.

6          THE COURT:  Stop apologizing and stop talking.

7          They have a right to make the inference, and you

8     have the right to rebut the inference.

9          But if there is a camera of the same type that's

10    seen in the front seat of that car, it could be argued by

11    anyone who has ever installed anything like that anywhere,

12    that you need the same type of equipment to replace the type

13    of equipment that was in that location.  And so assuming,

14    like you say, they run the stash house to this day and they

15    want to replace something that was taken away, they would

16    replace it with the same brand of equipment so it would be

17    consistent and useable as a camera.

18         Anybody who installs any kind of electronic

19    equipment knows, you've got to install the same type that

20    you lost or was taken or whatever it is in order to make the

21    equipment work.

22         But that's not my argument.  Maybe that's their

23    argument.  But you have your argument.

24         And let's put up the photograph, the last

25    photograph, let me see it.  Can you zero in on the seat?

Proceedings                                                995

1    Where is the camera?

2             MR. McDONALD:  In the center console.

3             THE COURT:  Is it that the white item?

4             MR. McDONALD:  Yes, your Honor.

5             THE COURT:  Do you have a photograph of what you

6    might put before the jury?

7             MR. McDONALD:  Yes.  It's been marked Government

8    Exhibit 905.

9             THE COURT:  Arlo video camera.

10            MR. VILLANUEVA:  Maybe I'm missing something.  Is

11   there testimony in this case that this item was stolen

12   before it was found, or before this photograph was taken?  I

13   don't recall that testimony.  There is no testimony that

14   anything was stolen or that this camera was stolen.  Without

15   that testimony, this exhibit has no probative value.

16            MR. McDONALD:  I asked Mr. Elias to explain why

17   there was an Arlo security camera in his vehicle.  He said

18   he had no knowledge of the Arlo camera in his vehicle and of

19   any contents in his vehicle.

20            We now have testimony there was a gun in the

21   vehicle, there were bloody clothes in the vehicle.  The fact

22   there was a security camera that matches the security camera

23   still at this premise, is probative to the fact that the

24   vehicle contained all sorts of contraband of a robbery.

25            MR. VILLANUEVA:  It's pure speculation, unless

Proceedings                                                     996

1   they can show that the video camera was stolen.  They have

2   no evidence that that happened.

3          And they have the cooperator, they could have

4   asked Hytmiah whether they stole the video.  If they would

5   have done that, we would be sitting down --

6          THE COURT:  They couldn't ask him whether there

7   was a security camera sitting in the defendant's car, the

8   defendant didn't know anything.  It was like he wasn't even

9   there.

10         MR. VILLANUEVA:  I understand that.

11         THE COURT:  I can't help that.  He is stuck with

12  that and so are you.

13         And so all I'm saying is that there is documentary

14  evidence that something appearing to be a security camera

15  was in the front seat of the car.  The defendant, who

16  testified, was asked about it.  I don't know what he was

17  saying at that point because he was like, you know,

18  somewhere else, he wasn't here -- he wasn't responsive, is

19  what I'm trying to say --

20         MR. VILLANUEVA:  I understand.

21         THE COURT:  -- as far as the Court is concerned.

22  But that's not my problem, that's the jury's problem.

23         But now if the Government wants to demonstrate

24  that a similar style security camera is currently by the

25  front door and then shows the two different photographs to

Proceedings                                          997

1  the witness who is going to testify, they can offer an

2  inference in argument and you can offer a contrary position.

3           MR. VILLANUEVA:  I understand.

4           THE COURT:  That's all I'm saying.

5           MR. VILLANUEVA:  I understand, Judge.  I want to

6  point out --

7           THE COURT:  And a security camera was confiscated

8  from the car, so I don't know what we're arguing about.

9           If you're saying that it might be prejudicial,

10  sure it might be prejudicial, but it might be probative.

11  And it certainly is not more prejudicial than it is

12  probative of anything, particularly taking into account

13  Mr. Commissiong's client's failure to address that and other

14  things in his testimony.  That's not my problem.

15           MR. VILLANUEVA:  I understand, Judge.

16           THE COURT:  So we're done with this discussion.

17  It's coming in, if it's proposed, if it's proposed in

18  rebuttal.

19           We'll resume at 2:00 o'clock.

20                    (Lunch recess.)

21              (Continued on the next page.)

22

23

24

25

Velsor - Direct - McDonald                    1006

1   Q    Can we go to the first page, the bottom of the first

2   page?  And can we clear the screen?  Is there an entry for a

3   camera in this invoice?

4   A    Yes.

5   Q    Could you read the entry for camera?

6   A    It says:  Camera color, white; make, Arlo; mutilated,

7   contaminated, no description; Arlo camera.

