# 23-6626 (L)

### 23-6627 (con)

*To Be Argued By*
*Jeremy Gutman*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

―――――――――――――――――

### UNITED STATES OF AMERICA,

**Appellee,**

#### -against-

**SHAMIEK HYTMIAH, AKA Sha-Balla, CONSTANTIN CHEESE, AKA Cons, DESMOND MURCHISON, AKA Dez, ANDRE BARNABY, AKA Goonie Dre, BRANDON DARBY, AKA Barrack, ANTONIO DAVIS, AKA Big Blood, TYQUAN HENDERSON, AKA Gun Play, MICHAEL MILES, AKA Menace, AVERY MITCHELL, AKA Slav, NAHJUAN PERRY, AKA Nas, PIERRE RAYMOND, AKA Leeky, JAMES ROBERSON, AKA Littles, SHAWN SILVERA, AKA Dum Out, SHAMEL SIMPKINS, AKA Sha Bang, RASHAWN SMITH, AKA Shawn, KIMBERLY THOMPSON, AKA Kimmy, LAWRENCE WOODS, AKA Lazo, KAHMEL GRANT, AKA Ornelly,**

**Defendants,**

**MATTHEW ELIAS, AKA Heddis, LATIFF THOMPSON, AKA LaBanga,**

**Defendants-Appellants.**

―――――――――――――――――

*Cover continued on reverse*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

_____

**REPLY BRIEF
FOR APPELLANT MATTHEW ELIAS**

Jeremy Gutman
521 Fifth Avenue, 17th Floor
New York, New York 10175
(212) 644-5200
*Attorney for Appellant*
*Matthew Elias*

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

      POINT ONE

      THE GOVERNMENT FAILS TO DEMONSTRATE THAT THE
      EVIDENCE WAS LEGALLY SUFFICIENT TO PERMIT A
      RATIONAL JUROR TO CONCLUDE BEYOND A REASONABLE
      DOUBT THAT ELIAS HAD THE REQUISITE KNOWLEDGE TO
      BE GUILTY OF AIDING AND ABETTING A ROBBERY AND
      UNLAWFUL USE OF A FIREARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      POINT TWO

      THE GOVERNMENT FAILS TO DEMONSTRATE THAT
      EVIDENCE OF ELIAS'S GANG AFFILIATION SERVED A
      PROPER PURPOSE OR THAT ITS INTRODUCTION WAS
      HARMLESS ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      POINT THREE

      BECAUSE ELIAS DID NOT OBTAIN PROCEEDS OF THE
      ROBBERY, THE ORDER OF FORFEITURE WAS UNLAWFUL. . . . . . 14

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

### Cases

*Honeycutt v. United States*, 581 U.S. 443 (2017). . . . . . . . . . . . . . . . . . . . . . . 14-18

*Rosemond v. United States*, 572 U.S. 65 (2014). . . . . . . . . . . . . . . . . . . . . . . . 6-7

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008). . . . . . . . . . . . . . . . . . 14

*United States v. Beverly,* 5 F.3d 633 (2d Cir. 1993). . . . . . . . . . . . . . . . 10-11, n.4

*United States v Curley*, 639 F3d 50 (2d Cir 2011). . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Khan,* 761 F. App'x 43 (2d Cir. 2019). . . . . . . . . . . . . . . . 16, n.8

*United States v McIntosh*, 2023 WL 382945. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v Nieves*, 58 F.4th 623 (2d Cir 2023). . . . . . . . . . . . . . . . . . . 14, n.7

*United States v. Papas*, 715 F.App'x 88 (2d Cir. 2018). . . . . . . . . . . . . . . . 16, n.8

*United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019).. . . . . . . . . . . . . . . . . . . . 8

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . 10, n.4

*United States v. Vanhise*, 797 F. App'x 618 (2d Cir. 2020). . . . . . . . . . . . . . . . . 7

### Statutes

18 U.S.C. § 981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21 U.S.C. § 853. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