8   Q    Where it says mutilated contaminated, what does that

9   mean?

10  A    It means it wasn't touched or moved.

11  Q    It was a white Arlo camera?

12  A    Correct.

13  Q    Can we pull up Government's Exhibit 220C along with

14  Government's Exhibit 905.  Zoom in on Government's Exhibit

15  220C on the center console of the vehicle.

16              Detective Velsor, looking at the two images in

17  front of you on the left Government Exhibit 905; on the

18  right 220C.  What do you see?

19  A    On the left is the photo I took of the camera at 192-11

20  Jamaica Avenue on the right it seems to be a camera inside

21  the console of the vehicle.

22  Q    The camera inside the console of the vehicle looks like

23  the Arlo camera you photographed at 192-11 Jamaica Avenue?

24              MR. COMMISSIONG:  Objection.

25              THE COURT:  You may answer.

Velsor - Cross - Villalona                    1007

1   A    It appears to be, yes.

2            MR. McDONALD:  No further questions.

3            THE COURT:  Cross-examination?

4            MS. VILLALONA:  Yes.

5   CROSS EXAMINATION

6   BY MS. VILLALONA:

7   Q    Good afternoon.

8   A    Good afternoon.

9   Q    My name is Bernarda Villalona.  I, along with Gary

10  Villanueva, we represent Latiff Thompson.  I have a few

11  questions for you.  Okay?

12  A    Yes.

13  Q    Detective Velsor, you worked with the New York Police

14  Department for 21 years?

15  A    I have been a New York City police officer for over 28

16  years.  I've been a detective for 21.

17  Q    Now in those 28 years, did you ever work at the 113

18  precinct in Queens?

19            MR. McDONALD:  Objection.  Scope.

20            THE COURT:  You may answer.

21  A    No, I haven't.

22  Q    Did you ever work at the 103 precinct in Queens?

23  A    No, I haven't.

24  Q    Yesterday you were asked to go to the location, I

25  believe, 192-11 Jamaica Avenue to take these photographs?

Velsor - Cross - Villalona                1008

1    A    Correct.

2    Q    When you took those photographs, now I believe you said

3    that the camera was ten or 11 feet up from the ground,

4    correct?

5    A    Yes.

6    Q    How tall are you?

7    A    6'1.

8    Q    Were you able to reach it from --

9    A    No.

10   Q    -- from the ground?

11   A    No.

12   Q    In fact, in order to reach it, you would have needed a

13   ladder, correct?

14   A    Yes.

15   Q    Did you have a ladder with you yesterday?

16   A    No, I didn't.

17   Q    Aside from being able to reach it needing a ladder,

18   that camera was also screwed into the ceiling, correct?

19   A    To the wall, not the ceiling.

20   Q    To the wall.  Okay.  In order to unscrew it you would

21   need a screwdriver, correct?

22   A    Correct.

23   Q    You went and spoke to the residents of apartment 2R,

24   correct?

25   A    Yes.

Velsor - Cross - Villalona                    1009

1  Q    That is on the second floor, rear apartment, correct?

2  A    Correct.

3  Q    They told you that that camera did not belong to them,

4  correct?

5  A    Yes.

6  Q    Do you know how long those residents had been living at

7  that location?

8  A    I don't know an exact amount of time, no.

9  Q    In regards to this case that you're testifying about,

10 the robbery that allegedly took place on September 7 of

11 2017, to your knowledge, there is no information that a

12 camera was stolen from that location of 192-11 Jamaica

13 Avenue, correct?

14 A    Not to my knowledge, no.

15 Q    That specific camera that was photographed yesterday,

16 you don't know when it was installed, correct?

17 A    Correct.

18 Q    You don't know by who it was installed, correct?

19 A    Correct.

20 Q    You don't know if that camera had been there back in

21 2017, correct?

22 A    That's correct.

23 Q    In regards to the Government Exhibit 220C, they did a

24 comparison of what was shown inside of the console of the

25 car, do you recall that?

Summation - Ms. Rehnquist                    1040

1    inside and filled the bags with marijuana.

2           And, again, Elias and Thompson both arrested an

3    hour later in a car.  And what was found in that car?  An

4    Arlo camera, a loaded firearm, a bloody sweatshirt, bloody

5    gloves, and the four people that Shamiek Hytmiah told you he

6    conducted that robbery with.

7           Now, before I end, I want to take just a few

8    moments to discuss the testimony of Shamiek Hytmiah and how

9    his testimony is supported by the evidence in this case.

10          First, the pre-meeting location.

11          Hytmiah told you that the night of the robbery, he

12   told Thompson and his crew to meet him at the Galway address.