### Docket Nos. 23-6626 (L), 23-6627(con)

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

### UNITED STATES OF AMERICA,

**Appellee,**

### -against-

**SHAMIEK HYTMIAH, AKA Sha-Balla, CONSTANTIN CHEESE, AKA Cons, DESMOND MURCHISON, AKA Dez, ANDRE BARNABY, AKA Goonie Dre, BRANDON DARBY, AKA Barrack, ANTONIO DAVIS, AKA Big Blood, TYQUAN HENDERSON, AKA Gun Play, MICHAEL MILES, AKA Menace, AVERY MITCHELL, AKA Slav, NAHJUAN PERRY, AKA Nas, PIERRE RAYMOND, AKA Leeky, JAMES ROBERSON, AKA Littles, SHAWN SILVERA, AKA Dum Out, SHAMEL SIMPKINS, AKA Sha Bang, RASHAWN SMITH, AKA Shawn, KIMBERLY THOMPSON, AKA Kimmy, LAWRENCE WOODS, AKA Lazo, KAHMEL GRANT, AKA Ornelly,**

**Defendants,**

**MATTHEW ELIAS, AKA Heddis, LATIFF THOMPSON, AKA LaBanga,**

**Defendants-Appellants.**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

——————————————

**REPLY BRIEF
FOR APPELLANT MATTHEW ELIAS**

——————————————

**INTRODUCTION**

Matthew Elias ("Elias") respectfully submits this brief in reply to the brief filed by the government ("GB"). As to matters that are not addressed here, we rely on our principal brief ("PB").[1]

——————————————

[1]Record and name references will follow the same format used in our principal brief. Unless otherwise indicated, quotations in this brief omit all internal alterations, quotation marks, footnotes, and citations.

# ARGUMENT

## POINT ONE

**THE GOVERNMENT FAILS TO DEMONSTRATE THAT THE EVIDENCE WAS LEGALLY SUFFICIENT TO PERMIT A RATIONAL JUROR TO CONCLUDE BEYOND A REASONABLE DOUBT THAT ELIAS HAD THE REQUISITE KNOWLEDGE TO BE GUILTY OF AIDING AND ABETTING A ROBBERY AND UNLAWFUL USE OF A FIREARM**

In our principal brief, we argued that, where the government's own witness could not say that Elias was paying attention when he explained the details of the crime he orchestrated or when other participants briefly and wordlessly exposed their firearms, the trial evidence provided only a speculative basis on which the jury could conclude that Elias knew the specific nature of the crimes for which he was enlisted to serve as a driver. The government's response, which relies on a selective and – in significant respects – unsupported recounting of the record, fails to show that the inferences it relies on were sufficient to permit a rational juror to find the requisite knowledge beyond a reasonable doubt.

According to the government, Hytmiah "testified that Elias was 'part of the group' during this conversation [regarding the robbery plan]" GB, p. 22, citing A 61-62 (in Elias's Appendix). That assertion is inaccurate because

3

Hytmiah did not refer to Elias in the cited portion of the trial transcript. Rather, he merely answered "Yes" when the prosecutor asked, "Were *you all* part of the group when this was happening?" [A 61 (emphasis added)] Because the testimony that preceded that question referred only to Henderson and Woods, there is no reason to assume that Hytmiah understood "you all" to include Elias.

The government's strained assertion that Hytmiah was attesting to Elias's participation in the planning discussion is further undermined by Hytmiah's response when the government asked, "Was anyone not paying attention to this planning? Was anyone just not following this?" Hytmiah answered: "I'm not for sure, because I wasn't looking at everybody else. I'm just talking to one person (identified in response to the following question as Thompson)." [A 62] Rather than attempting to square this part of Hytmiah's testimony with the claim that he identified Elias as "'part of the group' during this conversation," the government omits any reference to it.[2]

_____

[2]The government's selective references to Hytmiah's testimony also allow it to create the misimpression that we were merely speculating when we asserted that Hytmiah's discussion of the details of the plan was directed solely to Thompson: "Nor does Elias make any effort to explain why, *if* Hytmiah directed his remarks only to Thompson, it was Henderson and Woods who reacted by displaying firearms." (GB, p. 22) (emphasis added). Since the assertion that the government characterizes as a hypothetical is based on the testimony of the government's

(continued...)

4

The government's argument goes farther astray when it contends that Elias must have gained knowledge that there was a violent encounter with an occupant of the Stash House because, later in the evening, he came in contact with a "blood-soaked Darby" at Hytmiah's aunt's house (the "Galway Residence"). The government supports this argument by asserting that:

> Immediately after the robbery, Elias drove Thompson to the Galway Residence where they, along with Hytmiah and a blood-soaked Darby, broke into the stolen safe and accounted for the robbery proceeds.