13   You saw the phone records for yourself.  Hytmiah texted

14   Thompson his aunt's address.  Thompson responds, Copy, coming

15   now.  Elias testified that he drove them there in the silver

16   Altima.  Shamiek Hytmiah told you that Elias was the driver

17   that brought the crew there.

18          You also heard Hytmiah's detailed description of

19   the robbery location, how he described the apartment that was

20   robbed was the stash house above a church.  In the

21   photographs of the location, you can see the church sign

22   clearly in the front of the building, and you heard from the

23   landlord that there were residential units upstairs.  Hytmiah

24   told you that when was at the location during the time of the

25   robbery he took a left onto 193rd Street.  When he was

Summations - Villanueva                                    1057

1      MR. MCDONALD:  Objection.

2      MR. VILLANUEVA:  Which find --

3      THE COURT:  Overruled.  Go ahead.

4      MR. VILLANUEVA:  Two weeks ago, ladies and

5  gentlemen.  We're talking about five years.  5 years

6  5 years.  Five years.  Is there something fundamentally

7  wrong about that, ladies and gentlemen?  Does that offend

8  you?  Five years later?  And they didn't test it.  Nobody

9  tested it for blood.  They could have tested it.  His blood

10  could have been on it or somebody else's blood could have

11  been on it.  They never tested it.  So you take that for

12  what it's worth.  You take that for what it's worth.  And I

13  submit to you, it ain't worth much.  Not much at all.

14      So when Latiff Thompson took the stand, he took

15  the stand because he had grievances.  He took the stand

16  because he put it out there.  And nobody was listening.  And

17  he had these grievances from that stand and he told you what

18  happened.  He told you a credible version of events.  Some

19  of which are diametrically opposed to Shamiek Hytmiah, and I

20  submit to you, ladies and gentlemen, that Shamiek Hytmiah

21  has an interest in the outcome of this case.  Because it

22  directly will result in how much time he can -- he will or

23  will not do.  And it's not what the judge will do that is

24  important.  It's what's in his twisted mind that's

25  important.  Doesn't matter what the judge will do.  It's

1    SUMMATIONS

2    BY MR. COMMISSIONG:

3         MR. COMMISSIONG:  May it please the Court,

4    counsels, members of the jury.  As you already know, I'm

5    Karloff Commissiong.  I'm back again to tell you about

6    Matthew Elias, a dollar-cab driver trying to make ends meet.

7    Matthew Elias did not participate in this robbery and did

8    not possess a firearm in connection with this robbery.

9         We've heard a lot.  We've seen a lot.  We've

10   processed a lot at this trial.  But what are the important

11   points for us to focus on?  What really matters in this

12   case?

13        Mr. Elias testified that he was never at a

14   pre-robbery meeting in Mr. Hytmiah's aunt's basement.

15   Mr. Elias testified that he was never at this robbery.

16   Mr. Elias testified he was never at a post-robbery meeting

17   at that Keda Hinton's house.

18        Just to note before we move on, I want to make a

19   note that the first call between Mr. Elias and Mr. Thompson

20   on the evening of September 6 was not from Mr. Thompson to

21   Mr. Elias to recruit someone as part of a crew.  It was from

22   Mr. Elias to his friend Mr. Thompson.

23        This pre-robbery meeting, we heard Mr. Hytmiah

24   testify that Mr. Elias was at that meeting.  He said it

25   lasted about five minutes.  All he said to Mr. Elias was,

Summations - Commissiong                    1065

1    hey.

2          What do we know about Mr. Hytmiah?  He's not just

3    a thief, he's a master manipulator.  He planned, executed,

4    and profited from over 300 burglaries, in addition to home

5    invasions, and robberies, and an assorted array of fraud

6    crimes.  This is who Mr. Hytmiah is.  He's a conman that

7    needs to take control of any situation that he's involved

8    in.

9          When he was arrested in December 2017, he was ever

10   the conman.  For months Mr. Hytmiah never discussed this

11   robbery.  When he started talking about it, he never talked

12   about his aunt's house or basement.  He certainly never told

13   law enforcement that he saw Mr. Elias in his aunt's

14   basement, not in that first meeting with law enforcement.

15   It was months, months before Mr. Hytmiah even mentioned his

16   aunt's basement to law enforcement.  He's trying to control

17   the narrative.  He's a conman, and the con never ends.

18         When he came to court to testify, he needed to

19   continue the con, to put Matthew Elias in that basement,

20   because he needs this conviction.  He needs this conviction

21   so he can go home.  He needs it so he doesn't spend two

22   decades away from his friends, away from his family.