GB, p. 20, citing GA 91-93. The trial evidence, however, not only fails to support this rendition of the facts, but is inconsistent with the scenario the government urges upon this Court.

Hytmiah testified that, after leaving the Stash House, he and Darby, whose clothing had a lot of blood on it, brought the stolen safe to the Galway Residence, where Hytmiah *alone* opened it. (GA 88-93). As Hytmiah did so, he was speaking

---

[2](...continued)
witness, there is no reason we would need to explain it. It may be noted, however, that, unlike Elias, Henderson and Woods had an interest in knowing what they could expect to confront inside the Stash House because they would be going there to carry out Hytmiah's plan. Whether or not that is the reason they reacted when Hytmiah spoke of the likelihood that the Stash House residents would be armed, the salient point is that, according to the government's own witness, they reacted and Elias did not.

*by phone* to Thompson, who advised him that he and Elias had located Henderson and Woods at Woods's baby mother's house. (GA 94-95). Upon learning this, Hytmiah immediately drove to that location, but he did not bring Darby because he did not want to let him back into his car with bloody clothes. (GA 95-96). Thus, contrary to the government's claim, the evidence did not establish that Elias was at a location where he would have seen "the image of a bloodcovered Darby" (GB, p. 20). Consequently, there is no basis for finding, as the government's theory would have it, that Elias made observations from which he would have had to deduce that force was used against a resident of the Stash House.[3]

The government's theory is further flawed because – even if its factual claims were supported by the record – observations of blood-soaked clothes would

---

[3]The record also fails to support the government's hyperbolic claim that Henderson's sweatshirt was "visibly covered in blood" when he rode in the back of Elias's car. (GB, p. 21) Lieutenant Javier Rodriguez testified only that, when Henderson was arrested, his sweatshirt had "some blood stains" on its sleeve. (GA 148-51). Not only is it speculative to suppose that Elias noticed and identified the nature of those stains in the dark of night, but it is farfetched to suggest that Elias had to infer from their presence that Henderson had used force against a robbery victim; it would be at least as reasonable for Elias to infer that Henderson injured himself while climbing to the second floor window from which he gained access to the Stash House. The government also refers to the bloody gloves that the police recovered from Thompson's pocket, but does not go so far as to suggest that Elias must have seen them or that they would signify to him that an act of violence was perpetrated against an occupant of the Stash House.

6

not provide a basis for finding that Elias had "advance notice" that a firearm would be used, as required under *Rosemond v. United States*,  572 U.S. 65, 78 (2014), to prove a violation of 18 U.S.C. § 924(c). Since there are many ways other than the discharge of a firearm for blood to be spilled (and indeed, there is no suggestion that such a discharge was the cause of the blood in this case), the supposed observations on which the government's argument is based would not in any event permit a juror to conclude beyond a reasonable doubt that Elias knew his confederates were carrying firearms.

Finally, the government seeks to score a rhetorical coup by seizing on our comment, in a different part of our principal brief, that the evidence the government relies on to prove Elias's knowledge was "far from overwhelming." It attempts to read into that remark an acknowledgment that "Elias does not seriously contend that the evidence establishing his knowledge of the underlying crime was 'nonexistent or so meager' as to preclude a rational verdict." (GB, pp. 23-24, quoting *United States v. Vanhise*, 797 F. App'x 618, 620 (2d Cir. 2020)). Despite the government's effort, this Court will undoubtedly recognize that couching an argument about harmless error in terms of whether the evidence was "overwhelming" – a concept that is relevant in that context – is in no way

inconsistent with our contention that the evidence is indeed too "meager" to support the jury's verdict.

As we previously noted (PB, pp. 21-22), when "a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible," because the Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019). Because the evidence in the present case does not meet that standard with respect to the element of knowledge, the judgment should be reversed and the indictment should be dismissed.

### POINT TWO

**THE GOVERNMENT FAILS TO DEMONSTRATE THAT EVIDENCE OF ELIAS'S GANG AFFILIATION SERVED A PROPER PURPOSE OR THAT ITS INTRODUCTION WAS HARMLESS ERROR**

The government claims that the district court's admission of evidence of Elias's gang affiliation, which was excluded prior to trial because of its significant risk of unfair prejudice, was "necessary to correct the defendant's false or misleading testimony." GB, p. 32. The government, however, not only fails to

show that the testimony that prompted its renewed application to introduce the gang evidence was "false or misleading," but ignores the testimony of its own witness demonstrating that the testimony it sought to "correct" was truthful.