23         But Matthew Elias was not at that meeting.

24   Mr. Elias was not at the robbery.

25         Mr. Hytmiah also testified that Mr. Elias drove a

Summations - Commissiong                              1069

1     What do we also know?  We know that a week before

2  the robbery on August 30, 2017, Mr. Elias was in an accident

3  and rented the Nissan Ultima on that same day, August 30,

4  2017.  He was referred to Enterprise by an auto body shop

5  and Geico paid the bill.  That Nissan Ultima was not rented

6  to be used for a robbery.

7     Just a couple more things.  Government Exhibit 403

8  that's in evidence, it's the phone records for Matthew

9  Elias.  Take them back with you when you deliberate.  Look

10 at them, specifically page 36 of 51 of those phone calls.

11 They are calls the Government really doesn't highlight.

12 Take the records, look at them.  They'll show phone calls

13 that have nothing to do with any of the phone numbers on

14 this board or any of the phone numbers in the beautiful

15 summary chart that the Government made to show us.  It shows

16 Mr. Elias taking calls, talking to people, between

17 11:00 o'clock and 3:00 a.m.

18     So let me get this straight.  During a high-stakes

19 robbery, our guy, Matthew Elias is taking calls.  $400,000

20 in a safe, and our guy, Matthew Elias, is taking calls.

21 40 pounds of weed, people running around the street with

22 guns, and there is our guy, Matthew Elias, just taking

23 calls.  Does that seem like someone who's participating in a

24 robbery?

25     There was testimony regarding a gun found, bloody

Summations - Commissiong                     1070

1   clothing, a camera, all seemingly connected to the Nissan

2   Ultima.  However, Matthew Elias had nothing to do with any

3   of those things and there is no evidence to show that he

4   does.

5           When considering those things and considering

6   Matthew Elias, those things are distractions.  The

7   Government's distractions.

8           The Government has not proven beyond a reasonable

9   doubt that Mr. Elias participated in this robbery or

10  possessed a firearm in connection with this robbery.

11          Now, a very small, very technical but very

12  important point.  The Government must prove this robbery

13  effected interstate commerce.  I believe my colleague,

14  Mr. Villanueva, talked about Detective Hernandez who

15  discussed marijuana, where it's grown, where it comes from.

16  Mr. Hernandez never saw the weed that's alleged to be stolen

17  in this case.  Nobody in this case testified as to where

18  this weed was grown, where it came from.  No one observed

19  it, nobody manipulated it, nobody analyzed it.  Mr. Hytmiah

20  never testified as to the weed's origins.  Nobody did.

21  Nobody did.  Who knows where the weed was grown.  Who knows

22  where the weed came from.  That question remains unanswered.

23          Members of the jury, the Government did not prove

24  its case beyond a reasonable doubt.  Mr. Elias did not

25  participate in this robbery.  He did not possess a gun in

Summation - Mr. McDonald                    1089

1   trying to avoid all the things that Shamiek Hytmiah has done
2   he's trying to avoid taking responsibility for his own
3   actions.  He's trying to avoid taking responsibility for his
4   own actions by constantly pointing the finger at other
5   people.  You can't trust Shamiek Hytmiah.  You can't trust
6   N.Y.P.D. You can't the FBI.  You can't trust the phone
7   company?  You can't trust the phone records on your own phone
8   or electronic data that tells you exactly where Latiff
9   Thompson was on the night of the robbery.  These are all
10  distractions.
11          Let's talk about what was found in the car because
12  this is a critical point.
13          MR. VILLANUEVA:  Objection.
14          MR. MCDONALD:  Critical set points that has come up
15  of bloody clothing, a gun --
16          MR. VILLANUEVA:  Objection, your Honor.  I
17  apologize, your Honor, objection.
18          THE COURT:  Overruled.
19          MR. MCDONALD:  Let's talk about what was found in
20  the car.  A gun, bloody gloves, a bloody sweatshirt and a
21  security camera.
22          And one thing you heard a lot about was also video
23  games.  You heard about the video games there was even a joke
24  at the end of Latiff Thompson's testimony about who commits a
25  robbery with video games?  Where did those video games come

Summation - Mr. McDonald                    1090

1   from?  It wasn't the first time in this case that video games

2   had come up when Latiff Thompson brought them up.

3          Remember what Shamiek Hytmiah testified about

4   during his direct examination?  When he was describing what

5   he learned had happened inside the apartment from Brandon

6   Darby, from Barock, at Page 196 to 197 of the trial

7   transcript which you can ask to see.  I asked him to walk us

8   thousand that discussion.  He said, I asked him what

9   happened?  He basically told me that the guy was sleeping.