The government's effort to establish that Elias misled the jury begins with its erroneous assertion that he "denied the existence of any relationship between himself *and the other Stash House robbers*, especially [Shahmiek] Hytmiah." (GB, p. 29) (emphasis added). Contrary to the government's suggestion, the only robbery participant other than Hytmiah that Elias was questioned about was co-defendant Latiff Thompson, and, far from denying a relationship, Elias acknowledged that he and Thompson had been friends since childhood. [A 81-82]

While it is true that, in response to the government's questions on cross examination, Elias denied having a prior relationship with Hytmiah, that testimony was corroborated by Hytmiah himself. Appearing as a witness for the government, Hytmiah informed the jury that the first time he met Elias was on the night of the robbery. [A 63] Rather than reckon with the inconsistency between the factual claim it relies on to support its argument and the testimony it elicited on direct examination of its own witness, the government ignores Hytmiah's testimony and

declares – without any basis in the record – that Elias's denial of a prior relationship with Hytmiah was "false and misleading."

The government does not even attempt to explain how the gang evidence it introduced, consisting of postings to social media that it admits were not made until two years after the robbery (GB, p. 35), could demonstrate that Elias in fact had a relationship with Hytmiah, or with any other participant in the robbery, prior to its occurrence. Instead, the government comes very close to acknowledging the improper purpose served by the gang evidence when it asserts that it enabled the jury to draw conclusions about Elias's "reason for participating in the events in question and his knowledge of the nature and scope of the crime he was aiding and abetting." (GB, p. 34). The evidence that (long after the robbery) Elias identified himself as a Makk Balla Brim could support such inferences only by suggesting that he had a propensity to engage in such crimes.[4]

---

[4]Because of the disconnect between the gang evidence and the purported falsehood it was intended to "correct," the government's reliance on *United States v. Beverly,* 5 F.3d 633, 639-40 (2d Cir. 1993), is misplaced. *See* GB, pp. 32-33. The Court in *Beverly* held that "[w]here a defendant testifies . . . about *a specific fact*, the prosecution is entitled to prove on cross-examination that he lied *as to that fact*" (emphases added). Here, the "specific fact" to which Elias testified was that he did not know Hytmiah prior to the robbery, but the evidence offered by the government did not prove that he lied as to that fact. The other "opening the door" case relied on by the government, *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir.
(continued...)

While the government urges this Court to review admission of the gang evidence under the "deferential abuse-of-discretion" standard, it does not dispute our assertion that, as the Court held in *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006), that standard applies only if the district court "has conscientiously balanced the proffered evidence's probative value with the risk for prejudice." *See* PB, p. 24. Unable to point to any indication that the district court did so in response to the government's renewed application, the government suggests that requiring the court to "repeat" the balancing test it had performed prior to trial would "exalt form over substance." (GB, p. 34, n. 8) Given the government's claim that the "appropriate metric" had changed as a consequence of Elias's testimony (GB, p. 32), however, the court's pretrial analysis can hardly be deemed a substitute for weighing the prejudicial impact of the evidence against the purpose for which it was now being offered. There was no such balancing – in either form or substance – to which this Court can defer.

---

[4](...continued)
1993), held that a trial court may "permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." Because Elias did not introduce inadmissible evidence, *Rosa* provides no support for the government's contention that the gang evidence was properly admitted.

Moreover, even if it were to apply a deferential standard, this Court should readily conclude that it was error for the court to admit evidence of Elias's affiliation with a notorious street gang. In view of the government's inability to demonstrate either (1) that Elias's denial of a relationship with Hytmiah was false or (2) that the gang evidence offered by the government would "correct" his testimony on that subject, it is clear that the evidence could not serve any proper purpose at all, much less one that could outweigh what the district court had previously recognized to be a "significant danger of prejudice." [A 58] Under these circumstances, it is beyond question that the admission of that evidence was an abuse of discretion. *See United States v Curley*, 639 F3d 50, 57 (2d Cir 2011) (district court abuses its discretion when it admits "other act" evidence "with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue").[5]

The government also fails to provide a basis on which this Court could conclude that admission of the evidence was harmless. In Point One, *supra*, and in our principal brief, we discuss the scant evidence on which the government relied

---

[5]Tellingly, the government offers no response to our suggestion that, if the gang evidence was in fact offered for a proper purpose, the prosecution would have explained its relevance to the jury during its closing argument. *See* PB, p. 28.

to establish Elias's knowledge of the specific nature of the crimes he allegedly aided and abetted. Even assuming *arguendo* that the proof on that critical issue could be deemed legally sufficient when viewed most favorably to the government, a guilty verdict required the jurors to find that Elias was paying attention when Hytmiah discussed details of the plan, even though Hytmiah himself could not say he was [A 62-63], and to find that he was looking at other participants when they briefly exposed their firearms. Such evidence surely could have left one or more jurors with reasonable doubts about precisely what Elias knew regarding the crimes that were committed outside of his presence.