10  He had the RV, those things that you play the game with.  He

11  was sleeping with it on his head.  They tied him up, they

12  asked him where the money was.  He was screaming, I just

13  re-upped, I don't have no more money, all the money went to

14  the drugs.  When you say, and I asked a question, when you

15  say he had the RV, you're talking about the big virtual

16  reality type of glasses?  Yes.  On his head?  Yes.

17         Virtual reality glasses, use your common sense.

18  The guy they robbed had video game materials in his

19  apartment.  Why is there the exact same model of camera that

20  is in that apartment building in Matthew Elias's car?  Why

21  are there video games in the car?  Why is there a gun in the

22  car?  Because all of those people were at that apartment

23  taking things from that apartment and putting it in that car.

24  That is the only common-sense explanation for what is in that

25  car, and that is the common sense explanation for why there

1107

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
                                        18-CR-033(NGG)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4              Plaintiff,               Brooklyn, New York

5              -against-                March 24, 2022
                                        9:30 a.m.
6    MATTHEW ELIAS AND LATIFF THOMPSON,
               Defendants.
7    --------------------------------x

8              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
9             UNITED STATES SENIOR DISTRICT JUDGE

10   APPEARANCES
     For the Government:        UNITED STATES ATTORNEY'S OFFICE
11                              Eastern District of New York
                                271 Cadman Plaza East
12                              Brooklyn, New York 11201
                                BY:  JAMES MCDONALD , AUSA
13                                   DANA REHNQUIST, AUSA

14   For Defendant Elias:       ADAMS & COMMISSIONG LLP
                                65 Broadway, Suite 1603
15                              New York, New York 10006
                                BY:  KARLOFF C. COMMISSIONG, ESQ.
16   For Defendant Thompson:
                                GARY S. VILLANUEVA, ESQ.
17                              11 Park Place, Suite 1601
                                New York, New York 10007
18                                   -and-
                                VILLALONA LAW, PLLC
19                              271B Cadman Plaza E, #20114
                                Brooklyn, New York 11201
20                              BY:  BERNARDA VILLALONA, ESQ.

21   Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
22                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25

1139

JURY CHARGE

1 made a false statement or whether it was an innocent mistake;

2 whether the inconsistency concerns an important fact, or

3 whether it had to do with a small detail; whether the witness

4 had an explanation for the inconsistency and whether that

5 explanation appealed to your common sense.

6 It is exclusively your duty, based upon all of the

7 evidence and your own good judgment, to determine whether the

8 prior statement was inconsistent and, if so, how much, if any,

9 weight to be given to the inconsistent statement in

10 determining whether to believe all or part of the witness's

11 testimony.

12 The defendant in a criminal case never has any duty

13 to testify or come forward with any evidence. This is

14 because, as I have told you, the burden of proof beyond a

15 reasonable doubt remains on the government at all times and

16 the defendant is presumed innocent. In this case, the

17 defendants did testify and were subject to cross-examination

18 like any other witnesses. You should examine and evaluate the

19 testimony just as you would the testimony of any witness.

20 You may not infer that the defendants are guilty of

21 participating in criminal conduct merely from the fact that

22 they associated with other people who were guilty of

23 wrongdoing.

24 You have also heard testimony in this case

25 concerning the defendants' and others' association with

1140

JURY CHARGE

1    members of the Makk Ballas street gang.  The government

2    contends that the association with members of the Makk Ballas

3    is relevant to proving relationships among people involved in

4    this case.  You may consider the evidence only for that

5    purpose.  You may not infer that the defendants were guilty of

6    participation in criminal conduct merely from the fact that

7    they had relationships with people who were associated with,

8    or were associated with themselves, members of the Makk Ballas

9    street gang.

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1191

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 18-CR-033(NGG)
                                   :
                                   :
          -against-                : United States Courthouse
                                   : Brooklyn, New York
                                   :
MATTHEW ELIAS, also known as       :
"Heddis," and                      : Friday, March 25, 2022
LATIFF THOMPSON,also known         : 9:30 a.m.
as "La Banga,"                     :
                                   :
                                   :
          Defendants.              :

- - - - - - - - - - - - - X

              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
           UNITED STATES SENIOR DISTRICT COURT JUDGE

                   A P P E A R A N C E S :

For the Government: BREON S. PEACE, UNITED STATES ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                    BY:  JAMES P. MCDONALD
                       DANA REHNQUIST
                       Assistants United States Attorney

For the Defendant    ADAMS & COMMISSIONG LLP
Matthew Elias:          65 Broadway - Suite 1603
                       New York, New York 10006
                    BY:KARLOFF C. COMMISSIONG, ESQ.