The government's argument on appeal makes clear that the gang evidence was offered with the expectation that it would bolster the government's case with respect to that very issue. As previously noted, the government has informed this Court that the evidence of Elias's self-identification as a Makk Balla Brim would, in its view, assist the jury in drawing conclusions about Elias's "knowledge of the nature and scope of the crime he was aiding and abetting." GB, p. 34.[6] In the face

_____

[6]The government's belief that the gang evidence served that purpose is similarly confirmed by its assertion, in support of its sufficiency argument, that the jury obviously determined that "the group [that gathered prior to the robbery] – several members of which were related by a shared gang affiliation – knew and understood that what they were carrying out was an armed robbery of drug

(continued...)

of that acknowledgment – indicating that the improperly admitted evidence would serve to overcome the jury's doubts on the essential element as to which the proof was most tenuous – this Court cannot "conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008).[7]

## POINT THREE

### BECAUSE ELIAS DID NOT OBTAIN PROCEEDS OF THE ROBBERY, THE ORDER OF FORFEITURE WAS UNLAWFUL

In *Honeycutt v. United States*, 581 U.S. 443, 454 (2017), the Supreme Court held that forfeiture pursuant to 21 U.S.C. § 853(a)(1) is "limited to property the

---

[6](...continued)
dealers." (GB, p. 22)

[7]In our principal brief, we noted this Court's recognition of the "pervasive bias" against people associated with gangs and suggested that the likelihood that the gang evidence affected the jury's verdict was exacerbated by the fact that, in light of the district court's pretrial exclusion of such evidence, Elias had no reason to request that prospective jurors be screened for such bias. *See* PB, pp. 29-30, citing *United States v Nieves*, 58 F.4th 623, 633 (2d Cir 2023). The government misses the point of that argument and responds to it as if we were presenting a freestanding claim that the absence of such screening was reversible error. *See* GB, p. 54. Our point, however, is not that the failure to question jurors about their bias was error, but that in the absence of such questioning there is still less reason for the Court to be assured that the gang evidence did not affect the verdict.

defendant himself actually acquired as the result of the crime." Relying on that holding, and on *United States v McIntosh*, 2023 WL 382945, at *2 (2d Cir., Jan. 25, 2023), in which this Court found that *Honeycutt*'s reasoning applies with equal force to 18 U.S.C. § 981(a)(1)(c), we argued that the order directing Elias to forfeit $10,000 pursuant to the latter statute should be vacated because he did not receive any proceeds of the robbery. We noted that, on the basis of the same cases, the district court determined that forfeiture would be "plainly unlawful" with respect to co-defendant Kimberly Thompson because she "never received proceeds of the robberies, nor did she ever exercise control over the proceeds." [A. 127-28 (Memorandum and Order in *United States v. Kimberly Thompson*, 18 Cr. 33 (NGG) (cited at PB, pp. 39-40)]

In response, the government claims that *Honeycutt* is inapplicable because, in the present case, "there was no conspiracy charge and no joint and several liability." GB, p. 59. While it is true that *Honeycutt* arose from a case in which the defendant was convicted of a conspiracy and in which forfeiture was imposed on the theory that the defendant and a co-defendant were "jointly and severally liable," 581 U.S. at 447, neither of those circumstances was essential to the Supreme Court's holding that forfeiture is limited to property the defendant "actually acquired." The Court recognized that the statutory limitation of forfeiture

15

to property a defendant "obtained" is "*incompatible* with joint and several liability," 581 U.S. at 454, n. 2 (emphasis added), not that the limitation applies only in cases where that is the theory under which forfeiture was ordered. It is illogical to suppose, as the government's argument would require, that the forfeiture in *Honeycutt* would have been upheld if only the defendant had been convicted of a substantive offense rather than a conspiracy; the Supreme Court's unqualified recognition of the statute's limitation to proceeds that were "actually acquired" suggests nothing of the kind.[8]