For the Defendant    GARY S. VILLANUEVA, ATTORNEY AT LAW
Latiff Thompson:        11 Park Place - Suite 1601
                       New York, New York 10007

                     VILLALONA LAW PLLC
                        271B Cadman Plaza East - #20114
                        Brooklyn, New York 11201
                     BY:BERNARDA VILLALONA, ESQ.

              Linda A. Marino, Official Court Reporter
              225 Cadman Plaza East / Brooklyn, NY 11201
                           lindacsr@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

GA233

| | |
|---|---|
| Proceedings | 1196 |

1           (In open court; jury not present.)

2           (Court Exhibit 16 so marked.)

3           THE COURT:  Case on trial.  We have a note from the

4  jury, Exhibit No. 16, and it states:  We have reached a

5  verdict.

6           MR. COMMISSIONG:  Your Honor?

7           THE COURT:  Yes.

8           MR. COMMISSIONG:  Before you bring out the jury, I

9  want to note for the record that myself and Mr. Villanueva

10  engaged in plea negotiations, plea discussions, with the

11  Government.  The Government was instructed to end negotiations

12  and take the verdict.

13           I just want to note that for the record.

14           THE COURT:  Fine.  Thank you very much.

15           Let's bring in the jury and the alternates.

16           (Jury and alternates enter.)

17           THE COURT:  Please be seated, everyone.

18           The Court has received a message that the jury has

19  reached a verdict.

20           Will the foreperson please stand?

21           Has the jury reached a verdict?

22           THE FOREPERSON:  Yes, we have, your Honor.

23           THE COURT:  Please hand the verdict sheet to the

24  clerk.

25           (Pause in proceedings.)

Proceedings                                    1197

1          THE COURT:  The clerk will publish the verdict.

2          THE COURTROOM DEPUTY:  United States of America v.

3    Matthew Elias and Latiff Thompson.  Count One, *Hobbs Act*

4    robbery.

5          How do you find the Defendant Matthew Elias as to

6    Count One, guilty or not guilty?

7          THE FOREPERSON:  Guilty.

8          THE COURTROOM DEPUTY:  How do you find the Defendant

9    Latiff Thomas to Count One, guilty or not guilty?

10          THE FOREPERSON:  Guilty.

11          THE COURTROOM DEPUTY:  Count Two, using or

12    possessing a firearm during a crime of violence.

13          How do you find the Defendant Matthew Elias as to

14    Count Two, guilty or not guilty?

15          THE FOREPERSON:  Guilty.

16          THE COURTROOM DEPUTY:  How do you find the Defendant

17    Latiff Thompson as to Count Two, guilty or not guilty?

18          THE FOREPERSON:  Guilty.

19          THE COURT:  Please retrieve the verdict sheet.

20          You may be seated, sir.

21          The clerk will poll the jury.

22          THE COURTROOM DEPUTY:  Ladies and gentlemen of the

23    jury, having heard the verdict that was given by your

24    foreperson, Juror No. 1, is that your verdict?

25          JUROR NO. 1:  Yes.

Linda A. Marino, Official Court Reporter

Proceedings                                    1198

1    THE COURTROOM DEPUTY:  Juror No. 2?

2    JUROR NO. 2:  Yes.

3    THE COURTROOM DEPUTY:  Juror No. 3?

4    JUROR NO. 3:  Yes.

5    THE COURTROOM DEPUTY:  Juror No. 4?

6    JUROR NO. 4:  Yes.

7    THE COURTROOM DEPUTY:  Juror No. 5?

8    JUROR NO. 5:  Yes.

9    THE COURTROOM DEPUTY:  Juror No. 6?

10   JUROR NO. 6:  Yes.

11   THE COURTROOM DEPUTY:  Juror No. 7?

12   JUROR NO. 7:  Yes.

13   THE COURTROOM DEPUTY:  Juror No. 8?

14   JUROR NO. 8:  Yes.

15   THE COURTROOM DEPUTY:  Juror No. 9?

16   JUROR NO. 9:  Yes.

17   THE COURTROOM DEPUTY:  Juror No. 10?

18   JUROR NO. 10:  Yes.

19   THE COURTROOM DEPUTY:  Juror No. 11?

20   JUROR NO. 11:  Yes.

21   THE COURTROOM DEPUTY:  And Juror No. 12?

22   JUROR NO. 12:  Yes.

23   THE COURTROOM DEPUTY:  Jury is polled, your Honor.

24   THE COURT:  Please return the verdict sheet to me

25   for a moment.

Proceedings                                                    1199

1          (Pause in proceedings.)

2          THE COURT:  Very well.  This concludes your

3    responsibilities as jurors in this case.  I want to thank the

4    jury and the alternates for your attention to this trial.