As a fallback position, the government, out of whole cloth, concocts the theory that a defendant can properly be ordered to pay a forfeiture judgment so long as he "intended and expected" to receive a share of the proceeds. GB, pp. 60-62. The government cites no authority to support this theory and there is no hint in

---

[8]The government points to a summary order indicating that *Honeycutt*'s limitation did not apply to a case in which "there is no conspiracy charge, no joint and several liability, and [the defendant] was ordered to pay only proceeds he himself acquired," GB, pp. 58 and 59, citing *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019). There is no reason, however, to read that order to mean that *Honeycutt* does not apply unless all three of those factors are present. The government's citation of *United States v. Papas*, 715 F.App'x 88, 89 (2d Cir. 2018), GB, p. 58, also fails to support its contention that *Honeycutt* applies only when there is a conspiracy. The *Papas* Court did not suggest that its determination that, in light of *Honeycutt*, "the District Court must now determine a new forfeiture amount owed by defendant based only on his personal proceeds" turned on the fact that the defendant was convicted of a conspiracy.

*Honeycutt* (or any other case) that forfeiture can be ordered with respect to proceeds a defendant *hoped* to obtain. To the contrary, *Honeycutt*'s limitation of forfeiture to "property the defendant himself actually acquired" leaves no room for forfeiture based on a defendant's intent or expectations. Consequently, even if the district court had made a finding on this subject (which it did not), it would not establish a basis on which it could properly disregard the statutory limitation recognized in *Honeycutt.*

The government only muddles the issue when it speaks of *Honeycutt*'s "concern about low-level members of a conspiracy shouldering an outsized share of the proceeds derived by more culpable and higher-ranking members . . . ." GB, p. 60. While the limitation recognized in *Honeycutt* may sometimes have the effect of preventing such disparities, *Honeycutt* held that forfeiture may not – under any circumstances – be ordered against a defendant who did not obtain proceeds. It did not hold that a defendant who obtained no property can be ordered to pay forfeiture in an amount that is proportionate to the relative level of her culpability, nor did it hold that the statute's limitation depends on whether a defendant was "higher-ranking" or "lower level" or on the reason she did not obtain proceeds.

For this reason, the government is completely off the mark when it takes the liberty of suggesting that, even though the district court's Memorandum and Order

states clearly that the preliminary order of forfeiture in Kimberly Thompson's case was unlawful because "she never received proceeds of the robberies, nor did she ever exercise control over the proceeds" [A. 127-28], the order was "in actuality" based on the district court's view – somehow gleaned by the government – that it was improper under *Honeycutt* to hold a getaway driver accountable for a share of the proceeds that was disproportionate to her role. GB, p. 62. The government assumes similar powers of clairvoyance when it insinuates that our argument is based on a claim regarding the relative culpability of Elias and Thompson, *see* GB, pp. 62-63 – a claim that was never uttered or suggested in our brief.

The point that our brief made – and that the government fails to address – is that Elias and Kimberly Thompson are similarly situated with respect to one critical fact: that neither of them obtained proceeds of the crimes for which they were convicted. There is thus a disparity between the district court's rejection of the proposed forfeiture order in Thompson's case and its approval of the order in Elias's case. Apart from positing that the district court did not mean what it said when it decided the issue with respect to Thompson, the government offers no basis on which this Court could conclude that the disparate treatment of the two co-defendants is justifiable. The order in Elias's case is just as unlawful as the one in Thompson's and, like hers, should not be permitted to stand.

## CONCLUSION

For the reasons discussed above and in our principal brief, the judgment should be reversed.

Respectfully submitted,

Jeremy Gutman
521 Fifth Avenue, 17th Floor
New York, New York 10175
(212) 644-5200
*Attorney for Appellant*
*Matthew Elias*

January 10, 2025

## CERTIFICATE OF COMPLIANCE

I certify that the brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has

been prepared in proportionally spaced typeface using Wordperfect X6 in Times

New Roman, 14-point font. Because the brief is 4082 words in length, it is within

the limit set forth in Local Rule 32.1(a)(4)(A).

/s/
JEREMY GUTMAN
521 Fifth Avenue, 17th Floor
New York, New York 10175
(212) 644-5200
*Attorney for Appellant*
*Matthew Elias*

January 10, 2025