5          In particular, this has been an unusual situation

6    because of the COVID restrictions that we have had to endure.

7    But you have demonstrated a great deal of patience and grace

8    during your jury service, and the Court and the parties deeply

9    appreciate your efforts to do your civic duty.

10          All rise for the jury.

11          (Jury and alternates excused.)

12          THE COURT:  Please be seated for a moment.

13          (Pause in proceedings.)

14          THE COURT:  I'm going to set a sentencing date for

15    both Defendants.  Friday, July 8, 2022, at 10 a.m.

16          Are there post trial motions that you wish to make,

17    gentlemen?

18          MR. VILLANUEVA:  Yes, your Honor.

19          I would move pursuant to Rule 29(c), your Honor, but

20    I would ask that you give us time to talk to the Government

21    and set a briefing schedule.  But I move today pursuant to

22    Rule 29(c) with leave to speak to the Government to set up a

23    briefing schedule.

24          MR. COMMISSIONG:  I join in that application, your

25    Honor.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>KIMBERLY THOMPSON | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:    CR 18-0033 (S-2) (NGG)<br><br>USM Number:    91772-053<br><br>Thomas F.X. Dunn, Esq.<br>Defendant's Attorney |

## THE DEFENDANT:

X    pleaded guilty to COUNTS FIVE (5) AND TWELVE (12) OF THE SUPERSEDING INDICTMENT (S-2).

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1951(a) | HOBBS ACT ROBBERY | 09/23/2017 | 5 (S-2) |
| 18 U.S.C § 1951(a) | ATTEMPTED HOBBS ACT ROBBERY | 10/11/2017 | 12 (S-2) |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

X    The defendant is not named in Count(s) 3, 4, 7-11 &   15-20 of the Superseding Indictment  CR 18-0033 (S-2).

X Count(s)         1, 2,  6,  13  & 14 of (S-2)   ☐ is   X are dismissed on the motion of the United States.
X Any underlying Indictment is dismissed on the motion of the United States.
It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

February 10, 2022
Date of Imposition of Judgment

s/Nicholas G. Garaufsi

Signature of Judge

NICHOLAS G. GARAUFIS, U.S.D.J.
Name and Title of Judge

May 16, 2022
Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 4—Probation

|  |  | Judgment—Page | 2 | of | 7 |
|---|---|---|---|---|---|

DEFENDANT:     KIMBERLY THOMPSON
CASE NUMBER:   CR 18-0033 (S-2) (NGG)

## PROBATION

You are hereby sentenced to probation for a term of: FIVE (5) YEARS ON COUNT FIVE (5) OF THE SUPERSEDING

INDICTMENT (S-2) AND FIVE (5) YEARS ON COUNT TWELVE (12) OF THE SUPERSEDING INDICTMENT (S-2)

WHICH SHALL RUN CONCURRENTLY.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7. ☐ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8. You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9. If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 4A — Probation

| | Judgment—Page | 3 | of | 7 |
|---|---|---|---|---|

DEFENDANT:         KIMBERLY THOMPSON
CASE NUMBER:    CR 18-0033 (S-2) (NGG)

## STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____          Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 4B — Probation

Judgment—Page ___4___ of ___7___

DEFENDANT:       KIMBERLY THOMPSON
CASE NUMBER:    CR 18-0033 (S-2) (NGG)

## ADDITIONAL PROBATION TERMS

1. THE DEFENDANT SHALL NOT POSSESS A FIREARM, AMMUNITION OR DESTRUCTIVE DEVICE;

2. THE DEFENDANT SHALL NOT ASSOCIATE IN PERSON, THROUGH MAIL, ELECTRONIC MAIL, THE INTERNET, SOCIAL MEDIA, TELEPHONE, OR ANY OTHER MEANS WITH ANY INDIVIDUAL WITH AN AFFILIATION TO ANY ORGANIZED CRIME GROUPS, GANGS OR ANY OTHER CRIMINAL ENTERPRISE; NOR SHALL THE DEFENDANT FREQUENT ANY ESTABLISHMENT, OR OTHER LOCALE WHERE THESE GROUPS MAY MEET PURSUANT , BUT NOT LIMITED TO, A PROHIBITION LIST PROVIDED BY THE PROBATION DEPARTMENT. THE DEFENDANT SHALL NOT ACCESS ANY WEBSITE THAT IS AFFILIATED WITH RADICAL EXTREMIST GROUPS, TERRORIST ORGANIZATIONS; ORGANIZED CRIME GROUPS, GANGS, OR ANY CRIMINAL ENTERPRISE;

3. THE DEFENDANT SHALL NOT HAVE CONTACT WITH ANY OF THE VICTIMS OR ANY OF THEIR FAMILY MEMBERS. THIS MEANS THAT SHE SHALL NOT ATTEMPT TO MEET IN PERSON, OR COMMUNICATE BY LETTER, TELEPHONE, EMAIL, THE INTERNET, OR THROUGH A THIRD PARTY, WITHOUT THE KNOWLEDGE AND PERMISSION OF THE U.S. PROBATION DEPARTMENT;

4. THE DEFENDANT SHALL NOT RETURN TO LIVE IN THE COMMUNITY WHERE SHE LIVED AT THE TIME OF CRIME;

5. THE DEFENDANT IS EXCUSED FROM THE MANDATORY DRUG TESTING PROVISION OF 18 U.S.C. §3583(d), HOWEVER, MAY BE REQUESTED TO SUBMIT TO DRUG TESTING TO ENSURE COMPLIANCE WITH THE CONDITIONS OF HER PROBATION;

6. THE DEFENDANT SHALL OBTAIN A GED WITHIN TWO YEARS OF THE SENTENCING DATE FEBRUARY 10, 2022;

7. THE DEFENDANT SHALL PERFORM THREE HUNDRED (300) HOURS OF COMMUNITY SERVICE UNDER THE DIRECTION OF THE PROBATION DEPARTMENT;

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 4C — Probation

| | Judgment—Page | 5 | of | 7 |

DEFENDANT:        KIMBERLY THOMPSON
CASE NUMBER:      CR 18-0033 (S-2) (NGG)

## ADDITIONAL PROBATION TERMS

8. THE DEFENDANT SHALL COMPLY WITH THE  ORDER OF HYBRID RESTITUTION IN THE AMOUNT OF $41,200.00. DEFENDANT KIMBERLY THOMPSON'S  INDIVIDUAL LIABILITY IS APPORTIONED AT $4,000.00.

GA242

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  |  | Judgment — Page | 6 | of | 7 |
|---|---|---|---|---|---|

DEFENDANT:          KIMBERLY THOMPSON
CASE NUMBER:     CR 18-0033 (S-2) (NGG)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 41,200.00 | $ N/A | $ N/A | $ N/A |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| CONTACT THE U.S. ATTORNEYS OFFICE FOR THE EASTERN DISTRICT OF NEW YORK | | $41,200.00 | |

| TOTALS | $ _____ | $  41,200.00 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

GA243

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
              Sheet 6 — Schedule of Payments

| | |
|---|---|
| | Judgment — Page __7__ of __7__ |

DEFENDANT:      **KIMBERLY THOMPSON**
CASE NUMBER:   **CR 18-0033 (S-2) (NGG)**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   X   special assessment of $ ____200.00____   due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**   ☐  Fine is due immediately;

**C**   ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
       term of supervision; or

**E**   ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
       imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   X  Order of Restitution

       AN ORDER OF HYBRID RESTITUTION IN THE AMOUNT OF $41,200.00. DEFENDANT KIMBERLY THOMPSON'S INDIVIDUAL LIABILITY IS APPORTIONED AT $4,000.00 DUE IMMEDIATELY AND PAYABLE AT A RATE OF 10% OF HER GROSS MONTHLY INCOME WHILE ON PROBATION. THE CO-DEFENDANTS WHEN SENTENCED, WILL REMAIN JOINT AND SEVERALLY LIABLE FOR THE $41,200.00. See 18 U.S.C. §3664(h); *United States v. Yalincak*, 30 F.4th 115, 125-26 (2d Cir. 2022).

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Case Number
    Defendant and Co-Defendant Names                      Joint and Several       Corresponding Payee,
    *(including defendant number)*      Total Amount          Amount            if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

CAPTION:

UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE***

Docket Number(s): 23-6626(L), 23-6627(CON)

v.

HYTMIAH (ELIAS)

I, _____Wendell Bennett_____, hereby certify under penalty of perjury that on
(print name)

_____December 4, 2024_____, I served two copies of _____the Government's Brief and Appendix, and_____
(date)

compact disc that includes audio files.
(list all documents)

by (select all applicable)**

☐ Hand/Personal Delivery   ☑ United States Mail   ☐ Federal Express or other Overnight Courier

☐ Commercial Carrier   ☐ E-mail (on consent)   ☐ Facsimile

on the following parties:

Jeremy Gutman, Attorney at Law 521 Fifth Avenue, 17th Floor New York, NY 10175

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|

Paul Skip Laisure, 1225 Franklin Avenue,Suite 325 Garden City, NY 11530

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously filed.

**If different methods of service have been used on different parties, please complete a separate certificate of service for each party.

_____12/4/2024_____   _____/s/_____
Today's Date   Signature